**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **EVA MARISOL DUNCAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 5:14-cv-00912-** |
| | § | **FB-JWP** |
| **JPMORGAN CHASE BANK, N.A.,** | § | |
| | § | |
| **Defendant.** | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT, WITH BRIEF INCORPORATED**

**T**O THE HONORABLE FRED BIERY, UNITED STATES DISTRICT JUDGE:

Pursuant to Fed. R. Civ. P. 23, Plaintiff Eva Marisol Duncan, by and through Class Counsel, submits this Motion for Final Approval of the Class Action Settlement the Court previously preliminarily approved. (Doc. 29). Defendant JPMorgan Chase Bank, N.A. ("Chase") does not oppose this motion.

## I.      INTRODUCTION

1.      On October 21, 2015, the Court granted preliminary approval of the proposed Settlement Agreement and Release ("Agreement" or "Settlement") of this class action case. (Doc. 29). Pursuant to the Preliminary Approval Order, Notice was disseminated to the Settlement Class.[1] By this motion, Plaintiff respectfully requests that the Court conduct a final review of the Settlement and approve it as fair, reasonable, and adequate.

2.      The Settlement is the product of arm's-length negotiations with the assistance of a highly qualified mediator and provides significant benefits to Settlement Class Members.

---

[1] Capitalized terms have the meaning provided in the Settlement Agreement.

Specifically, Chase will establish a Settlement Fund of $8.75 million.  Each Settlement Class Member who timely filed a valid claim will receive a pro-rata share of the Settlement Fund after deduction of costs, fees, and Plaintiff's service award.  Additionally, for three years from Final Approval, Chase will follow a practice of annual audits reasonably designed to confirm that Chase's periodic Account Review Inquiries have excluded individuals who owe no debt to Chase, retain no interest in any property securing a debt owed to Chase, and have no other account with Chase.

3.      The Settlement provided a robust Notice Program that included direct mailed notice to Settlement Class Members whose addresses could be ascertained with reasonable effort, Publication Notice, and a Settlement Website.

4.      Settlement Class Members had until March 23, 2016, to submit claims, objections, and exclusion requests.  The Settlement Class has overwhelmingly indicated its approval of the settlement terms, with 472,167 claims timely filed, only 172 opt-outs, and only 6 objections filed by class members, out of 2,119,219 million Settlement Class Members.

5.      Plaintiff respectfully submits that the Settlement satisfies the standards for final settlement approval, and requests that the Court grant final approval.

## II.      STATEMENT OF FACTS AND PROCEDURAL POSTURE

**A. Factual Background**.

6.      This case is essentially a privacy case brought under the "permissible purpose" section of the Fair Credit Reporting Act ("FCRA"),[2] which governs who can access Consumer Report Information from credit reporting agencies and for what purpose.  To that end, the statute

---

[2] 15 U.S.C. 1681b.

enumerates certain "permissible purposes" for accessing credit reports, one of which is to conduct an "account review."[3]

7.      Creditors clearly have a permissible purpose to review an account when it is open and active.  Plaintiff contends, however, that after the account is closed and the consumer is no longer personally liable to pay any money, a creditor no longer has a permissible purpose to access the consumer's credit information for the purported purpose of conducting an account review. This situation occurs, for example, after the consumer pays and closes her account, or when the consumer receives a discharge of personal liability in bankruptcy and the creditor closes the account, when the creditor has sold the account, and in other situations.  Plaintiff contends that Chase's decision to conduct account reviews on Class Members' closed accounts[4] violates the permissible purpose provisions of the FCRA.  Chase denies all of the allegations, but, without admitting liability, has agreed to settle the case by compensating certain consumers with closed accounts whose credit reports were accessed over the last five years and agreeing to an annual audit of its Account Review Inquiries for a period of three years.

**B.  Procedural Background.**

8.      Plaintiff filed her complaint on October 16, 2014 (Doc. 1), and Chase answered on December 16, 2014 (Doc. 7).  After Plaintiff served her Interrogatories, Requests for Production of Documents, and Requests for Admissions, the parties filed a Joint ADR Report and moved to stay the proceedings in order to pursue ADR by way of mediation.  Chase produced certain documents requested by Plaintiff to allow her counsel to fully evaluate the merits of the case.  The parties exchanged confidential mediation briefs and engaged in mediation on June 8, 2015, in San

---

[3] 15 U.S.C. 1681b(a)(3)(A), (F).

[4] As used in this motion and brief "closed accounts" is a short-hand reference for consumer accounts that fit any of the five criteria of the class definition, section III A, *infra*.

Francisco with the Honorable Magistrate Judge Edward A. Infante (Ret.), who has served as mediator in some of the nation's largest consumer class action cases.  After extensive negotiations, the parties agreed to some of the principal terms of a prospective settlement at the mediation. Negotiations continued after the mediation, and the parties did not reach a final settlement until mid-September 2015.   Prior to reaching final agreement, Class Counsel deposed Chase's designated corporate representative in Dallas.  Plaintiff filed the Settlement Agreement with the Court on September 30, 2015. (Doc. 28-1).  On October 21, 2015, the Court granted preliminary approval of the Settlement. (Doc 29).

      **C**.  **Current Status of the Settlement.**

      **Notice Program.**

      9.     The Settlement Administrator ("KCC") provided Notice to Settlement Class Members in accordance with the Notice Program approved by the Court in the Preliminary Approval Order.  *See* Geraci Decl. Ex. 5.  On December 18, 2015, over two million (2,119,217) notices were mailed out to Class Members.  *Id*.  Publication noticed appeared in the December 28, 2015 issue of People magazine, available for purchase on December 18, 2015, and in the January 2016 issue of Better Homes and Gardens magazine, available for purchase on December 20, 2015. *Id*.  The Settlement Website (www.chasefcrasettlement.com) went live on December 18, 2015.  *Id*. As of the March 23, 2016 claims filing deadline, the website had over 130,000 unique visitors and the Settlement Administrator received over 35,000 telephone calls.  *Id*.  After returned mail was re-mailed to new addresses, the Settlement Administrator estimates that at least 94% of the class members received direct notice by mail.  *Id.*  In addition to the Court-approved Notice Program and website, secondary websites that purport to serve as class action information repositories

reported the Settlement and directed potential class members back to the official website.[5]  The participation rate in the Settlement, discussed below, indicates that the Notice Program was very effective in providing notice to Settlement Class Members.

**Number of Claims Filed.**

10.     There were 472,167 claims timely filed in the case.  This represents a participation rate or "claims rate" of 22.28%.  This is an extremely high participation rate for any kind of consumer class action case.  *See* Bingham Decl. Ex.4 ¶ 10.  This is also by far the highest claims rate of any FCRA account review class action case of which Plaintiff's counsel are aware.  *See* Hervol Decl. Ex. 3 ¶ 21.

