# EXHIBIT "3"
## Declaration of H. Anthony Hervol

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| EVA MARISOL DUNCAN, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 5:14-cv-00912 |
| | § | |
| JPMORGAN CHASE BANK, N.A., | § | |
| | § | |
| **Defendant.** | § | JURY TRIAL DEMANDED |

## DECLARATION OF H. ANTHONY HERVOL

I, H. Anthony Hervol, declare as follows:

1.     My name is H. Anthony Hervol.  I am over 18 years of age and am fully competent to make this Declaration.  The facts stated in this Declaration are based upon my personal knowledge and are true and correct.  I submit this Declaration in support of Plaintiff's Motion for Final Approval of Class Action Settlement, with Brief Incorporated (the "Motion").

2.     In this class action case, I acted as Co-Class Counsel, being an attorney of record for Eva Marisol Duncan (hereinafter "Mrs. Duncan" or the "Representative Plaintiff" in this case) and for the class as defined previously in these proceedings (hereinafter, the "Class").

3.     The purpose of this Declaration is to advise the Court of certain facts impacting on the *Reed* factors[1] discussed in the Motion.

4.     I have been licensed to practice law in the State of Texas since November 6, 1992.  I was admitted to practice in the Federal Courts within the Western District of Texas on August 31, 1993.  I have been licensed to practice before the United States Court of Appeals for the Fifth Circuit since May 3, 1993.  I am also admitted to practice before the United States District Court for the Southern District of Texas, and the United States District Court for the District of Colorado.

5.     During my career, I have practiced primarily in the areas of bankruptcy and civil litigation.  However, in 2004, I significantly altered my legal practice to develop a specialty in consumer rights and consumer litigation matters.  I am a member of the National Association of Consumer Advocates ("NACA"), which is a nationwide organization of more than 1500 attorneys committed to promoting justice for consumers, with a stated goal of promoting a fair and open marketplace that protects the rights of consumers, particularly those of modest means. I have attended various NACA consumer litigation conferences, including Fair Credit Reporting Act ("FCRA") conferences, acquiring highly specialized knowledge from some of the nations'

---

[1] *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

leading experts in consumer litigation and, in particular, litigating claims under the FCRA.  In a 2007 contested matter filed in the United States Bankruptcy Court for this District, Chief Judge Ronald B. King qualified me as an expert in credit reporting for purposes of a hearing concerning the reporting of a mortgage loan by Washington Mutual Bank.  *In re Rivas*, 01-55318-RBK, hearing held March 8, 2007.

6.     Because one of my primary areas of practice is consumer litigation, I have handled many cases brought under the FCRA, Fair Debt Collection Practices Act ("FDCPA"), Texas Debt Collection Act ("TDCA") (the State equivalent of the FDCPA), and Real Estate Settlement Procedures Act ("RESPA").   I have significant knowledge and experience in consumer class action cases and, in particular, class action cases involving the same claim asserted herein: an FCRA impermissible access claim grounded upon "soft inquiry" account reviews.  I was certified by the United States District Court for this District as lead or co-lead class counsel in two nationwide FCRA class actions asserting this exact claim, being *Sleezer, et. al. v. Chase Bank USA, N.A., et. al.*, Civil Action No. 5:07-cv-961-HLH (W.D. Tex.) (Final Order entered August 6, 2009, Doc. No. 73), and *King v. United SA Federal Credit Union*, Civil Action No. 09-cv-0937-NN (Final Order entered October 8, 2010, Doc. No. 31).  I was also certified by the Court as co-lead class counsel in a state-wide class action filed under the FDCPA and TDCA, being *Boles vs. Moss Codilis, LLC*, et. al., Civil Action No. 5: 10-cv-1003-XR (W.D. Tex.) (Opinion certifying class and finding counsel adequate – Doc. No. 69; Final Judgment entered July 30, 2012).

7.     This case concerned Defendant JP Morgan Chase Bank, N.A.'s ("Chase") accessing of information from a credit reporting agency for the purpose of conducting alleged account reviews.  In the credit reporting industry, these types of accesses of credit information are often referred to as "soft pulls" of credit report information.  The term "soft pulls" generally connotes the situation where a user of credit information accesses data from a credit reporting agency for certain alleged purposes that are not incident to an application for credit.  The most common examples that are readily seen on a credit report are: (A). an account review – which is a credit report inquiry "to review an account to determine whether the consumer continues to meet the terms of the account" and (B). a promotional inquiry – which is a request from an entity that seeks to send a "firm offer of credit or insurance" to the consumer (for example – a "pre-approved" credit card offer).  To the best of my knowledge, no credit scoring models deduct points from an individual's credit score based upon account reviews.  This makes intuitive sense because why would a person be less credit worthy simply because a creditor maintains a practice of obtaining information from its customers' credit reports on a monthly basis to determine if such customers continues to be eligible for the particular form of credit?  In fact, all three of the major credit reporting agencies make it clear that account reviews do not affect a consumer's credit score. *See* Exh. "3-A" attached.  The most widely accepted credit scoring model in the United States is the FICO score which is a proprietary product of the Fair Isaac Corporation based in San Jose, California.  On its website, www.Myfico.com, Fair Isaac makes it clear that account reviews do not effect one's credit score. *See* Exh. "3-B" attached.   As discussed more fully herein, the fact that account reviews do not effect one's credit score makes it virtually impossible to prove actual damages in a "soft pull" impermissible access case.

