# EXHIBIT "4"
## Declaration of Benjamin R. Bingham

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| EVA MARISOL DUNCAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 5:14-cv-00912 |
| | § | |
| JPMORGAN CHASE BANK, N.A., | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## DECLARATION OF BENJAMIN R. BINGHAM

I, Benjamin R. ("Ben") Bingham, declare under penalty of perjury:

1. I am over 18 years of age and I am competent to make this Declaration. The facts stated in this Declaration are within my personal knowledge or on information and belief or opinion as stated or indicated by the context, and are true and correct. I submit this Declaration in support of the Motion for Final Approval submitted herewith in this case ("Motion"). This Declaration supplements the two declarations that I have previously made in this case, Doc. 28-2, Ex. D (made in support of preliminary approval of the proposed settlement) and Doc. 32, Ex. 3 (made in support of Class Representative's Service Award and Class Counsels' fee and expense award).

2. In this case, I have acted as an attorney of record for Plaintiff Eva Marisol Duncan and as one of the Court appointed Class Counsel for the Settlement Class. I have been class counsel or co-class counsel in over 25 class actions in the past 15 years or so. Many of those have been "no damage" class actions brought under the Fair Credit Reporting Act ("FCRA"), the Fair Debt Collection Practices Act ("FDCPA"), and the Telephone Consumer Protection Act ("TCPA").

3. In support of approval of the proposed settlement I testify herein about the "*Reed* factors" and other matters.

4. First, the settlement is not the product of fraud or collusion. The settlement was reached in arm's length negotiations with the assistance of a mediator experienced in consumer class actions, the Honorable Magistrate Judge Edward Infante (Ret.), followed by three months of continued information exchanges and negotiations.

5. With respect to the second *Reed* factor, the probability of success on the merits at the trial court level, in my opinion, was low. As set out in the briefing submitted herewith, the case law makes it very difficult to obtain statutory damages, and injunctive relief is not available in the Fifth Circuit in FCRA suits.

6. With respect to the range of possible recovery in this case, if we could prove willful conduct on the part of Chase and secure class certification, the range is quite high, 220 million to 2.2 billion dollars. However, under the "objectively unreasonable" standard currently applied to FCRA cases, it made no matter that Chase had once before been sued for the exact same FCRA violation. The willfulness issue is not about Chase's subjective behavior; it is whether the behavior is objectively unreasonable. The only court of appeals case to examine the issue of accounts reviews on closed accounts, the *Levine* case in the Eleventh Circuit held that it is not objectively unreasonable to interpret the FCRA as allowing account reviews on closed accounts. *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314 (11th Cir. 2009). From review of the docket sheet in the *Levine* case, it appears to have been vigorously litigated and was filed by excellent lawyers at big class actions firms, including the James, Hoyer, et al law firm, the same firm that was lead class counsel in the *De Hoyos v. Allstate* case here in San Antonio, and cited throughout the briefing. Therefore, in this case, unless we could change the standard for measuring willfulness, the range of recovery is irrelevant.

7. As to the fourth *Reed* factor, the case is obviously complex and any litigated result would probably involve several appeals before the case is concluded. If the class were certified (and no "account review" case has ever been certified when contested) Chase would undoubtedly pursue an interlocutory appeal. If the certification ruling would survive the Fifth Circuit's review, Chase would then file a motion for summary judgment. If summary judgment were granted, Plaintiff would appeal. If summary judgment were denied and a trial ensued, the losing party would then appeal. If Plaintiff won a $220 million or $2.2 billion award in this case where no actual damages are alleged, any appeal would implicate due process concerns, complicating an appeal even further. In short, absent settlement, this case could go on for a very long time for the parties, and the courts. For example, in a similar case against American Express, as Plaintiff's counsel, Mr. Hervol and I litigated for 3 years, only to lose at the class certification stage. *Watts v. American Express*, 1:08-cv-01970-MSK-MJW (D. Colo.) (Docs. 81, 86, 92).