**Number of Exclusions.**

11.     There were 172 Settlement Class Members who excluded themselves ("opted out") from the Settlement.  This represents .008116% of the class.  If the Settlement is approved, those who opted out will not be bound by the Final Judgment, and their names will be appended to the Final Judgment and identified as excluded from its binding effect.

**Number of Objections**.

12.     Eight objections to the Settlement were filed, but two have been withdrawn when it was determined that the objectors were not class members.  This represents .000283 % of the class.  Of the remaining six objections, three are represented by or are attorneys, and three are not really objections, but rather express concerns unrelated to the terms of this Settlement.  Plaintiff will file responses to the remaining objections on or before April 20, 2016, in accordance with the deadlines established in the Preliminary Approval Order.

---

[5] *See, e.g*., www.topclassaction.com; www.classactionrebates.com; www.classactionreporter.com.

**CAFA Notice**.

13.     Pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") were timely notified of the terms of the Settlement and provided with documents related to the Settlement. Neither the CFPB nor the OCC has objected to the Settlement.

## III.     SUMMARY OF THE SETTLEMENT TERMS

The Settlement's terms are detailed in the Settlement Agreement.  (Doc. 28-1).  The following is a summary of the material terms of the Settlement:

**A.  The Settlement Class.**

14.     The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rules of Civil Procedure.  The Settlement Class is defined as:

"All persons who were borrowers or guarantors on a Chase account or Chase-serviced account and whose Consumer Report Information was accessed by Chase through an Account Review Inquiry during the period October 16, 2009 through October 16, 2014, at a time when the subject account met any one of the following criteria: (1) the account was closed with a zero balance; (2) the account had been sold or transferred to a third party; (3) the debt on the account had been discharged in bankruptcy; (4) Chase had foreclosed the property securing the account loan; or (5) Chase had sold in a short sale or had transferred through a deed in lieu of foreclosure the property securing the account loan.  Excluded from the Class are all current Chase employees, officers and directors, and the judge and magistrate judge presiding over this Action and their respective staff."  (Doc. 28-1, ¶ 35).

### B.  Monetary Relief for the Settlement Class.

15.     Chase will pay $8.75 million into the Settlement Fund.  (Doc. 28-1, ¶ 58).  Each Class Member who timely filed a valid claim will be paid a pro-rata share of the Settlement Fund after deduction of administrative expenses, attorneys' fees, and the class representative award.  In other words, after paying his or her fair share of the expenses incurred to create and administer the Settlement Fund, each claimant will receive his or her fair share of the Settlement Fund.  The exact amount to be paid will be determined after the Court determines the amount of attorneys' fees and expenses to be paid from the fund, but because of the extraordinarily high number of claims, the costs of administering the settlement is higher than originally anticipated, and thus will reduce the pro-rata share that each claimant will receive.  Nevertheless, those notice costs and claims processing costs, including check issuing costs, are properly included in determining the value of the benefit conferred on the class members.  *See In re Heartland Payment Sys.*, 851 F. Supp. 2d 1040, 1077-1078 (S.D. Tex. 2012) (citing cases).

### C.  The Injunctive Relief for the Class.

16.     In addition to the monetary benefit to Settlement Class Members, and, perhaps more importantly, for a period of three years from Final Approval, Chase will implement and follow a practice of annual audits reasonably designed to confirm that Chase's periodic Account Review Inquiries have excluded individuals who owe no debt to Chase, retain no interest in any property securing a debt owed to Chase, and have no other account with Chase. (Doc. 28-1, ¶¶ 36, 37).  This injunctive relief could not have been obtained absent a Settlement because, as the Fifth Circuit has held, injunctive relief is not available under the FCRA.[6]

---

[6] *See Washington v. CSC Credit Servs.*, 199 F.3d 263, 268 (5th Cir. 2000); *see also Garza v. Sporting Goods Properties*, No. CIV. A. SA-93-CA-108, 1996 U.S. Dist. LEXIS 2009 at *54-55 (W.D. Tex. Feb. 6, 1996) (noting

17.     The privacy and FCRA expert retained by Class Counsel attributes a value of $5 per Class Member ($11 million) for the three years of auditing agreed to by Chase.  *See* Ex. 6, Hendricks Decl. ¶ 22.  In addition, he attributes another $1 per class member ($2.2 million) for the value received by Settlement Class Members from the educational benefit they obtained from receiving notice advising them of "what happened, why it matters, and what they can do about it." *Id.* ¶¶ 14-18.  This brings the total value of the Settlement to just under $22 million.

**D.  Class Release.**

18.     In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released the Released Parties from claims as detailed in Section XIV of the Settlement Agreement.  (Doc. 28-1, ¶¶ 76-79).

**E.  Settlement Termination.**

19.     Either party may terminate the Settlement if the Settlement is rejected or materially modified by the Court or an appellate court.  (Doc. 28-1, ¶ 85).

**IV.     ARGUMENT AND CITATION OF AUTHORITY FOR FINAL APPROVAL**

20.     Court approval is required for settlement of a class action. Fed. R. Civ. P. 23(e). The Court conducts this approval analysis bearing in mind that "[t]he public interest strongly favors the voluntary settlement of class actions."  *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 931 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014).  This "overriding public interest" manifests itself in a "strong presumption" in favor of finding the settlement fair, adequate, and reasonable. *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007) (citing *Garza v. Sporting Goods*

that an important part of the settlement value was defendant's agreement to change practices because "this Court may or may not have the power to grant the requested relief").

*Properties*, No. CIV. A. SA-93-CA-108, 1996 U.S. Dist. LEXIS 2009, at *41 (W.D. Tex. Feb. 6, 1996)).  Indeed, "settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291, 301 (S.D. Miss. 2014) (quoting *In re Nisssan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977)).

21.     The settlement approval requirements are easily met in this case.  Below, in Part A, we explain that the direct-mail notice program satisfied the requirements of Rule 23 and due process.  In Part B, we explain that the terms of the Settlement are fair, reasonable, and adequate. In Part C, we explain briefly that, for the reasons set forth in the Court's Preliminary Approval Order, the Settlement Class should be certified.

**A.     The direct-mail notice provided to the Class satisfies Rule 23 and due process.**

22.     Federal Rule of Civil Procedure 23 and the Due Process Clause require that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."   Fed. R. Civ. P. 23(c)(2)(B).  The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005) (citations omitted).  Still, "the type of notice to which a member of a class is entitled depends upon the information available to the parties about that person."  *In re Nissan Motor Corp.*, 552 F.2d at 1098.  Thus, neither Rule 23 nor due process requires actual notice to all class members who may be bound by the litigation.  *See Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008).