## A. The Existence of Fraud or Collusion Behind the Settlement

8.     The settlement reached in this case is the result of arm's-length negotiations between counsel for Chase and Class Counsel.   Both Mrs. Duncan and Chase were well represented in this case by attorneys with extensive class- action experience.   As noted below, the settlement was reached only after extensive research into the merits of the claim, extensive fact-finding concerning the claim, and based upon my own specialized knowledge and experience in cases of this type.   This is my fourth FCRA impermissible access class action case involving alleged "soft pulls" of information from consumer's credit reports.   Therefore, I know a great deal about this particular claim.   After conferring concerning the Joint ADR Report required to be filed by the Scheduling Order entered herein, the parties agreed to submit this matter to non-binding mediation with Hon. Edward A. Infante (Ret.), a renowned mediator with JAMS in San Francisco, California.   Magistrate Judge Infante has mediated some of the largest class action cases in the Country, including many consumer class-action cases.   The parties provided detailed position statements to Magistrate Judge Infante prior to the mediation, with copies to opposing counsel.   The parties mediated this case on June 8, 2015, with Magistrate Judge Infante at JAMS' offices in San Francisco.   After a full day of intensive mediation, the parties agreed in principle on a term sheet, with other details to be discussed thereafter.   The parties continued to negotiate for three months and after completing certain confirmatory discovery, a final settlement was reached.   Class Counsel reviewed many consumer class action settlements and was determined to ensure that a settlement reached in this case would far surpass any other settlement reached in any other "soft pull" impermissible access case.   Therefore, the Settlement was the result of informed, good faith, arm's-length negotiations between the parties and their capable and experienced counsel and was not the result of fraud or collusion.

## B. The probability of plaintiff's success on the merits;

9.     Provisions of the FCRA have been termed "less than pellucid" by the United States Supreme Court.   *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 69-70 & n.20 (2007).   Further, as noted by one Court, "[t]he FCRA, particularly in the class action context, is a complex and challenging area of law."   *White v. Experian Info. Solutions*, 2014 U.S. Dist. LEXIS 61433, 2014 WL 1716154 (C.D. Cal. May 1, 2014).   Because I practice in this area, I endeavor to keep updated on the latest developments in this specialized area of the law.   Since the FCRA was enacted more than 45 years ago, there have actually been only a comparatively small amount of reported "account review" cases, and even fewer of them are brought as class actions.   *See, e.g.*, *Barel v. Bank of America*, 255 F.R.D. 393 (E.D.Pa. 2009); *Nienaber v. Citibank*, No. Civ. 04-4054 (D. S.D.); *Perry v. FleetBoston Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005); *Keener v Sears Roebuck & Co., et.al.*, 03-1265 (C.D. Cal).   Most reported cases founded upon accesses to credit reports are actually based upon obvious invasions of privacy (such as the nosey parent who pulls a report on a potential suitor for a son or daughter) or unauthorized "hard pulls" (such as when an entity pulls the report for what appears to be an application for credit, but the consumer has not actually applied for credit).   Because there are generally no provable damages associated with a "soft pull" FCRA impermissible access claim, the relief sought would be statutory damages, which requires proving a willful violation.   Further, the claim is difficult to recognize unless you review many credit reports as part of your practice.   Because I have represented so many consumers in connection with my bankruptcy practice, I review all three credit reports (i.e. from

Experian, TransUnion and Equifax) concerning almost every one of my clients.  Over the years, I have asked many questions of my clients in order to attempt to ascertain whether or not inquiries on their credit reports may give rise to a claim.  This is because a debtor filing a bankruptcy case has a duty to disclose all claims or risk a waiver based upon judicial estoppel.  In fact, in 2006, I was employed by a Chapter 7 Bankruptcy Trustee to represent a Debtor's Bankruptcy Estate to pursue claims founded upon "soft pulls" appearing on my client's Experian report.  *John Patrick Lowe, Trustee vs. American Express Travel Related Services, et. al.*, Adversary No. 06-5070-LMC (Bankr. W.D. Tex.).

10.     Once a valid "soft pull" impermissible access claim is identified, there are significant obstacles to overcome on the merits when one desires to pursue such a claim.  In the *Safeco* case, the United States Supreme Court held that a violation of the FCRA could be proven "willful" if an action was taken that contravened a decision of a court of appeals or "authoritative guidance" from a responsible federal agency clearly prohibits the challenged conduct under the statute.  *See* 551 U.S. at 69-70 & n.20.  Only one circuit level court has addressed the permissibility of such closed account reviews, but it not only rejected the "willfulness" of a creditor's actions in reviewing closed accounts, it also observed that the FCRA's "permissible purpose" provision does not distinguish between open and closed accounts.  *See Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318-1319 (11th Cir. 2009); *see also Banga v. Experian Info. Solutions, Inc.*, 2013 U.S. Dist. LEXIS 144999 (N.D. Cal. Sept. 30, 2013) (same).  Further complicating matters is the Fifth Circuit's *Wilting* case in which it considered a permissible purpose claim for a paid off or settled account.  The Court stated: "We note that neither the Act [i.e. FCRA] nor the FTC's commentary on the Act suggests that a report may only be permissibly obtained during particular points in the parties' relationship."  *Wilting v Progressive County Mutual Insurance Co.*, 227 F.3d 474, 476 (5th Cir. 2000).  Likewise, certain District Courts have found that that a consumer's discharge of personal liability in bankruptcy does not necessarily eliminate the creditor's permissible purpose for conducting account reviews on a debtor's mortgage account.  *See, e.g.*, *Germain v. Bank of America*, 2014 WL 5802018, at *5-7 (W.D. Wis. Nov. 7, 2014), *reconsideration denied* 2015 WL 471704 (W.D. Wis. Feb. 5, 2015); *Saumweber v. Green Tree Servicing, LLC*, 2015 WL 2381131, at *4 (D. Minn. May 19, 2015).

11.     In light of the foregoing, the probability of success in this case, both as to certification of a class and surviving summary judgment on the merits, were far from being assured.  All of this was factored into the decision to enter into the Settlement.

### C.     *The range of possible recovery;*

12.     For negligent violations, the FCRA provides for recovery of actual damages.  As discussed above, the account reviews at issue in this case ("soft pulls") do not affect the consumers' credit scores (which in turn determine credit eligibility and the costs of credit).  Further, account reviews are not visible to third persons who may view the consumer's credit report.  Because soft pulls do not result in changes to an individual's credit score, it is highly unlikely that one could prove actual damages.  In fact, based upon my review of case law in this area, I can find no reported case of a consumer proving actual damages as a result of a soft pull account review inquiry.  There is thus little prospect for recovery of actual damages in an FCRA

"soft-pull" case. To the extent that any of the Class Members believe they have suffered actual damages, the Settlement not only notified them of the existence of the claim in the first place, but it also provided them with the opportunity to exclude themselves from the effects of the Settlement to pursue the claim on their own.