8. This case settled reasonably early; the final settlement agreement was signed about 11 months after the case was filed. Little formal discovery occurred, but the many of the material facts were not contested. Chase did not, and could not, deny that it systematically conducted account reviews on certain closed accounts. Informal discovery revealed which of those accounts were subject to the challenged account reviews, and those accounts are the subject of the class definition in this case. Chase did argue that the facts of some of the different particular circumstances of the account reviews precluded class certification, but those were not contested facts for which discovery was needed; they were facts that might affect the legal issues involved in the case. Mr. Hervol had already served as class counsel in the exact same kind of case filed in this district in 2007 and settled in 2009, the *Sleezer v. Chase Bank USA* case. I was initially involved in that case too, and was able to stay informed about it. In that case, there was

substantial formal discovery, including deposition of the Chase representative. That gave Mr. Hervol not only detailed knowledge of some of Chase's procedures concerning account reviews, but also enabled us, in this case, to propound very specific and targeted discovery. Further, after the mediation and months of continued negotiations, Plaintiff took the deposition of Chase's corporate representative. Again, we were able to be very specific in our questioning, and were able to confirm many aspects of the composition of the class.

9. Regarding the final *Reed* factor, the opinion of class counsel, I know that this is a very good settlement that I am very proud of. First and foremost, in my opinion (and the opinion of many class members with whom I have spoken with over the last 4 months) is the fact that Chase has agreed to conduct annual audits to make sure it is not pulling credit reports of consumers who no longer have a credit relationship with Chase. It is true that class members are not actually injured in a way that would be cognizable in the Fifth Circuit, but it may be highly offensive to know that a former creditor is still pulling and reviewing your credit report. The example that we use in depositions is that accessing one's credit report is like a stranger looking into the contents of one's purse or wallet. A person may not be hurt by a stranger looking at his or her wallet or purse, but the invasion of privacy may pass a personal boundary that we all have. When it is a credit report instead of a wallet, it is impermissible under the FCRA. For many (or most) of the class members, their relationship with Chase ended in a bankruptcy, foreclosure, or both, but which left them not owing money to Chase. To have Chase then pulling their credit report, which contains their most private personal and financial information, may have added insult to injury. To know that Chase will audit its business practices to attempt to prevent further alleged privacy breaches provides to class members comfort, and many have expressed to me that the privacy granted by this settlement means more to them than the money. But there is

money in this case. This is by far the largest "account review" settlement in FCRA history, and only the second to have a common fund for class members; the first was prosecuted by Mr. Hervol and me in this district, the *King vs. United SA Federal Credit Union* case over which Magistrate Nowak presided, and which is cited in the briefing. Of any type of FCRA class settlement, this is among the biggest cases in terms of monetary relief.

10. As stated in my Declaration submitted in connection with the motion for preliminary approval, the participation rate (or "claim rate") in statutory damage TCPA class action cases in several judicial circuits surveyed is empirically proven to average about 5.4%. (Doc.28-2, Ex. D ¶13). In this case, we wanted to exceed the typical 5% claim rate. We made it easy to file claims by simply returning a tear-off portion of the postcard notice, with no additional proof of anything and postage prepaid. We hoped to increase the number of claims over 105,000, which is about 5% of the class and reach around a 10% claim rate. We did. More than 472,000 claims (22.28% of class) were filed. Even with the returnable postcard, more than 106,000 claims were filed electronically online. This is extraordinary and never in my experience seen or heard of. I've seen or heard of cases getting over a 10% rate, sometime up to 13%, but never 22%. I attribute the high claims rate to the facts that about 94% of the class members were successfully mailed notice (which is probably much higher than average), the notice was understandable to class members, and it was very simple to make a claim by returning the post-card notice or filing online.

11. Given the specific facts of this case, this settlement is fair, reasonable and adequate and I urge that it be approved.

_____  April 13, 2016
Ben Bingham