23.     As to content, Rule 23(c)(2)(B) requires that the notice provided to absent class members clearly and concisely state the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through an attorney if the member so desires; that the court will exclude from the class any member who requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class judgment.  Fed. R. Civ. P. 23(c)(2)(B).  The notice provided here contains all of that information and more.  *See* Geraci Decl. Ex. 5 ¶8-11.

24.     As this Court previously found, the Notice Program met these standards by providing for direct-mail notice to all class members at the last known address shown in Chase's records as updated by the Settlement Administrator.   As detailed in the declaration of the Settlement Administrator, over 94% of Class Members were provided with direct notice of the Settlement.  *See* Geraci Decl. Ex. 5 ¶16.  In addition, notice appeared in two national magazines (Publication Notice), on the Settlement Website, and on numerous other websites.  *See supra* n.5.

25.     In short, Settlement Class Members received the best practicable notice, which was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the settlement and afford them an opportunity to present their objections."  *In re Oil Spill*, 910 F. Supp. 2d at 940 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, (1950)).  The high participation rate, the number of opt-outs, and the number of objections indicate that the terms of the Settlement as conveyed by the three methods of notice, were understood by the class.  *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 572 (D.N.J. 2010), *rev'd on other grounds sub nom. Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012).

**B.      The Settlement is Fair, Adequate, and Reasonable.**

26.      A district court has broad discretion to approve a class-action settlement under Rule 23(e). *DeHoyos*, 240 F.R.D. at 285-87.  In examining a proposed settlement, the court "must not try the case." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 654 (N.D. Tex. 2010) (quoting *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)).  Rather, the inquiry is confined to assessing the fairness, reasonableness, and adequacy of the proposed settlement because the "very purpose of compromise is to avoid the delay and expense" of a trial. *Id.*

27.      In assessing whether a settlement satisfies the "fair, adequate, and reasonable" standard, the Fifth Circuit has identified six key points of analysis, known as the "*Reed* factors." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012) (citing *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)); *DeHoyos*, 240 F.R.D. at 286-87.  These are:

1.   the existence of fraud or collusion behind the settlement;

2.   the probability of plaintiff's success on the merits;

3.   the range of possible recovery;

4.   the complexity, expense, and likely duration of the litigation;

5.   the stage of the proceedings and the amount of discovery completed; and

6.   the opinions of the class counsel, class representatives, and absent class members.

Each of the *Reed* factors favor approval of this Settlement.

**1.  No Fraud or Collusion behind the Settlement Favors Approval.**

28.      Courts may presume that a proposed settlement is fair and reasonable, and lacking fraud or collusion, when it is the result of arm's-length negotiations. *DeHoyos*, 240 F.R.D. at 287. The Court may likewise presume that no fraud or collusion occurred between opposing counsel in

the absence of any evidence to the contrary.  *Klein*, 705 F. Supp. 2d at 632.  In this case, the Court has already found in its Preliminary Approval Order that this "Settlement is the result of informed, good faith, arm's-length negotiations between the parties and their capable and experienced counsel and is not the result of collusion." (Doc. 29, p. 2).  As noted, both parties are represented by counsel experienced in complex class action litigation and, in particular, statutory consumer finance class actions.  This supports the conclusion that the Settlement is fair and free from fraud or collusion.  *Id.*  The multi-million-dollar settlement itself, the contested nature of the proceedings, the fact that the parties reached a settlement with the assistance of a preeminent mediator, followed by three months of continued negotiations and confirmatory discovery, all demonstrate the absence of fraud or collusion behind the settlement.  *See* Decls. Riley, Hervol, Bingham, Exs. 2 ¶2, Ex. 3 ¶8, Ex. 4 ¶4.

### 2.  The Probability of Plaintiff's Success on the Merits Favors Approval

29.    Once the Court determines that the settlement was reached without fraud or collusion, the next most important factor in determining the fairness, adequacy, and reasonableness of the settlement, is the likelihood of plaintiff's success on the merits if the case were to proceed to trial.  *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D. Tex. 1999) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)).  In evaluating the likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial.  *Id.* (citations omitted).  This factor weighs strongly in favor of approval of this proposed settlement.

30.    Plaintiff sued Chase based upon allegations that Chase had obtained Consumer Report Information on individuals in circumstances where it did not have a "permissible purpose" under the FCRA.  The accounts in question were closed accounts with zero balances; accounts

sold or transferred to a third party; accounts where the debt had been discharged in bankruptcy; and accounts where the property securing the loan had been foreclosed, sold in a short sale, or transferred through a deed in lieu of foreclosure. *See* Pl. Compl., Doc. 1, ¶ 28.[7]

31.    The FCRA permits creditors such as Chase to obtain a Consumer Report Information on an individual when, among other things, it intends to use the information "in connection with a credit transaction … involving the extension of credit to, or review or collection of an account of, the consumer" or "to review an account to determine whether the consumer continues to meet the terms of the account."[8]  Plaintiff asserts that if the account, for example, is closed with a zero balance, there is no longer an account to review, and so any Account Review Inquiries conducted on closed accounts are impermissible.

32.    It is not disputed that Chase conducted Account Review Inquires on the accounts in question.  Plaintiff does not claim, however, that she suffered any actual damages from these Account Review Inquiries or "soft pulls," because soft pulls do not affect a consumer's credit score and are only visible to the consumer and Chase—they are not visible to other creditors or third persons.  Nor could Class Members likely recover on an actual damages theory.  In the 45-year history of the FCRA, there is no reported case of a consumer proving actual damages as a result of a soft pull account review inquiry.  *See* Hervol Decl. Ex.3 ¶12.

33.    The FCRA nonetheless provides for statutory damages of $100 to $1,000 for "willful" violations of the FCRA.  15 U.S.C. § 1681n(a)(1)(A).  Therefore, in order to prevail on her claim for statutory damages under the FCRA, Plaintiff would have had to prove that (1) it is impermissible under the FCRA to conduct Account Review Inquiries on closed accounts, and

---

[7] As used in this motion and brief, the term "closed accounts" is a short-hand reference for consumer accounts that fit any of the five criteria of the class definition, *supra*. P.3, n.4.

[8] 15 U.S.C. § 1681b (a)(3)(A), (F).

(2) Chase "willfully" violated the FCRA in conducting such inquiries.