13. The range of recovery upon proof of a willful violation of the FCRA is $100 to $1,000. With approximately 2.2 million class members, the range of recovery in this case, upon proof of willfulness, is $220 million to $2.2 billion. However, this presumes that the Court would find a *willful* violation of the FCRA on the part of Chase, and that the case could be certified on a class-wide basis. My research has not revealed a single FCRA account review case that has been certified when certification was contested. *See, e.g.*, *Germain v. Bank of Am., N.A.*, No. 13-cv-676, 2014 U.S. Dist. LEXIS 158874, at *13-15 (W.D. Wis. Nov. 7, 2014), reconsideration denied, 2015 U.S. Dist. LEXIS 14009 (W.D. Wis. Feb. 5, 2015) (certification denied); *Watts v. American Express*, 1:08-cv-01970-MSK-MJW (D. Colo.) (Docs. 81, 86, 92) (class certification denied). Therefore, proving willfulness and obtaining certification of a class is certainly a difficult proposition. Class counsel in this case was uniquely positioned to argue that while the first alleged violations by Chase may not have arguably been willful (referring to the *Sleezer* case), willfulness could more likely be proven the second time the same defendant (or its affiliate) is found committing the same alleged violation. No matter how appealing this argument might have been to the fact-finder, there remained the difficult prospect that the "authoritative guidance" standard set forth in *Safeco* might doom the case on appeal. Although the upper end of recovery could have been significant if willfulness was proven, Mrs. Duncan and the Class could also have received absolutely nothing given the obstacles identified. As noted privacy law expert Mr. Evan Hendricks in his attached expert Declaration (Exh. 6 submitted herewith), "class counsel in a FCRA case face financial risks that they may not face in other types of consumer litigation, [and] . . . these added risks undercut private enforcement of the Act [which Mr. Hendricks views as] critical to achieving its purposes [as] the issue has not been visited by traditional FCRA enforcement authorities, like the Consumer Financial Protection Board [sic] ('CFPB'), the Federal Trade Commission ('FTC') or State Attorneys General."

### D.    *The complexity, expense, and likely duration of the litigation*

14. The complexity of the legal issues involved in the case are discussed at length in the Motion at para. 53-54. I concur with this analysis.

### E.    *Stage of the Proceedings and the amount of discovery completed:*

15. In applying this factor, courts ask "whether the parties have obtained sufficient information to evaluate the merits of the competing positions . . . and whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed[.]" *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (citations omitted). Based upon my extensive prior experience with cases of this sort, my investigation of the claim asserted herein before the

lawsuit was filed, and the discovery conducted during the lawsuit, this factor supports approval of the settlement for the following reasons.

### *"Front-end" discovery:*

16.     Before agreeing to the settlement reached in this case, my co-counsel and I extensively investigated the claims of Plaintiff and the Settlement Class, positioning ourselves to obtain a strong settlement for the Class.   First, before this action was filed, I set up an investigation to try to identify and confirm whether or not Chase potentially had a systemic problem in performing account reviews on closed accounts, or whether or not there were reasons unique to individual consumers (like Mrs. Duncan) that might make such reviews of credit information permissible or perhaps, due to the very unique history and circumstances of Mrs. Duncan's mortgage loan, this was the reason for the problem we were seeing on her reports.   I was in a very good position to conduct this investigation for the following reason: one of my primary areas of practice is bankruptcy law, and more than 50% of my cases are consumer bankruptcy cases.   Over the years, I have represented more than 3,200 individuals who have filed for bankruptcy relief.   It is standard practice in my office to require all bankruptcy clients to obtain their credit reports from all three of the major credit reporting agencies (i.e. Experian, TransUnion and Equifax).   This is done, in part, to ensure that our clients meet their obligation to list all of their creditors in their bankruptcy schedules (*see* 11 U.S.C. §521(a)(1)(A)).   Therefore, I have access to hundreds of such credit reports as part of the work product from my bankruptcy client files.   After being advised of Ms. Duncan's mortgage account history and what was being seen on her credit reports, I reviewed hundreds of credit reports from current and former clients' bankruptcy files for the years' 2008 through 2014.   I also interviewed a number of my clients to determine if the individual circumstances of their mortgage or other Chase installment loan accounts could offer a legitimate explanation for the account reviews.   The focus of my investigation was to determine if Defendant potentially had a systemic problem on various "closed-account" scenario cases such as bankruptcy discharged accounts, foreclosure accounts, repossession accounts (for auto loan), and/or paid off accounts.   As part of my investigation, I also performed legal research concerning mortgage servicing issues to determine what permissible purpose a loan servicer might have in conducting account reviews.   Further, I updated my prior extensive research into case law and regulatory authority covering this issue, as well as consulting with an expert on technical information concerning system design.   All of these actions laid the groundwork for setting up the claim in this case, and for providing Class Counsel a sufficient factual framework to be able to discuss the claim from a real-world "cause and effect" type of analysis.

### *Case discovery:*

17.     Class counsel served extensive written discovery to Chase including Rule 26 Disclosures, Interrogatories, Requests for Production and Requests for Admissions, and reviewed hundreds of pages of documents provided by Chase in connection with the discovery conducted in the case. The investigation and discovery performed in this case was much more than adequate to understand the claims asserted herein and to evaluate the merits of the parties' competing positions. Further, the information obtained served as the basis for a well-reasoned judgment about the desirability of settling the case under the terms proposed in this Settlement.