### a. Account Reviews on Closed Accounts.

34.     In the 45-year history of the FCRA, only two cases have found that it is impermissible to conduct Account Review Inquiries on closed accounts.[9]  Additionally, a few cases asserting the impermissibility of conducting soft pulls on closed accounts have survived motions to dismiss.[10]  More often, including in the Fifth Circuit, courts have determined that the FCRA is ambiguous and does not distinguish between open and closed accounts, leaving open the question of whether it is permissible to conduct Account Review Inquiries on closed accounts.  *See Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318-1319 (11th Cir. 2009) ("[W]e cannot say that the term 'account' necessarily means 'an open account[]'"; affirming summary judgment dismissal of plaintiff's claim that it was impermissible to conduct account reviews on closed accounts); *Wilting v Progressive County Mutual Insurance Co.*, 227 F.3d 474, 476 (5th Cir. 2000) (rejecting plaintiff's claim that only "existing" accounts could be reviewed and noting that "neither the [FCRA] nor the FTC's commentary on the Act suggests that a report may only be permissibly obtained during particular points in the parties' relationship[]"); *see also Banga v. Experian Info. Solutions, Inc.*, 473 F. App'x 699 (9th Cir. 2012) (affirming district court's holding that it is not objectively unreasonable to read the FCRA as permitting inquiries on closed accounts).

---

[9] *Haberman v. PNC Mortg. Co.*, No. 4:11-cv-126, 2012 U.S. Dist. LEXIS 191086, at *24-25 (E.D. Tex. Sept. 7, 2012) (bench trial, finding willful or reckless impermissible account review on discharged closed accounts, but defendant did not contest issue of permissibility of account reviews on closed accounts); *Godby v. Wells Fargo Bank, N.A.*, 599 F. Supp. 2d 934 (S.D. Ohio 2008) (held on cross motions for summary judgment: no permissible purpose to conduct account review on account discharged in bankruptcy).

[10] *Pulliam v. Am. Express Travel Related Servs. Co.*, No. 08-cv-6690, 2009 U.S. Dist. LEXIS 47864, at *6-10 (N.D. Ill. June 4, 2009) (dismissed by stipulation of the parties (N.D. Ill. April 13, 2010 Doc. 116)); *Martin v. Asset Acceptance, LLC*, No. 11-cv-6256, 2012 U.S. Dist. LEXIS 10340,3 at *9-11 (N.D. Ill. July 25, 2012) (dismissed by stipulation and before class certification (N.D. Ill. Mar. 25, 2013, Doc. 54)); *Barton v. Ocwen Loan Servicing LLC*, No. 12-cv-162, 2012 U.S. Dist. LEXIS 137536, at *8-9 (D. Minn. Sept. 26, 2012) (dismissed by stipulation of the parties (D. Minn. Feb. 13, 2014 Doc. 105)).

35.     Relatedly, courts have found that a consumer's discharge of personal liability in bankruptcy does not necessarily eliminate the creditor's permissible purpose for conducting Account Review Inquiries, even though the consumer's liability to pay the account is discharged in bankruptcy.  *See, e.g.*, *Germain v. Bank of Am., N.A.*, No. 13-cv-676, 2014 U.S. Dist. LEXIS 158874, at *13-15 (W.D. Wis. Nov. 7, 2014), *reconsideration denied*, 2015 U.S. Dist. LEXIS 14009 (W.D. Wis. Feb. 5, 2015).

36.     In *Germain*, the plaintiffs filed a class action complaint alleging that it was impermissible for Bank of America to conduct soft pulls on accounts that had been discharged in bankruptcy.  The plaintiffs filed a motion for class certification, but the court granted defendant's motion for summary judgment before considering the class certification motion, finding the plaintiffs' claim "without merit."  *Germain*, 2014 U.S. Dist. LEXIS 158874, at * 2-3.   In *Saumweber*, the court followed *Germain* and found that a credit relationship existed where, after the consumers' debt was discharged in bankruptcy, they remained in the home financed by the creditor and voluntarily, *i.e.*, without legal obligation to do so, made payments to the mortgagee. Because the court found that a credit relationship existed, it also found that the mortgagee had a permissible purpose to access the consumer's credit information.  *Saumweber v. Green Tree Servicing, LLC*, No. 13-cv-3628, 2015 U.S. Dist. LEXIS 65175, at *13 (D. Minn. May 19, 2015); *see also Helman v. Udren Law Offices, P.C.*, No. 14-cv-60808, 2015 U.S. Dist. LEXIS 45922, at *16-18 (S.D. Fla. Apr. 8, 2015) (following *Germain*).

**b.  Willfulness**.

37.     Even if Plaintiff were successful in convincing this Court that it is impermissible to conduct Account Review Inquiries on closed accounts, there would be no possibility of recovering statutory damages unless Plaintiff could also prove that Chase acted willfully in conducting the

challenged account reviews.  *See* 15 U.S.C. § 1681n(a) (authorizing statutory damages only for "willful" violations).

38.    The Supreme Court definitively addressed the FCRA's willfulness requirement in *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007).  In *Safeco*, the Court considered a provision of the FCRA that requires notice to a consumer subjected to "adverse action . . . that is based in whole or in part on any information contained in a consumer [credit] report." *Id.* at 52.  With respect to an insurance company, an "adverse action" is defined in part as an "increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for." *Id.* at 53.  The defendant insurance companies in *Safeco* argued that they did not violate the statute by failing to give notice because the plaintiffs' claims were based on "initial rates charged for new insurance policies." *Id.* at 60-61.  The defendants argued that the initial rate for a new policy "cannot be an 'increased' because there is no prior dealing" between the parties. *Id.* at 61.  In other words, the defendants argued that the statutory reference to "increase in any charge" was meant to cover "change[s] in treatment for an insured, which assumes a previous charge for comparison." *Id.*

39.    The Supreme Court rejected the defendants' interpretation, concluding that applying the statute to initial rates for new policies is a "better fit with the ambitious objective set out in the Act's statement of purpose."  551 U.S. at 62.  Although the Court found a violation of the statute, it concluded that the violation was not willful, holding that the willfulness component is not met "unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.  Accordingly, the Court held that a violation does not cross the willfulness threshold just because a defendant's interpretation is

erroneous; it must instead be "objectively unreasonable." *Id.*

40.     The "objectively unreasonable" standard was not met in *Safeco* for several reasons. First, the Supreme Court found a "dearth of guidance" on this "less-than-pellucid" statute, referring to the absence of regulatory interpretation and court of appeals decisions. 551 U.S. at 70. Second, the defendant's proposed interpretation had a "foundation in the statutory text . . . and a sufficiently convincing justification to have persuaded the District Court to adopt it." *Id*. at 69-70. Finally, the Court noted that "[b]efore these cases, no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC." *Id*. at 70.[11]  Accordingly, the Court concluded that the defendant's reading was not objectively unreasonable, and fell "well short" of meeting the willfulness standard. *Id*.