18.     As noted above, this case represents the fourth FCRA consumer class action case that I have handled involving a "soft pull" impermissible access claim.  Therefore, this is also the fourth case that I have either taken or attended the deposition of a defendant's 30(b)(6) corporate representative concerning said defendant's account review system.  This is also the fourth case in which I have reviewed confidential documents provided by a defendant under a protective order concerning the design and execution of such a system.  Further, because I was co-lead class counsel in the *Sleezer* case, I acquired a great deal of specific knowledge on the design, operation, execution and limitations of Chase's account review system as it existed in 2008, and for a certain period of time leading up to 2008.  I obtained specific knowledge in reviewing all of the documents produced, formulating questions for Chase's 30(b)(6) representative and attending a lengthy deposition which was conducted in Wilmington, Delaware in April 2008.  My experience in the *Sleezer* case was also particularly helpful in focusing the investigation in this case.  We were able to anticipate the defenses that Chase would raise in this case, both on the merits and in opposition to class certification, because Chase had filed a motion for partial summary judgment and stated its positions regarding class certification in the *Sleezer* case.  Furthermore, during the course of the current litigation, the Parties exchanged additional information to support and elaborate each side's legal and factual positions, and Class Counsel advised Chase's counsel that this would be necessary prior to engaging in any settlement discussions in the case.  Thus, when we mediated the dispute with Chase, we had the information needed to advise and assist Ms. Duncan on making a well-informed decision on settlement of the case.  Finally, after the mediation, we obtained confirmatory discovery to confirm certain facts upon which the settlement was made, including the processes by which Chase identified the class members who had been the subject of the challenged account reviews.  This was essential to obtaining a great settlement for the Class in this case, as Class-Counsel were able to use the information obtained in this case, along with the information obtained in the *Sleezer* case, to determine the merits of the claim and evaluate and execute a successful negotiation of the settlement in this case.

19.     In light of the forgoing, my co-counsel and I were able to enter into settlement negotiations in this case with a substantial factual basis on which to premise settlement.  Therefore, we were able to fully protect the interests of the class based upon the information obtained in this case, and the extensive knowledge gained in other cases involving the identical claim and even the same Defendant.

### F.     The Opinions of Counsel and the Class Members Favor Settlement

20.     I have researched prior settlements of similar FCRA class action cases.  Attached hereto as Exhibit "3-C" is a chart which summarizes the results achieved in those cases, compared to the results achieved in the present case.  Based upon my review of similar cases filed across the country, prior to the *King* case noted above, all of the settlements in class action cases involving the "soft pull" account review claim asserted herein settled without a common fund and for relief which included short term credit monitoring services, credit scores, or some "coupon-type" relief.  *See, e.g.*, *Keener v Sears Roebuck & Co., et.al.*, 03-1265 (C.D. Cal) (coupon for Sears store products); *Perry v. FleetBoston Corp.*, 229 F.R.D. 105, 111 (E.D. Pa. 2005) (two credit scores); *Nienaber v. Citibank*, No. Civ. 04-4054 (S.D.) (6 mos. credit monitoring); *Barel v. Bank of America*, 255 F.R.D. 393 (E.D.Pa. 2009) (4 mos. of "Privacy Assist Premier," a credit report monitoring service); *Sleezer, et. al. v. Chase Manhattan Bank USA, N.A., et. al.*, Civil Action No. 5:07-cv-961-HLH (W.D. Tex.) (6 mos. credit monitoring).  As a result, very few class members bothered to seek the relief obtained in those settlements.  *See id.*  Based upon my research, the *King* case was the first FCRA impermissible access account

review case that was settled with the creation of a common fund from which class members could seek a settlement payment. Attorney Benjamin Bingham and I were class counsel in the *King* case. Because of the low interest and lack of participation by class members in the prior cases, Mr. Bingham and I set out to negotiate a settlement that provided for better notice and creation of a common fund (i.e. actual cash payments to class members), as we believed this would increase the participation rate from the class. There were 7,349 Class members in the *King* case with a total common settlement fund of $500,000.00, and the final claims rate was 9.1% - far greater than any other prior FCRA impermissible access class action case. Because of our experience in *King*, we set out to negotiate a settlement in the present case that also included excellent notice (i.e. actual mailed notice to all class members, with address updating) and establishment of a common fund from which class members could receive a cash payment. We were successful in negotiating such a settlement, and did so notwithstanding the grant of certiorari in the *Spokeo* case

21.    Throughout the claim period in this case, my co-counsel and I have received periodic reports from the Court-approved settlement administrator, Kurtzman Carson Consultants LLC ("KCC"), concerning the status of claims filing and other matters. In the latest report, KCC reports that there were a total of 472,167 claims timely filed in this case. This means that the total claims participation rate is over 22% - more than double the rate in *King*. Based upon my review of similar cases, this is by far the highest claims rate of any FCRA account review class action case in the history of the FCRA. Also, as shown in the attached summary of settlements of similar class action cases, the $8,750,000 cash component of the Settlement is far greater than any other account review settlement in the 45- year history of the FCRA. *See* Exh. 3-C.

22.    In addition, the true value of the settlement is greater than the fund created because Chase has agreed to implement procedures to ensure that it does not conduct account reviews with credit reporting agencies for individuals who no longer owe Chase any money, retain no interest in any property securing a debt owed to Chase, and have no other account with Chase. [Settlement Agreement, Doc. 28-1, Para. 37]. As noted by Mr. Evan Hendricks in his attached expert Declaration (Exh. 6 submitted herewith), the settlement also affords benefits with a conservative estimated value of $2.2 million based upon the education class members receive from being notified about the alleged impermissible access to their credit reports, and another $11 million based upon changes in Chase's practices and procedures followed by three years of audits to ensure compliance. Thus, the total value of the settlement is close to $22 million.

23.    Finally, as part of the Settlement that was negotiated, the benefits from the settlement will be realized for the Class, assuming the Court approves the settlement, no matter what the final outcome in *Spokeo, Inc. v. Robins*, now pending before the Supreme Court. This is because Class Counsel negotiated a provision which is Paragraph 110 of the Settlement Agreement that provides that the agreement will be binding on the parties even if an adverse ruling in the *Spokeo* case occurs.

24.    Since the initial class notice was mailed to over 2 million people on December 18, 2015, my office has received hundreds of telephone calls from class members. In my opinion, the level of class member interest in this case has been intense and unexpected. Most of the

telephone calls from Class Members have concerned matters unrelated to this case, as most Class Members who have called have wanted to discuss problems with their mortgage loans that are entirely unrelated to the claim at issue in this case.  However, those callers who were willing to listen to what we had to say about the nature of the claim involved in this case were supportive of the settlement and happy that someone had brought the case.