41.     As applied to this case, the only court of appeals to confront the issue of Account Review Inquiries on closed accounts is the Eleventh Circuit in *Levine*.  The court of appeals held in *Levine* that there could be no willful violation of the permissible purpose provisions of the FCRA because the statute did not distinguish between open and closed accounts.  Therefore, interpreting the FCRA to permit Account Review Inquiries on closed accounts was not "objectively unreasonable."  554 F.3d at 1318-19.  The *Levine* court also held that "*Safeco* makes clear that evidence of subjective bad faith cannot support 'a willfulness finding . . . when the company's reading of the statute is objectively reasonable.'"  *Id.* at 1319 (citations omitted).  Citing *Safeco*, the *Levine* court also rejected as "authoritative guidance" two FTC Advisory Opinions that opine that there is no permissible purpose to conduct account reviews on closed accounts.[12]  *Id.* (citations

---

[11] The Court then noted that the FTC has only enforcement authority, not rule-making authority.  551 U.S. at 70.

[12] Letter from Clarke W. Brinckerhoff, Federal Trade Commission, to Kenneth J. Benner, American Council on Consumer Awareness (Aug. 30, 1999) ("Once an account is closed because the consumer has paid the debt in full . . . it is our view that no permissible purpose exists for a [consumer reporting agency] to provide file information . . . to the creditor. Because there no longer exists any account to 'review' and the consumer is not applying for credit, the

omitted); *see also Landrum v. Harris Cty. Emergency Corps.*, No. 14-cv-1811, 2015 U.S. Dist.
LEXIS 92361, at *16-18 (S.D. Tex. July 16, 2015) (FCRA violation found, but no willfulness);
*Watkins v. Experian Info., Solutions, Inc.*, No. 13-cv-239, 2014 U.S. Dist. LEXIS 150321, at *29
(W.D. Tex. Sept. 8, 2014) (no willful violation of FCRA).

      42.     Plaintiffs' losses in *Levine*, *Germain*, *Watts v. American Express* (another account
review case),[13] and other cases cited herein demonstrate that the probability of success in this case
could be considered low due to the many legal obstacles to overcome on the merits.

      43.     Despite this adverse case law, Plaintiff's counsel was perhaps uniquely positioned
to argue for a new theory of willfulness, one that would re-introduce subjectivity into the analysis.
Plaintiff argued in her complaint that Chase's violation of the FCRA was willful because a Chase
entity had previously settled a class action involving the same conduct, *Sleezer v. Chase Bank
USA, N.A.*[14]  While this argument might have been appealing to the factfinder, the lack of appellate
decisions and authoritative guidance regarding soft pulls on closed accounts might still have
doomed the case on appeal if the Fifth Circuit were to hold firm on the "objectively unreasonable"
standard despite the defendant's alleged repeated conduct.  Further, lurking in the background of
this case was the United States Supreme Court's grant of *certiorari* last spring in the *Spokeo* case.

      **c.  *Spokeo v. Robins*.**

      44.     *Spokeo, Inc. v. Robins* added uncertainty as to the possible recovery of statutory
damages in this case.  *Spokeo* is an FCRA case in which the district court determined that because

---

FCRA provides no permissible purpose for the creditor to receive a consumer report from [the agency]."); Letter from
Clarke W. Brinckerhoff, Federal Trade Commission, to Don Gowen, Security Mutual Financial Services, Inc. (April
29, 1999) ("review" refers to an existing (i.e., open or current) account").

[13] *Watts v. American Express*, 1:08-cv-01970-MSK-MJW (D. Colo.) (Docs. 81, 86, 92) (FCRA account review case;
class certification denied after nearly 3 years of litigation. (Mr. Hervol and Mr. Bingham as Plaintiff's counsel)).

[14] *Sleezer v. Chase Bank USA, N.A.*, SA-07-CA-0961-H (W.D. Tex. (Filed Nov. 27, 2007, settlement approved Aug.
6, 2009, Doc. 74)

the plaintiff asserted "a statutory violation" of FCRA, without alleging actual damages, he lacked standing to pursue the FCRA claim, and the case was dismissed.[15]   The plaintiff appealed and the Ninth Circuit reversed, holding that the alleged FCRA violation alone established the standing necessary to confer jurisdiction on the Court.[16]   Spokeo sought a writ of certiorari to the Supreme Court to consider "[w]hether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute."[17]   The Court granted certiorari on April 27, 2015, which was after the parties in this case had agreed to mediate this case, but before the scheduled mediation took place.

45.     Following the grant of certiorari in *Spokeo*, other defendants sought and obtained stays of FCRA cases pending the outcome of *Spokeo*.  *See, e.g.*, *Patel v. Trans Union, LLC*, No. 14-cv-522, 2015 U.S. Dist. LEXIS 176601, at *4 (N.D. Cal. Sept. 3, 2015) (FCRA case where two classes had already been certified, stayed pending *Spokeo* ruling); *Larroque v. First Advantage LNS Screening Solutions,* No. 15-cv-4684, 2016 U.S. Dist. LEXIS 139, at *4-6 (N.D. Cal. Jan. 4, 2016) (citing cases) (FCRA case stayed pending ruling in *Spokeo*); *Boise v. ACE USA, Inc*., No. 15-cv-21264, 2015 U.S. Dist. LEXIS 87200, at *11-13 (S.D. Fla. July 6, 2015) (TCPA case stayed pending *Spokeo* and while class certification motion pending).

46.     In this litigation, Chase maintained the position that: (1) there is no violation of law because the account reviews on closed accounts were permissible, relying on the *Levine*, *Germain*, and *Saumweber* cases; (2) even if there were violations, they could not be found "willful" under

---

[15] *Robins v. Spokeo, Inc*., No. 10-cv-5306, 2011 U.S. Dist. LEXIS 14079, at *4 (C.D. Cal. Jan. 27, 2011).

[16] *Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014).

[17] *Spokeo, Inc. v. Robins,* 135 S. Ct 1892 (Apr. 27, 2015).

the current state of the law because there was no "authoritative guidance" regarding whether Chase could review closed accounts, relying on *Safeco* and *Levine*; (3) class certification could never be achieved because there were too many individual issues about former borrowers' situations, relying on *Saumweber* and other cases; (4) interlocutory appeal would be sought in the event of any successful class certification; (5) any judgment for Plaintiff would be appealed to the Fifth Circuit; and (6) the U.S. Supreme Court's decision in *Spokeo* could entirely foreclose Plaintiff's lawsuit by denying her standing to sue under the FCRA because she could not show actual injury.

47.    *Spokeo* implicates not only standing, but the ability of a plaintiff to achieve class certification.  In another FCRA class action case in which the court granted the defendants' motion to stay pending the outcome of *Spokeo*, the court noted that a "decision in *Spokeo* reversing the Ninth Circuit would thus raise serious questions regarding [plaintiff's] ability to establish his own individual standing, as well as the predominance and superiority requirements necessary to certify and maintain a class action under Rule 23(b)(3)." *Larson v. Trans Union, LLC*, No. 12-cv-5726, 2015 U.S. Dist. LEXIS 83459, at *24 (N.D. Cal. June 26, 2015).   Given current case law interpreting the FCRA as it concerns account reviews on closed accounts and willfulness, coupled with the possibility of an adverse outcome for plaintiffs in *Spokeo*, Plaintiff faced major litigation risks.  Thus, Plaintiff's chance of litigation success in this case favors approval of the Settlement.