25.    In my opinion, the settlement reached in this case was fair, reasonable, and adequate and I endorse the settlement as an excellent result for the Settlement Class.  I base this opinion on: (A). my experience with other FCRA account review cases, other FCRA cases, and other statutory "no damage" class action cases; (B). the knowledge gained through my involvement in the prior *Sleezer* case involving the same claim against Chase; (C). the content of the information and discovery obtained from Chase in this case; (D). the opinions of Evan Hendricks, the privacy and FCRA expert retained in this case; (E). my participation in the negotiations occurring in the full-day mediation with a highly regarded and experienced mediator; (F). my office's conversation with Class Members who have called the office; and (G). the exceedingly high claims participation rate which occurred in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of April, 2016.

_____

H. Anthony Hervol

# EXHIBIT "3-A"

My Account | Contact Us                                Back to Equifax.com



| Products | FAQs | Resources | Member Center |
|---|---|---|---|

Home › Reports › General Information › Credit File Inquiries

## Frequently Asked Questions

| account review | Go |
|---|---|

Advanced Search

**Reports**
  Disputes
  Free Report
  Freeze a Report
  General Information
  Lock A Report
  Share a Report
**Scores**
  General Information
**Debt**
  General Information
  Alert Notifications
**Alerts**
  General Information
  Report
  Score
  Monitoring
**Policies/Rights**
**Contact Us**

# Credit File Inquiries

### What if I do not recognize an inquiry on my Equifax credit file?

Inquiries contain information about companies that have requested and/or viewed your credit report information typically within the last two years.  As you review inquiries on your Equifax credit file, consider the following:

- A third party may access your Equifax credit file to assist in the underwriting of your request for credit. This is often the case when you request a retail store credit **account**, or when you apply for some mortgage products;
- If you apply to have certain services, such as utilities (gas, electricity, water, etc.), phone service, or home security, your application, whether verbal or in writing, generally allows the company to make a credit inquiry; and
- A signed application or an affirmative consent to pull credit is not required for a company to pull credit if you have indicated you are applying for credit (This does not apply to Vermont residents, who must provide affirmative consent).

Additionally, there are inquiries that only you can see on your Equifax credit file and that do not impact your credit score.  The following are examples:

- An **account review** inquiry by a company with which you have a loan/credit **account**;
- A collection inquiry by a company with whom you do business or a company that has purchased your **account** or been assigned the collection of your **account**;
- An inquiry by a company for the purposes of investing in a loan portfolio or purchasing your **account** or the servicing of it; and
- A promotional inquiry by a company, but only if they find you qualify for, and you are made,  a firm offer of credit or insurance.

Updated 06/30/2015 09:56 PM
Answer ID 1244

✉ Email this page
🖨 Print this page

**Can't find what you are looking for?**

Ask a Question ▸

Chat ▸

‹ Go Back to Search Results

ORACLE

©2016 Equifax, Inc., All rights reserved     Privacy Policy | Security | Terms of Use | FCRA Summary of Rights | Ad Choices
Equifax and the Equifax marks used herein are registered trademarks of Equifax, Inc. Other product and company names mentioned herein are property of their respective owners.



Home    Careers    Contact Us     Canada: English  |  Français

**Personal** | **Business** | **About TransUnion**

Credit Report    Credit Disputes    Fraud & Identity Theft    **Consumer Support**

Contact Us

**FAQs**
- Disputes
- Fraud
- General
- **Score**
- Web/Technical Related

# Score

- What is a Credit Score?
- Once my credit report is updated, how long before my score is updated?
- Does every inquiry affect my score?
- How is the TransUnion Personal Score Calculated?
- I corrected things on my credit report and my score went down. Can you explain.
- What is a good score to get?
- Will I be penalized for shopping around for the best interest rate?
- Do credit lenders use the TransUnion Credit Score?
- Why don't I have a Personal Credit Score?
- How can the TransUnion Personal Credit Score help me?
- Can I use the TransUnion Personal Credit Score to apply for credit?
- What is a factor description?
- Why do lenders use credit scores?
- Is there just one type of score?
- What are the advantages of credit scores?
- How do inquiries affect my score?

**CONTACT US**

Can't find an answer?

Contact Us



**Q What is a Credit Score?**
**A** A credit score is a statistically derived prediction of an individual's credit risk at a particular point in time. Credit risk is typically defined as the likelihood of an individual becoming seriously delinquent (ie. 3 payments past due or worse) within a 12-24mth period in the future). The score is a three-digit number that lenders use to help them make decisions. A higher score indicates that the individual is a better credit risk to a lender.

It is important to regularly review your own credit score to understand how you may be viewed by lenders and other businesses when submitting applications for credit products and services. Get UNLIMITED access to your Credit Score now at www.creditprofile.transunion.ca

A credit score is:

   An objective summary of the information contained in your credit report at a particular point in time.
   A number that lenders use to help them decide whether or not to give any given person a loan or credit card and the risks associated to whether or not they can expect to be paid in accordance with the credit agreement.
   An objective and non-biased lending tool used by lenders to provide the consumer with a faster, equitable and more consistent response.
   A number that is made up of 6 main categories of information from your credit report:
     Payment History (maintaining Credit) – What is your track record?
     Amount of credit you owe (total balances) – How much is too much?
     Utilization of credit – How close are your balances to their credit limits?
     Length of time credit established (Credit Experience) – How established is yours?
     Search for an acquisition of new credit (new accounts and inquiries) – Are you taking on more debt?
     Types of credit established (Credit Mix) – Is it a healthy mix?

return to top



**Q Once my credit report is updated, how long before my score is updated?**
**A** Credit scores are calculated when requested by a lender based on the most current information available on your credit file.

return to top



**Q Does every inquiry affect my score?**

**A** No. The only inquiries that would affect your credit score are those initiated by you for specific credit transactions. Also, most scoring models take the appropriate steps to ensure that your score is not lowered because of the multiple inquiries that might occur in a specific time as a result of shopping for the best terms for an auto or home loan. Inquiries have less importance than delinquencies, balances owed and the length of time you have used credit. In general, scores only consider inquiries from the last 12 months. Inquiries are usually more important on your credit score if you have a limited credit history.