### 3.  The Range of Possible Recovery Favors Approval of the Settlement

48.    Under this factor, the Court must consider whether the range of possible recovery or the benefit of the settlement to plaintiffs outweighs the risk of proceeding through litigation. *DeHoyos*, 240 F.R.D. at 290.  This *Reed* factor requires a Court to determine the "value of the settlement in light of the potential for recovery." *San Antonio Hispanic Police Officers' Org.*, 188 F.R.D. at 460.  When considering the possible range of recovery, a court should keep in mind that

"compromise is the essence of a settlement." *Murphy Oil*, 472 F. Supp. 2d at 850 (citations omitted).

### a. Actual Damages.

49.     For negligent violations, the FCRA provides for recovery of actual damages.[18]  As discussed above, the account reviews at issue in this case ("soft pulls") do not affect the consumers' credit scores (which in turn determine credit eligibility and the costs of credit).  *See* Hervol Decl. Ex.3 ¶¶ 7,12.  Further, account reviews are not visible to third persons.  *Id*.[19]  Therefore, it would be difficult for a consumer to show actual damages from a soft pull.  Indeed, there is no reported case of which Class Counsel are aware finding that a consumer has suffered actual damages as a result of an account review.  *Id.*  There is thus little prospect for recovery of actual damages in an FCRA soft-pull case.  To the extent that any of the Class Members believe they have suffered actual damages, the Settlement not only notified them of the existence of the claim in the first place, but it also provided them with the opportunity to exclude themselves from the effects of the Settlement to pursue the claim.

### b. Statutory Damages.

50.     The range of recovery upon proof of a willful violation of the FCRA is $100 to $1,000.  With approximately 2.2 million class members, and assuming that the case could be certified[20] the range of recovery in this case, upon class-wide proof of willfulness, is $220 million to $2.2 billion.

---

[18] 15 U.S.C. §1681n (a)(1)(A).

[19] By contrast, "hard pulls" are initiated by the consumer when requesting credit, are visible to other creditors, and affect credit scores, at least temporarily, by causing a decline in credit scores, which may in turn make it harder, more expensive, or impossible to obtain credit.

[20] There is no reported FCRA "account review" case where a class has been certified when certification was contested. *See, e.g. Germain v. Bank of Am., N.A.*, No. 13-cv-676, 2014 U.S. Dist. LEXIS 158874, at *13-15 (W.D. Wis. Nov.

51.     However, as discussed in the preceding section, it is highly unlikely that a plaintiff will be able to prove a willful violation of the FCRA concerning account reviews on closed accounts unless and until:  (1) a court of appeals issues an opinion contrary to *Levine*; (2) the FCRA is amended to clarify that account reviews on closed accounts are prohibited; or (3) an agency with rulemaking authority issues "authoritative guidance" declaring that account reviews on closed accounts are prohibited.  (No such future event, however, would make Chase's past conduct willful at the time it was undertaken.)  Again, the FCRA does not distinguish between open and closed accounts; the two FTC Advisory Opinions, *see supra* n.12, have not been recognized by the courts as authoritative; and the only courts to even hint that accounts reviews on closed accounts may be impermissible are not courts of appeals.  The only court of appeals decision on point is *Levine*, which held that it is not "objectively unreasonable" to interpret the FCRA to allow account reviews on closed accounts—thus, there was no willful violation found.[21]

52.     The range of possible recovery must take into account the likelihood of success on the merits.  The Court should not evaluate the adequacy of this Settlement against some theoretically available judgment, but against what Plaintiff could reasonably expect to recover.  That is, if the likelihood of success on the merits is low, it is almost meaningless to say that $2.2 billion could have been recovered in this case.  In a recently approved settlement involving invasion of privacy claims, Facebook faced astronomical damages of $750 per class

---

7, 2014), reconsideration denied, 2015 U.S. Dist. LEXIS 14009 (W.D. Wis. Feb. 5, 2015) (certification denied); *Watts v. American Express*, 1:08-cv-01970-MSK-MJW (D. Colo.) (Docs. 81, 86, 92) (class certification denied).

[21] One district court has pointed out the absurdity of the *Levine* holding: "Under Defendant's interpretation of *Safeco* and *Levine*, businesses and other entities that use consumer reports would have *carte blanche* in accessing and using the reports of anyone who previously had an open account with them, regardless of purpose.  This is an absurd result that Congress could not possibly have intended."  *Martin v. Asset Acceptance, LLC*, No. 11-cv-6526, 2012 U.S. Dist. LEXIS 103403, at *11 (N.D. Ill. July 25, 2012).  *Martin* is not a court of appeals decision, and the *Martin* opinion concerns only a defendant's motion to dismiss.  The case was later dismissed by the parties, who presumably settled the case.

member with 150 million class members.  The Ninth Circuit found that the district court did not

abuse its discretion in approving payment of $15 per claiming class member (.02% of $750) where

there were long odds of winning the case.  *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 943-44

(N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, No. 13-16819, 2016 U.S. App. LEXIS 518

(9th Cir. Jan. 6, 2016).  Moreover, the Ninth Circuit specifically noted that $15 received by class

members who filed claims[22] was reasonable given the "minimal (if any) harm" suffered by the

plaintiffs.  2016 U.S. App. LEXIS 518, at *1.  The Ninth Circuit also noted that awarding $750 in

available statutory damages per claimant would implicate due process concerns.  *Id.*

53.    A similar situation exists here.  Plaintiff faced significant litigation risk, *see supra*;

Plaintiff and the Settlement Class Members suffered no legally cognizable actual harm; and

awarding damages of $220 million to $2.2 billion would implicate due process concerns.  *Cf.*

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("An award that would be

unconstitutionally excessive may be reduced….") (internal citation omitted).  Thus, the $8.75

million cash component of the Settlement is valuable, and it is far greater than any other account

review settlement in the 45-year history of the FCRA.  *See* Hervol Decl. Ex. 3 ¶21.  The Settlement

is well within the range of reasonableness, given the possibility that the class could have received

nothing.