Also, the score excludes inquiries when:

-A credit grantor has verified your identity for the purpose of offering you credit.
-A credit grantor with whom you have a business relationship has reviewed your account with them.
-You have received your own personal credit report.

return to top



**Q How is the TransUnion Personal Score Calculated?**
**A** To calculate a score, numerical weights are placed on different aspects of your credit report and a mathematical formula is used to arrive at a final credit score. TransUnion calculates your credit score based on many factors of your credit history and payment behavior. These many factors may include but are not limited to:
 How you are paying your accounts
 How much money you currently owe
 How long your accounts have been open
 What different types of credit you use
 How much credit you use compared to the amount of credit you have available
 How often and how recently you have applied for credit
The credit industry uses various types of credit scores to assess risk for different types of credit. For example, a creditor may use one type of score when assessing risk for a credit card account and another type of score when assessing risk for a mortgage account.

return to top



**Q I corrected things on my credit report and my score went down. Can you explain.**
**A** The effect on your score due to changes made to your TransUnion credit report depends on the nature of the information that was changed, what information is left intact and what other items on your credit report have been updated during the time that the corrections were made.
Some specific reasons why your score may not have improved include:
 Your TransUnion credit report included several negative items and some but not all of them were removed. The presence of one or more negative items may still have an adverse impact on your score.
 Your TransUnion credit report reflects some positive changes but there may have been new updates to your file that offset them such as higher balances reported on accounts, new account openings or new credit inquiries.

return to top



**Q What is a good score to get?**
**A** There are several types of credit scores available. Typically, the higher the score the better. Each lender decides what credit score range it considers to be a good credit risk or a poor credit risk. For this reason, the lender is the best source to explain what your credit score means in relation to the final credit decision. After all, they determine the criteria used to extend credit. The credit score is only one component of information evaluated by lenders.

return to top



**Q Will I be penalized for shopping around for the best interest rate?**
**A** Most scoring models take the appropriate steps to ensure that your score is not lowered because of the multiple inquiries that might occur in a specific time period as a result of shopping for the best terms in an auto or home loan.

return to top



**Q Do credit lenders use the TransUnion Credit Score?**
**A** Currently, there are some lenders that do use the TransUnion score but most credit lenders use their own scoring tools to make a credit decision. While the overall purpose of credit scores is universal, there are numerous score products in the market today that measure different components of an individual's credit worthiness. Each lender will use his or her own criteria to measure an individual's credit worthiness. The only way to find out about how they measure this is to ask the individual credit lender.

return to top



**Q Why don't I have a Personal Credit Score?**
**A** A credit score cannot be calculated because one or more of the following has occurred:
    Your credit report does not contain at least one account
    A remark on one of your accounts references a person who is deceased

return to top



**Q How can the TransUnion Personal Credit Score help me?**
**A** You can use your TransUnion Personal Credit Score to help you learn more about your use of credit and the types of tools lenders are using when making credit decisions. Credit scores are one of the primary tools a lender considers when determining the risks associated to lending to you. Lenders use scores to determine whether or not to grant credit and if so, how much credit and at what rate? Lenders may also access and consider your complete credit report, which can provide further support on a given component of the score that could impact their final decision. However, as most credit decisions are made very quickly, it is the credit score that is most often used.

return to top



**Q Can I use the TransUnion Personal Credit Score to apply for credit?**
**A** Most lenders will access their own scoring tool(s) to assess a consumer's credit worthiness so they may not be interested or ask for the consumer score you have obtained online. However, you can use the TransUnion Personal Credit Score to gauge your credit worthiness for future credit applications and needs.

return to top



**Q What is a factor description?**
**A** A factor description explains the top reason(s) why your score was calculated as it was. When you receive your TransUnion Personal Credit Score, up to four "factor descriptions" are also delivered.

return to top



**Q Why do lenders use credit scores?**
**A** Lenders use credit scores because it provides a fast and objective measurement in determining the risk associated to lending money.
As a result of using credit scores:
    People acquire credit faster
    Credit decisions are far more equitable

return to top



**Q Is there just one type of score?**
**A** No, there are literally thousands of score models used in the credit industry that consider different variables for different types of credit.

return to top



**Q What are the advantages of credit scores?**
**A** When examining an applicant's credit report, many lenders find it valuable to have a

numeric score based on the credit report itself. Credit scores can give lenders a fast, objective and impartial snapshot of a credit report and can be a helpful tool in making loan approval decisions. As credit granting processes become more efficient, customers can more quickly gain access to the credit they need.

return to top



**Q How do inquiries affect my score?**

**A** A common misconception is that every inquiry decreases your credit score a certain number of points. This is not true. While an inquiry is recorded on your personal credit report every time you, one of your creditors or a potential creditor obtains your credit report, the presence of inquiries has only a small impact on your credit score and certain types of inquiries (your inquiry to your file and account review inquiries) have absolutely no impact.