### c.  Injunctive Relief.

54.    The FCRA does not permit private litigants to obtain injunctive relief.  *See*

*Washington v. CSC Credit Servs.*, 199 F.3d 263, 268 (5th Cir. 2000).  Thus, there is no statutory

"range of recovery" concerning injunctive relief.   Yet Class Counsel was able to secure an

---

[22] Approximately 615,000 Facebook class members filed claims, less than on-half of one percent (Doc. 352, June 21, 2013), and 6,825 excluded themselves from the settlement (Doc. 348, June 14, 2013).  *Fraley v. Batman*, C-11-1726 (N.D. Cal.).

agreement for audit procedures on Chase's Account Review Inquiries for three years from Final Approval.  In the words of another court, Class Counsel "hit a home run" in securing injunctive relief where none was available under the FCRA.  *See White v. Experian Info. Solutions, Inc.*, No. 05-cv-1070, 2011 U.S. Dist. LEXIS 79044, at *16-17 (C.D. Cal. July 15, 2011) ("Injunctive Relief Class Counsel hit a home run with the injunctive relief settlement:  it achieved virtually everything that Plaintiffs could have achieved had they prevailed on their claims for injunctive relief after full litigation."), *rev'd on other grounds*, *Radcliffe v. Experian Info. Solutions, Inc.*, No. 11-56376, 2013 U.S. App. LEXIS 7932 (9th Cir. Apr. 22, 2013); *see also Fraley*, 966 F. Supp. 2d at 94 ("Although the monetary relief to each class member is relatively small and the percentage of class members who submitted claims is limited, the settlement as a whole provides fair, reasonable, and adequate relief to the class, in light of all the circumstances, including the low probability that a substantially better result would be obtained through continued litigation.  The injunctive relief, while not incorporating all features that some of the objectors might prefer, has significant value and provides benefits that likely could not be obtained outside the context of a negotiated settlement, even if plaintiffs were to prevail on the merits."); *De Hoyos* 240 F.R.D at 295 (making the point that injunctive relief extends not only to this class, but to future classes of an indefinite sizes).

### 4.  The complexity, expense, and likely duration of the litigation

55.     As demonstrated in discussing the probability of success on the merits, the FCRA is a complex statute with complex case law attempting to interpret its purpose and meaning.  *See White v. Experian Info. Solutions*, No. 05-cv-1070, 2014 U.S. Dist. LEXIS 61433, at *51 (C.D. Cal. May 1, 2014).  Some of the case law defies common sense and seems divorced from the realities of the marketplace.  When considering whether the complexity of the case favors approval

of the proposed settlement, this Court has explained before that the Court should consider the "vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *DeHoyos*, 240 F.R.D. at 291 (citations omitted).  In this respect, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Id.* (citations omitted).

56.    The complexity of the FCRA and interpreting case law often leads to prolonged litigation. *See, e.g.*, n. 13 *supra.*  In this case, Class Counsel believed that they could get this case certified as a class action, provided that (1) no stay was imposed pending the decision in *Spokeo*, and (2) the case moved fast enough to avoid a decision in *Spokeo* which might effectively strip Plaintiff of standing in this case. *But see Germain*, 2014 U.S. Dist. LEXIS 158874, at *23-25 (denying class certification because the "precise nature of the post discharge relationship must be determined with respect to each consumer" and holding that individualized questions predominated over common ones; for example, "Were the consumers in possession of the property? Were they contesting foreclosure? Did they inform the bank that they wanted to modify their loans or make payments to stay in possession?").  If Plaintiff succeeded in moving for class certification, she likely would have faced another motion to stay due to the increased risk to Chase[23] or a Rule 23(f) interlocutory appeal.  A stay or an appeal would have meant not only delay, but also a heightened probability that *Spokeo* would be decided in a way that would annihilate the case completely.  Even if the case survived an interlocutory appeal to the Fifth Circuit and was remanded, Plaintiff and the certified class would still have faced summary judgment.  At summary judgment, Chase would have asserted that the challenged account reviews were permissible.  The

---

[23] *See, e.g.*, *Patel v. Trans Union, LLC*, No. 14-cv-522, 2015 U.S. Dist. LEXIS 176601, at *4 (N.D. Cal. Sept. 3, 2015) (staying case pending *Spokeo* after class certified).

Court may have held that nothing in the FCRA expressly prohibits account reviews on closed accounts in light of *Levine* and *Wilting*. But even if the Court were to rule in favor of Plaintiff and the class on the permissible purpose issue, Class Counsel would still have had to prove that Chase acted willfully or recklessly to secure any damages. Under current law, the Court is to look for a court of appeals decision or other "authoritative guidance." As discussed *supra*, the only court of appeals decision, *Levine*, is not helpful to Plaintiff as the *Levine* Court found no willfulness in conducting account reviews on closed accounts. Had Plaintiff lost at the summary judgment stage, there would have been an appeal. Even if Plaintiff were able to survive Chase's summary judgment motion, there likely would have been a trial followed by an appeal.

57.     In short, securing the implementation of audit procedures and more monetary compensation than any other similar FCRA case in history is a better option than years of risky and uncertain litigation.

### 5.  The Stage of the Proceedings and the Amount of Discovery Completed Favors Approval of the Settlement

58.     In applying this factor, courts ask "whether the parties have obtained sufficient information to evaluate the merits of the competing positions . . . and whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed[.]" *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (citations omitted). Courts can approve a settlement even if the parties have not conducted much formal discovery. *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *Newby v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004) ("The overriding theme of our case law is that formal discovery is not necessary as long as (1) the interests of the class are not prejudiced by the settlement negotiations and (2) there are

substantial factual bases on which to premise settlement."); *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (agreeing with district court's conclusion that formal discovery is not a prerequisite to approving a settlement as reasonable).  Of importance to this case, information obtained in prior litigation can also serve as the basis for an informed settlement of this case.  *See San Antonio Hispanic Police Officers' Org.*, 188 F.R.D. at 459; *DeHoyos*, 240 F.R.D. at 292.

59.     As discussed in the declarations submitted herewith, before agreeing to the Settlement, Class Counsel extensively investigated the claims of Plaintiff and the Settlement Class and positioned the Settlement Class to obtain a strong settlement.  Before even filing this action, Class Counsel tried to identify and confirm what appeared to be a systematic problem of account reviews on closed accounts (as opposed to simply a mistake with Plaintiff's credit reports), and reviewed many credit reports of Plaintiff and of former clients covering multiple years.  Class counsel analyzed current case law and authority related to the permissibility of account reviews on closed accounts and willfulness under the FCRA.  In addition, one of Class Counsel (H. Anthony Hervol) had previously represented the plaintiff in *Sleezer*, which involved the same claim against a Chase entity.  *Sleezer* equipped Class Counsel to anticipate the defenses that Chase would raise here both on the merits and in opposition to class certification because that Chase entity had filed a motion for partial summary judgment and informally advanced positions regarding class certification in *Sleezer*.  *See* Hervol Decl. Ex. 3 ¶18.