Inquiries have less importance than delinquencies, balances owed and the length of time you have used credit. In general, scores only consider inquiries from the last 12 months. Inquiries are usually more important on your credit score if you have a limited credit history.

return to top

**NEXT STEPS:**

Can't find an answer?
Contact us

©2007-2015 TransUnion. All rights reserved.    |    Site Map    Privacy Policy    Terms of Use    Accessibility    Become an Affiliate

- Experian.com
- Personal
- Business
- Small Business
- About Experian
- Consumer Assistance

- United States
- Global Sites



- Member Sign In

- Browse Categories
- What can we help you fin    Search

Search
What can we help you fin    Search
Home
Ask Experian

- Report Advice
- Score Advice
- Fraud and ID Theft
- Life Events

Credit Education

- Audio Library
- Credit 101 Videos
- CreditScope
- Financial Life Stages
- Identity Theft and Credit Fraud
- Report Basics
- Score Basics

Live Credit Smart

- State of Credit

Community

- Connect with Us

Consumer Assistance

- [Disputes](#)
- [Fraud Alert](#)
- [Security Freeze](#)
- [Denied Credit](#)
- [Free Annual Credit Report](#)
- [Contact Us](#)

[Home](#) » [Ask Experian](#) » [Report Advice](#) » "Requests viewed only by you" do not affect credit scores

Jul
08
2015

# "Requests viewed only by you" do not affect credit scores

Posted by [experian.team](#) under [Report Advice](#), [Score Advice](#)



*Dear Experian,*

*On my credit report in the section "Requests for your credit history summary," there is a "Requests viewed only by you" section. One creditor has about 62 requests in the past two years, and I don't have an account with them. Does this affect my credit score every time they check my credit? Or, is this just for their records to send me offers and does not affect me? I did not apply for a credit card from them ever.*

*- JYG*

Dear JYG,

"Requests viewed only by you" are inquiries that are shown only to you on your personal credit report. They do not affect lending decisions or credit scores. For that reason they are sometimes called

"soft inquiries." The inquiries are provided so that you have a complete record of who has accessed your credit report.

Soft inquiries may be added for several reasons. The most common is to make a prescreened credit offer, which is what happened in your example. It's not uncommon to see many inquiries for that purpose, especially if you have a strong credit history and would be evaluated as a preferred new customer.

Your existing creditors may also review your credit report periodically as part of a regular account review. Requesting your own report and reports obtained for employment or insurance purposes also result in soft inquiries.

Thanks for asking.

**The "Ask Experian" team**

- Share

Tags: inquiries, inquiry, preapproved offer, prescreened offer

Categories: Report Advice, Score Advice

## Ask Experian

- Report AdviceWhat you need to know about this crucial financial document
- Score AdviceInformation to help you get the credit scores you need to qualify for the credit you want
- Fraud and ID TheftInformation to help you prevent, identify and recover from fraud and ID theft
- Life EventsInformation to help ensure success as you experience important life events.

Subscribe to Ask Experian

## Have a question?

E-mail Address
Please enter a valid email address.
City
State
Please enter your city.
Please select your state.

Question
Please enter a question.
Your privacy and the information collected here.
Submit

**Thank you for writing to Experian**

Thank you for submitting your question to Ask Experian, credit advice column.

If you would like to search for a particular topic within the Ask Experian columns, please use the search at the top.

**The Ask Experian Team**

## Tags

authorized user   bad debt   bankruptcy   building credit   chapter 7   charge off   closing accounts   collection   collection agency   cosigner   credit   credit card   credit report content   credit report facts   credit score   credit score facts   credit scores   debt   declined credit   delete   delinquency   dispute   divorce   establishing credit   FICO   fraud   fraud alert   fraud and identity theft   freeze   good credit   identity theft   improve credit   inquiries   inquiry   joint   judgment   life events   mortgage   original delinquency date   public record   repossession   score   score factors   security alert   settled

**Our policies for Ask Experian:**

The information contained in Ask Experian is for educational purposes only and is not legal advice. You should consult your own attorney or seek specific advice from a legal professional regarding your particular situation. Please understand that Experian policies change over time. Posts reflect Experian policy at the time of writing. While maintained for your information, archived posts may not reflect current Experian policy. The Ask Experian team cannot respond to each question individually. However, if your question is of interest to a wide audience of consumers, the Experian team will include it in a future post.

- **Ask Experian**
- Report Advice
- Score Advice
- Fraud and ID Theft
- Life Events

- **Credit Education**
- Audio Library
- Credit 101 Videos
- CreditScope
- Financial Life Stages
- Identity Theft and Credit Fraud
- Report Basics
- Score Basics

- **Consumer Assistance**
- Disputes
- Fraud Alert
- Security Freeze
- Denied Credit
- Free Annual Credit Report
- Contact Us

- **Consumer Products**
- Credit Report
- Credit Score
- 3 Bureau Credit Report and Score
- Credit Monitoring
- Identity Theft Protection
- Member Login and Assistance

- **Live Credit Smart**
- State of Credit

- **Community**
- Connect with Us

- Legal Terms & Conditions
- Privacy Policy
- Press
- Careers
- Investor Relations
- Site Map
- Contact Us

©2015 Experian Information Solutions, Inc. All rights reserved.

Experian and the Experian marks used herein are trademarks or registered trademarks of Experian
Information Solutions, Inc.
Other product and company names mentioned herein are the property of their respective owners.

# EXHIBIT "3-B"

Cart    Log In    Support    Español

## myFICO™

compare our **PRODUCTS**     achieve my **GOALS**     learn about **SCORES**     find my savings & **CREDIT CARDS**     connect with the **COMMUNITY**

**Learn About Scores:**    Credit Basics    Credit Q&A    Calculators & Educators

**Credit scores**

- FICO® Score 8
- Other FICO® Scores
- What's in my score
- Payment history
- Amounts owed
- Credit mix
- New credit
- **What's not in my score**
- How scoring helps me
- Improving my score
- How lenders use scores
- Gardening your credit
- Facts & fallacies

**Credit reports**

- What's in my report
- Credit Checks
- How mistakes are made
- Missing accounts
- Fixing an error
- Investigating
- Fair credit reporting act
- Equal credit opportunity act
- Fair credit billing act
- Fair debt collection practices
- **ID theft**
- **Contacts and resources**
- **Glossary**

# What's not in my FICO Scores

FICO Scores consider a wide range of information on your credit report. However, they do not consider:

- **Your race, color, religion, national origin, sex and marital status.**
  US law prohibits credit scoring from considering these facts, as well as any receipt of public assistance, or the exercise of any consumer right under the Consumer Credit Protection Act.

- **Your age.**
  Other types of scores may consider your age, but FICO Scores don't.

- **Your salary, occupation, title, employer, date employed or employment history.**
  Lenders may consider this information, however, as may other types of scores.