60.     During the course of litigation, the Parties exchanged additional information to support and elaborate each side's legal and factual positions.  *See* Hervol Decl., Ex. 3 ¶8, 16-18. Plaintiff also obtained confirmatory discovery after mediation to confirm certain facts upon which the settlement was made, including the processes by which Chase identified the class members

who had been the subject of the challenged account reviews.  That in turn led to a class definition and release of liability, which is neither over nor under inclusive.  *Id.*

61.    In sum, Class Counsel spent a substantial amount of time working on the relevant issues, and they developed a reasonable factual understanding that enabled them to engage in well-informed settlement negotiations.  As a result, this factor favors approval of the Settlement.

### 6.  The Opinions of Counsel and the Class Members Favor Settlement

62.    When "evaluating the terms of the compromise in relation to the likely benefits of a successful trial . . . the trial court is entitled to rely upon the judgment of experienced counsel for the parties."  *Cotton*, 559 F.2d at 1330.  "Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."  *Id.*  Class Counsel thoroughly understand the practical and legal issues they would face litigating these claims against Chase based in large part on their experience with, and understanding of, other similar claims and account review cases around the country.  *See*  Hervol Decl. Ex. 3 ¶20.

63.    Counsel are the Court's main source of information about the fairness, adequacy, and reasonableness of a proposed class settlement.  *Murphy Oil,* 472 F. Supp. 2d at 852.  As a result, "[t]he Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight."  *Klein*, 705 F. Supp. 2d at 649; *see also DeHoyos*, 240 F.R.D. at 292 (class counsel's opinion "entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims").

64.    Class Counsel whole-heartedly recommends the Settlement as an excellent result for the Settlement Class.  *See* Hervol Decl., Ex. 3 ¶25; Riley Decl., Ex.2 ¶6,12; Bingham Decl**.,** Ex. 4 ¶8, 9, 11.  *See also*, Duncan Decl. Ex. 1. Indeed, as set forth in the accompanying

declarations, Class Counsel endorse the Settlement as fair, reasonable, and adequate based upon: (i) their extensive experience with other actions involving FCRA account reviews, other FCRA cases, and other statutory "no damages" class actions, (ii) their hands-on involvement in this litigation and the prior *Sleezer* litigation, (iii) their knowledge of the information that they reviewed in this case and in the prior *Sleezer* case, (iv) the opinions and guidance they received from their experts, (v) their participation in arm's-length and adversarial negotiations in the full-day mediation with a highly regarded and experienced mediator, (vi) their conversations with Settlement Class Members who have called their offices, and (vii) the exceedingly high claims participation rate which occurred in this case. *Id*. ¶¶ *. See Reed*, 703 F.2d at 175 (noting that "adequacy of representation and adequacy of settlement are different sides of the same question," such that competent counsels' approval is an indicator of reasonableness).

65.     The named class representative also whole-heartedly agrees that the settlement is a fair, adequate, and reasonable compromise. *See* Duncan Decl. Ex.1.   Perhaps most tellingly, a miniscule percentage of the class members excluded themselves from the settlement and an even smaller percentage objected to the settlement.   In a class this size, it is hard to imagine a more resounding endorsement of the fairness of the settlement. *See In re Oil Spill*, 910 F. Supp. 2d at 938 ("one indication of the fairness of a settlement is the lack of or small number of objections"); *see also Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (upholding district court's approval of class settlement with 45 objections and 500 opt-outs for a class of 150,000); *Hanlon v Chrysler Corp.*, 150 F.3d 1011, 1026-27 (9th Cir. 1998) (upholding district court's approval of class settlement where 99.9% of class agreed to be bound).

66.     The support of the Settlement by Class Counsel, the class representative, and the absent class members demonstrate that the Settlement is a favorable result and should be approved.

**C.      The Court Should Certify the Settlement Class**

67.      This Court has previously found the requirements of Rule 23(a) and 23(b)(3) satisfied in this action in a settlement posture.  *See* Doc. 29, ¶ 5.  The Court should make the same class certification findings in granting Final Approval.

## V.      CONCLUSION

68.      Based on the foregoing, the Court should grant final approval of the Settlement as fair, adequate, and reasonable and certify the Settlement Class.

Accordingly, Plaintiff and Class Counsel respectfully request that this Court enter a final judgment that (1) grants final approval of the Settlement, excluding from the binding effect of the judgment all persons who have timely and validly excluded themselves from the Settlement; (2) certifies for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) approves the *cy pres* recipients (*see* Unopposed Motion for Approval of *Cy Pres* Designations, Doc. 33); (4) approves the requested Service Award for the Class Representative; (5) awards Class Counsel attorneys' fees and expenses; and (6) dismisses the action with prejudice.

Respectfully submitted,

RILEY & RILEY
Attorneys at Law
320 Lexington Avenue
San Antonio, Texas 78215
(210) 225-7236 Telephone
(210) 227-7907 Facsimile
charlesriley@rileylawfirm.com

By: ___*Charles Riley*_____
      CHARLES RILEY
      State Bar No. 24039138

LAW OFFICE OF H. ANTHONY HERVOL
4414 Centerview Dr., Ste. 200
San Antonio, Texas 78228
(210) 522-9500 Telephone
(210) 522-0205 Facsimile
hervol@sbcglobal.net

By:____*H. Anthony Hervol*_____
       H. ANTHONY HERVOL
       State Bar No. 00784264


BINGHAM & LEA, P.C.
319 Maverick Street
San Antonio, Texas 78212
(210) 224-1819 Telephone
(210) 224-0141 Facsimile
ben@binghamandlea.com

By*:*____*Ben Bingham*_____
       BENJAMIN R. BINGHAM
       State Bar No. 02322350

CLASS COUNSEL

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves e-mail notification of such filing to the following counsel of record on this _13th_day of April, 2016 and a true and correct copy of the above and forgoing has therefore been served on the following counsel of record for the Defendant at the e-mail address listed hereunder:

Noah A. Levine
Alan E. Schoenfeld
Fiona Kaye
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, New York 10007
noah.levine@wilmerhale.com
alan.schoenfeld@wilmerhale.com
fiona.kaye@wilmerhale.com

Wm. Lance Lewis
Kenneth A. Hill
QUILLING, SELANDER, LOWNDS
WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
llewis@qslwm.com
kenhill@qslwm.com

In addition, the undersigned hereby certifies that the foregoing was served upon the objecting parties named below via electronic mail on April 13, 2016, and will be served via first class mail, postage prepaid, to the same parties on April 14, 2016:

Thomas L. Cox, Jr.
7129 Tabor Dr.
Dallas, TX 75231-5647
Via electronic mail and regular mail

Marilyn Paul
130 N. Garland Court
Chicago, IL  60602
Via electronic mail and regular mail

Amirali Jabrani
c/o Christopher T. Bandas
Bandas Law Firm, P.C.
500 N. Shoreline Blvd., Suite 1020
Corpus Christi, Texas 78471
Via electronic mail and regular mail

  /s/ H. Anthony Hervol
H. Anthony Hervol
Co-Class Counsel