- **Where you live.**

- **Any interest rate being charged on a particular credit card or other account.**

- **Any items reported as child/family support obligations.**

- **Certain types of inquiries (requests for your credit report).**
  Your scores do not count "consumer-initiated" inquiries – requests you have made for your credit report, in order to check it. They also do not count "promotional inquiries" – requests made by lenders in order to make you a "pre-approved" credit offer – or "administrative inquiries" – requests made by lenders to review your account with them. Requests that are marked as coming from employers are not counted either.

- **Any information not found in your credit report.**

- **Any information that is not proven to be predictive of future credit performance.**

- **Whether or not you are participating in a credit counseling of any kind.**

Was this article helpful? **Give us feedback**

**More Credit Basics**

Your FICO® Scores can impact your loan interest rates, terms, approvals and more.

Learn more

### Related Topics

- What's in my FICO score?
- Credit score facts & fallacies
- What factors don't hurt my FICO score?
- How does credit counseling affect my FICO score?
- Some things you might not know about how FICO is calculated
- Income doesn't matter to FICO!

**Advertiser Disclosure**

*Offers from our partners*



See more offers...

**Featured TRAVEL REWARDS cards**

Barclaycard Rewards MasterCard®



CardRatings.com editor ratings‡

Credit Needed: Good/Fair

Apply Now

4/11/2016
Case 5:14-cv-00912-FB Document 57-3 Filed 04/18/16 Page 25 of 27
What's Not in Your Credit Score and How FICO Works | myFICO

**Advertiser Disclosure:** The listings that appear on myFICO are from companies from which myFICO receives compensation, which may impact how and where products appear on myFICO (including, for example, the order in which they appear). myFICO does not review or include all companies or all available products.

‡ **Credit card ratings:** Editors from CardRatings.com rate credit cards objectively based on the features the credit card offers consumers, the fees and interest rates, and how a credit card compares with other cards in its category. Ratings vary by category, and the same card may receive a certain number of stars in one category and a higher or lower number in another.

The ratings are the expert opinion of the editors from CardRatings.com, and not influenced by any remuneration their website may receive from card issuers.

   **FICO.**

myFICO is the consumer division of FICO. Since its introduction over 25 years ago, FICO® Scores have become a global standard for measuring credit risk in the banking, mortgage, credit card, auto and retail industries. 90 of the top 100 largest U.S. financial institutions use FICO Scores to make consumer credit decisions.

>> About myFICO





**CONNECT WITH US**      **SUBSCRIBE TO myFICO EMAIL**     submit

**POPULAR LINKS**

Credit scores | Credit reports | myFICO Blog | Affiliates | myFICO mobile

Copyright ©2001-2016 Fair Isaac Corporation.  All rights reserved.  | Terms of Use  | Privacy Policy  | Sitemap

**IMPORTANT INFORMATION:** All FICO® Score products made available on myFICO.com include a FICO® Score 8, along with additional FICO® Score versions. Your lender or insurer may use a different FICO® Score than the versions you receive from myFICO, or another type of credit score altogether.  Learn more

FICO, myFICO, Score Watch, The score lenders use, and The Score That Matters are trademarks or registered trademarks of Fair Isaac Corporation. Equifax Credit Report is a trademark of Equifax, Inc. and its affiliated companies. Many factors affect your FICO Scores and the interest rates you may receive. Fair Isaac is not a credit repair organization as defined under federal or state law, including the Credit Repair Organizations Act. Fair Isaac does not provide "credit repair" services or advice or assistance regarding "rebuilding" or "improving" your credit record, credit history or credit rating.
  FTC's website on credit.

# EXHIBIT "3-C"

### Comparison of "Soft-pull" Impermissible Access FCRA Class Action Settlements

| Case Name | Class Size | Notice Method | Relief Obtained for Class Members | # of Claims Filed / Opt-outs / Objections | Claims rate (%) |
|---|---|---|---|---|---|
| *Perry v. Fleet Boston Fin'l Corp., 229 F.R.D. 105 (E.D. Pa. 2005)* | 90,534 | Direct Mail & Publication | 2 credit reports and 2 credit scores ($31 value);  Defendant will take all reasonable efforts to ensure FCRA compliance on post-bankruptcy account reviews for one year | Not known (claims period ran after final approval order) / 70 / 0 | Unknown |
| *Nienaber v. Citibank (SD), N.A., 04-cv-4054, 2006 WL 2850535 (D. S.D. Sept. 29, 2006.)* | At least 1 million (est.) | Publication only | 6 mos. credit monitoring ($42 value) | 0 / 0 / 1 | 0% |
| *Keener v. Sears, 03-cv-01265 (C.D. Cal. 2006)* | 2.3 million (est.) | Publication only | Choice between $10 coupon for use at any Sears retail store for any purchase of $25 or more, or $15 coupon for any purchase of $100 or more | 0 / 0 / 0 | 0% |
| *Barel v. Bank of America, N.A., 255 F.R.D. 393 (E.D. Pa. 2009)* | 27,350 | Direct mail & Publication | 4 mos. credit monitoring ($52 value) | Not known (claims period ran after final approval order) / 139 / 0 | Unknown |
| *Sleezer v. Chase Bank USA, N.A., 07-cv-0961-HH (W.D. Tex. 2009)* | 1 million (est.) | Publication only | 6 mos. credit monitoring ($72 value) | 2 / 0 / 1 | .000002% |
| *King v. United SA FCU, 09-cv-0937-NN (W.D. Tex. 2010)* | 7,349 | Direct Mail | $500,000 common fund (each class member filing a claim would receive up to $100 and an optional credit score ($15)); change of practice/injunction to not conduct account reviews on closed accounts with no balance owing plus procedures to monitor. | 669 / 20 / 0 | 9.1% |
| *Duncan v. Chase, 14-cv-00912-FB-JWP (W.D. Tex. 2016)* | 2.1 – 2.2 million | Direct mail & Publication | Pro rata share of $8,750,000 common fund + annual audits for 3 years to ensure account reviews exclude customers with no Chase account and no property secured by debt owed to Chase | 472,167 / 173 / 8 | 22% |