UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

EVA MARISOL DUNCAN,          *
                            *
            Plaintiff,       *
                            *
v.                           *   CIVIL NO. SA-14-CA-00912-FB
                            *
JPMORGAN CHASE BANK, N.A.,    *
                            *
            Defendant.       *
                            *

<u>MEMORANDUM AND RECOMMENDATION</u>

Pursuant to Federal Rules of Civil Procedure 23(h)(1) and 54(d)(2), plaintiff has filed the following: Unopposed Motion for Approval of Service Award to the Class Representative and for Approval Award of Class Counsels' Attorneys' Fees and Expenses (docket no. 32)[1]; and Unopposed Motion for Approval of Cy Pres Designations (docket no. 33). Additionally, plaintiff has filed a Motion for Final Approval of Class Action Settlement with Brief Incorporated (docket nos. 57 and 65), and most recently, an Unopposed Motion for Leave to File Sur-Reply (docket no. 83). On April 27, 2016, a Fairness Hearing was held and all parties, including two objectors, appeared.

Based on the pleadings, the objections, the parties' arguments at the Fairness Hearing, the remainder of the record, and the relevant law, this Court reviewed its preliminary certification of the settlement class and recommends: (1)

---

[1]Plaintiff has also submitted a supplement entitled, "Declarations Regarding Attorneys' Fees and Expenses". (Docket no. 75).

approval of the proposed settlement; (2) approval of the attorneys' fees as modified; (3) approval of the costs; (4) approval of the proposed service award to Eva Marisol Duncan in the amount of $10,000.00; and (5) approval of the cy pres designation. (Docket nos. 32 and 33). Additionally, plaintiff's Unopposed Motion for Leave to File Sur-Reply is **GRANTED** (docket no. 83), and the undersigned recommends that plaintiff's Motion for Final Approval of Class Action Settlement be **GRANTED** (docket no. 57) provided this Court's recommendation as to attorney's fees is adopted.

## Background

Plaintiff, Eva Marisol Duncan, brought this suit under the Fair Credit Reporting Act ("FCRA") against JP Morgan Chase Bank, N.A. ("Chase"), alleging that Chase lacked a permissible purpose to obtain her credit report after foreclosure proceedings were executed against the property securing her mortgage. **15 U.S.C. § 1681b.** Although plaintiff did not allege any actual injury since Chase's credit pulls were not visible to other creditors and had no effect on her credit score, she maintained that Chase's conduct was a "willful" violation of the statute, entitling her to statutory damages pursuant to **15 U.S.C. § 1681n.** Plaintiff brings this suit on behalf of herself and other Chase customers she claims "no longer ha[d] accounts" with

the bank when their credit reports were pulled, seeking statutory damages as to each putative class member.

Approximately six months after suit was filed, the parties filed a Joint ADR Report and moved to stay the case to pursue mediation. (Docket no. 14). The case was subsequently mediated on June 8, 2015, before the Honorable Magistrate Judge Edward A. Infante (Ret.), who has served as mediator in a number of consumer class actions. Following extensive negotiations, the parties agreed to settle the case. However, the parties engaged in additional negotiations and discovery, including the deposition of Chase's corporate representative in Dallas. Almost one year after this suit was initiated, the parties filed their Motion for (1) Preliminary Approval of the Terms of the Proposed Settlement, (2) Conditional Certification of a Settlement Class, and (3) Approval of Proposed Notice to the Class (docket no. 28), which the Court granted on October 21, 2015 (docket no. 29). The Fairness Hearing was held on April 27, 2016, at which time the parties and counsel appeared, as did two objectors. (Docket no. 70). Out of time objections were filed on April 19, 2016 (docket nos. 59 and 64), April 23, 2016 (docket nos. 74 and 77), April 26, 2016 (docket no. 72), and April 28, 2016 (docket no. 76), which have not been considered.

As set forth in the Order Preliminarily Approving Settlement, the following issues remain to be considered following the hearing:

(1)  the merits of any objections to the Settlement;

(2)  whether to grant final approval of the Settlement Agreement pursuant to Rule 23(e) as fair, reasonable, adequate and in the best interests of the Class and to authorize all acts necessary to consummate and effectuate the terms and conditions of the Settlement Agreement;

(3)  whether the Court should enter a Final Judgment approving the settlement and dismissing the Action with prejudice;

(4)  whether to grant attorneys' fees and expenses and a service award for Plaintiff; and

(5)  whether other related matters pertinent to the preliminary approval of the Settlement should also be approved.

(Docket no. 29, pgs. 2-3).

### I.   Class Certification

Prior to this Court's determination of the class certification issue, the parties reached the proposed settlement and Chase agreed to class certification for settlement purposes only.  Plaintiff and Chase jointly moved for an order from this Court conditionally certifying the settlement class, which was granted on October 21, 2015. (Order Preliminarily Approving Settlement, docket no. 29).  Despite the conditional class certification, this Court has previously recognized that "courts employing settlement classes must still make findings that the

4

class complies with Rule 23(a) and the appropriate parts of Rule 23(b), and the failure to do so is 'a plain error of law, and hence an abuse of discretion, requiring the certification be set aside.'" *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D.Tex. 2007)(*quoting* **In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.**, 55 F.3d 768, 800 (3d Cir.1995)). Accordingly, the Court considers the prerequisites for class action certification notwithstanding the fact that conditional class certification was previously granted. *See DeHoyos*, 240 F.R.D. at 279 (*citing* **Garza v. Sporting Goods Properties, Inc.**, No. CIV. A. SA-93-CA-108, 1996 WL 56247, at *3-6 (W.D.Tex. Feb.6,1996)(discussing class certification prerequisites)).

**A. Rule 23(a)**

"A class may be certified if all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met and one or more of the provisions of Rule 23(b) is satisfied." *Id.* (*citing* **Garza**, 1996 WL 56247, at *3 (internal quotation omitted)). A district court is given wide discretion in deciding whether to certify a class. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471-72 (5th Cir. 1986).

Rule 23(a) provides:

One or more members of a class [action] may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the

representative parties are typical of the claims or
defenses of the class, and (4) the representative parties
will fairly and adequately protect the interests of the
class.

*DeHoyos*, 240 F.R.D. at 279(*quoting* **FED.R.CIV.P. 23(a)**).

### 1. Numerosity

Rule 23 (a)(1) requires that the class be so numerous that
joinder of all members is impracticable.  **FED.R.CIV.P. 23(a)(1)**.
The numerosity requirement is satisfied in the present case as
there are approximately 2.2 million class members nationwide.
(Docket no. 28, Appx. 2, exh. C, Declaration of H. Anthony
Hervol, ¶6).  *See Zeidman v. J. Ray McDermott & Co.*, 651 F.2d
1030, 1038 (5th Cir. 1981)(noting that classes with as few as
twenty-five or thirty members have been certified).

### 2. Commonality

Rule 23(a)(2) also requires that there be at least one
factual or legal issue common to all or substantially all of the
class members.  **FED.R.CIV.P. 23(a)(2)**; *DeHoyos*, 240 F.R.D. at
280(*citing* **Lightbourn v. County of El Paso**, 118 F.3d 421, 426
(5th Cir.1997)).  "The commonality test is met when there is at
least one issue whose resolution will affect all or a
significant number of the putative class members." *DeHoyos*, 240
F.R.D. at 280(*quoting* **Forbush v. J.C. Penney Co.**, 994 F.2d 1101,
1106 (5th Cir.1993)(internal quotation omitted)); *see also San
Antonio Hispanic Police Officers' Org., Inc. v. City of San*

6

*Antonio*, 188 F.R.D. 433, 442 (W.D.Tex. 1999)(determining that "[a]s long as class members are allegedly affected by a defendant's general policy, and the general policy is the crux or focus of the litigation, the commonality prerequisite is satisfied").   Because Chase's practice of using automated criteria to conduct account review inquiries impacts all class members and Chase's general policy is the focus of this litigation, the commonality requirement has been met.

### 3. Typicality

Rule 23(a)(3) further requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."   **FED.R.CIV.P.23(a)(3)**.   Insofar as settlements are concerned, this prerequisite requires "proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement."   *DeHoyos*, 240 F.R.D. at 282(*quoting* **Jenkins**, 782 F.2d at 472).   A complete identity of claims is not required; as long as the claims arise from a similar course of conduct and share the same legal theory, factual differences will not otherwise defeat typicality.   **James v. City of Dallas, Tex.**, 254 F.3d 551, 571 (5th Cir. 2001); **see also Jenkins**, 782 F.2d at 472 ("[t]he 'typicality' requirement focuses less on the relative strengths of the named and unnamed

plaintiffs' cases than on the similarity of the legal and remedial theories behind their claims").

Here, plaintiff asserts that Chase conducted a soft pull account review at a time when plaintiff no longer had an active account. Plaintiff makes the same claim on behalf of the class members, and maintains that if this case were to proceed to trial, there is no question that she could establish that Chase conducted soft pull account reviews on millions of former customers who no longer had active accounts with Chase. The dispute would concern whether the account reviews were done with a permissible purpose, and if not, whether Chase willfully violated the statute.

Because Chase's practices adversely affected the plaintiff and the other proposed class members in the same general fashion, the plaintiff's claims are typical of the claims of the entire class and the legal and remedial theories asserted by the class representative are typical of the class itself. *Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 498 (E.D.Pa. 2009)(where "[t]he claims of Mr. Chakejian's and each of the prospective class members arise from the same course of conduct, and are based on the same theory of liability", the requirement of typicality is satisfied).

### 4. Adequacy of Representation

Rule 23(a)(4) also requires that "the representative parties will fairly and adequately protect the interests of the class." **FED.R.CIV.P. 23(a)(4)**. Here, plaintiff must demonstrate "[1] the zeal and competence of the representative[s'] counsel and [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees." *DeHoyos*, 240 F.R.D. at 282 (*citing Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (citations omitted)).

#### a. Qualifications of Counsel

Plaintiff's attorneys are knowledgeable and experienced in class action litigation and in litigation of FCRA claims, and appear to have no conflicts with the class. (Docket no. 57, exh. 3, Hervol's declaration; exh. 4, Bingham's declaration). One Class Counsel successfully litigated a case against Chase's "sister company in which account reviews of closed credit card accounts were at issue." (Id., exh. 2, Declaration of Charles Riley, pg. 2, ¶ 5). Further, both Benjamin R. Bingham and H. Anthony Hervol have significant experience with class actions in general and consumer rights and consumer litigation in particular. (Id., exh. 3). In addition to being licensed in federal court and having extensive experience and training in the field of consumer rights and consumer litigation, Mr. Hervol

has served as an expert in credit reporting during a hearing in bankruptcy court.  (Id., exh. 2).  Similarly, Mr. Bingham has been class counsel or co-class counsel in over 25 class actions in the past 15 years.  (Id., exh. 4).  A large number of these actions have involved the FCRA.  (Id.).  Moreover, as discussed in greater detail below, Class Counsel have successfully negotiated a settlement for the class notwithstanding serious obstacles that might easily have foreclosed plaintiff's ability to pursue her claim.  Based on the foregoing, the undersigned believes that Class Counsel have adequately represented the class.

### b. Class Representatives

The primary standard for determining adequacy of class representation is satisfied when class representative through counsel vigorously and tenaciously protects the interest of the class.  *DeHoyos*, 240 F.R.D. at 283 (*citing* **Gonzales v. Cassidy**, 474 F.2d 67, 75 (5th Cir.1973)).  Generally, "[c]lass representatives satisfy the adequacy requirement unless they have an insufficient stake in the outcome or interest antagonistic to the unnamed members." ***Id.*** (*quoting* **Garza**, 1996 WL 56247, at *4 (internal quotation omitted)).  However, as long as "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation

purposes." *Id.* (*quoting* *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir.1981)).

In this case, the Court believes that the Class Representative has adequately represented the class. Eva Marie Duncan is a member of the proposed class and a former Chase account holder. There appear to be no intra-class conflicts between Duncan and the other class members. Moreover, Duncan, who works in the consumer finance industry, has a solid understanding of the case and, in fact, was the person who initiated this action by alerting counsel that Chase was impermissibly accessing credit reports of inactive accounts. She appears to have provided invaluable information and support to Class Counsel in pursuing and litigating this suit and further, has reviewed and approved the settlement documents. Finally, it appears that there are no subclasses and every member who filed a claim, including Duncan, will receive the same amount from the net settlement fund.

**B. Rule 23(b) Requirements**

In addition to complying with the prerequisites of rule 23(a), a putative class action must also satisfy one or more subsections of rule 23(b). Rule 23(b)(3), cited to by Class Counsel, requires that the district court make a finding that (1) questions of law or fact common to class members predominate over questions affecting only individual members and (2) that a

11

class action is superior to other methods for fairly and efficiently adjudicating the controversy. **FED.R.CIV.P. 23(b)(3).** The rule provides that "matters pertinent to these findings include:"

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

**FED.R.CIV.P. 23(b)(3).** When certification of a conditional settlement class is sought, these elements are usually not as stringent because the settlement disposes of any issues that might otherwise arise were the case tried. *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040, 1058-1060 (S.D.Tex. 2012). The predominance requirement is more demanding than the Rule 23(a) requirement of commonality and tests whether proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

In the present case, common issues predominate because the central issue of whether Chase conducted systematic account reviews on class members' credit files can be established through generalized evidence. *See, e.g., In re Heartland*, 851

12

F.Supp.2d at 1059 (finding that the common questions predominated over individual issues where the case presented several common questions of law and fact arising from the central issue of Heartland's conduct and the resulting injury to each class member from that conduct). Further, because the claims are being certified for purposes of settlement, there are no issues with manageability. ***Amchem***, 521 U.S. at 620 (in a settlement-only certification, "a district court need not inquire whether the case, if tried, would present intractable management problems"). Moreover, there is no question that a class action that resolves millions of claims in a single action is far superior to individual lawsuits insofar as it promotes judicial efficiency, economy and consistency.

### C.   Conclusion as to Rule 23 Requirements

Based on the foregoing, the Court finds the proposed class meets the Rule 23 requirements for certification as a settlement-only class action.

### II.  The Proposed Settlement Agreement

Plaintiff and Chase seek approval of settlement of this FCRA class action suit based on Chase's credit pulls of former customers who no longer had an account with Chase. Over 2,000,000 notices were sent out to class members and 472,167 class members timely filed claims. Both the Consumer Financial Protection Bureau and the Office of the Comptroller of the

Currency were also notified of the settlement terms pursuant to **28 U.S.C. §1715(c)(1)**, and neither has objected to the Settlement.

Nineteen individuals initially filed "objections" or some type of response with the court; however, the objections of four individuals were stricken because they did not fall within the class (Gors, Hollins, Morales and Paul); four individuals who filed objections opted out of the suit and, therefore, lacked standing to object (Clivens, Ellis, Martinez, and Chavez); two individuals did not object to the Settlement but instead, indicated an intent to be a class member (Grigsby and Dean); and four individuals filed untimely objections (Jadwiga, Baker, Harris and Hubener).  Of the remaining five objectors, three (Rodriguez, Haigh and Lewis) did not object to any provision of the Settlement Agreement but rather, appeared to object to issues unrelated to the claims in this suit. Finally, Jabrani objected that the $8.7 million dollar settlement is insufficient to compensate the class members and that the proposed injunctive relief is illusionary; alternatively, Jabrani argued that the requested attorneys' fees totaling one-third the cash value of the settlement fund should be rejected or reduced.  Cox also objected to the attorneys' fees, maintaining they are excessive.

**1. The Settlement Class**

The Settlement Class is defined as follows:

All persons who were borrowers or guarantors on a Chase account or Chase-serviced account and whose Consumer Report Information was accessed by Chase through an Account Review Inquiry during the period October 16, 2009 through October 16, 2014, at a time when the subject account met any one of the following criteria: (1) the account was closed with a zero balance; (2) the account had been sold or transferred to a third party; (3) the debt on the account had been discharged in bankruptcy; (4) Chase had foreclosed the property securing the account loan; or (5) Chase had sold in a short sale or had transferred through a deed in lieu of foreclosure the property securing the account loan. Excluded from the Class are all current Chase employees, officers and directors, and the judge and magistrate judge presiding over this Action and their respective staff.

(Docket no. 28-1, ¶ 35).

## 2. Monetary Relief for the Benefit of the Class

Pursuant to the Settlement Agreement, the total cash consideration to be provided by Chase shall be $8,750,000 for "cash compensation to the Settlement Class, inclusive of all attorneys' fees, costs, and expenses, and the Service Award, and all fees, costs, charges, and expenses of the Settlement Administrator incurred in connection with the administration of the Notice Program." Each Class Member who timely filed a valid claim will be paid a pro-rata share of the Settlement Fund after deduction of administrative expenses, attorneys' fees, and the class representative award. The exact amount to be paid to each Class Member will be addressed later in this Memorandum and Recommendation along with the discussion of attorneys' fees and expenses to be paid from the fund.

### 3. Additional Relief

In addition to the monetary benefit to Settlement Class Members, "Chase agrees that, for a period of three years from Final Approval, Chase will implement and follow a practice of annual audits reasonably designed to confirm that Chase's periodic Account Review Inquiries have excluded individuals who owe no debt to Chase, retain no interest in any property securing a debt owed to Chase, and have no other account with Chase."

### 4. Class Release and Termination

Pursuant to the Settlement Agreement, Settlement Class Members who do not opt out agree to release Chase from their claims.  The Settlement Agreement further provides that if the Settlement is rejected or materially modified by the Court or an appellate court, either party may terminate the Settlement.

### 5. Jurisdiction & Notice

Plaintiff maintains that this Court has subject matter jurisdiction over this case pursuant to **28 U.S.C. §§ 1332(d)(2)** and **(6)**, and **28 U.S.C. § 1407**, and personal jurisdiction over plaintiff, as well as all members of the Settlement Class because they received notice and due process. ***See Richard v. Hoechst Celanese Chem. Group, Inc.***, 355 F.3d 345, 351 (5th Cir. 2003).

Plaintiff also asserts that the best notice practicable was provided to the Settlement Class.  Plaintiff asserts that notice was sent to all Settlement Class Members whose addresses could be ascertained with reasonable effort, that over two million notices were mailed out to Class Members, and that publication notices appeared in two separate magazines.  Additionally, a website (www.chasefcrasettlement.com) went live on December 18, 2015, and had over 130,000 unique visitors as of the deadline for submitting claims.

After returned mail was re-mailed to new addresses, it is estimated that approximately 94% of the class members received direct notice by mail.  (Id.).  Overall, 472,167 Settlement Class Members timely filed claims, resulting in a claims rate of 22.28%.  According to Class Counsel, who are experienced in consumer class action suits, this is an extremely high participation rate for a consumer class action and demonstrates that the Notice Program was effective in providing notice to Settlement Class Members.  (Docket no. 57, Bingham Decl. ¶ 10; Hervol Decl. ¶ 21).

Plaintiff also maintains that the Notice was reasonably calculated to inform settlement class members of their rights. The Settlement Administrator ("KCC") provided Notice to Settlement Class Members pursuant to the Notice Program approved by the Court in the Preliminary Approval Order.  (Docket no. 57,

exh. 5, Geraci Decl.).   It defined the settlement class, described the substantive claims, described the release provided to Chase under the agreement, described the amount and manner of allocating the settlement proceeds, informed class members of their right to opt-out and object, informed class members of the date, time and place of the Fair Notice hearing, informed the class members of Class Counsel's intent to seek attorneys' fees and the amount, and informed class members that a class judgment would bind them unless they opted out.   Additionally, the Notice provided class members with a website where they could obtain further information, as well as Class Counsel's phone and address.

Moreover, both the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") were timely notified of the Settlement terms and provided with relevant documents; however, neither filed an objection to the Settlement Agreement.   **28 U.S.C.§ 1715(c)(1).** Nor has there been any objection made regarding the type or adequacy of the Notice provided in this case.

**III. Settlement Review**

Having concluded that the class is properly certified, the Court next addresses the proposed Settlement Agreement.   Before a settlement is approved, the Court must find the proposed settlement is "fair, reasonable and adequate."   **FED.R.CIV.P.**

**23(e)(1)(C)**; *DeHoyos*, 240 F.R.D. at 285-86 (*citing* **Cotton v. Hinton**, 559 F.2d 1326, 1330 (5th Cir.1977)).  "The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed class action is that the court must 'ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression.'"  *DeHoyos*, 240 F.R.D. at 286 (*citing* **Garza**, 1996 WL 56247, at *11)(*quoting* **In re Shell Oil Refinery**, 155 F.R.D. 552, 559 (E.D.La. 1993)).

The Court must either approve or disapprove of the proposed settlement and cannot modify its terms.  *Id.*, (*citing* **Garza**, 1996 WL 56247, at *11 (internal citation omitted)).  There is a strong presumption in favor of finding the Settlement Agreement fair.  *Id.*  The following factors are to be considered in determining whether a settlement is "fair, adequate and reasonable":

    (1)  the existence of fraud or collusion behind the settlement;

    (2)  the probability of plaintiff's success on the merits;

    (3)  the range of possible recovery;

    (4)  the complexity, expense and likely duration of the litigation;

    (5)  the stage of the proceedings and the amount of discovery completed; and

    (6)  the opinions of class counsel, class representatives, and absent class members.

*DeHoyos*, 240 F.R.D. at 286-87 (*citing* **Reed v. Gen. Motors Corp.**, 703 F.2d 170, 172 (5th Cir.1983)(internal citations omitted)).

### 1. Evidence of Fraud or Collusion

Generally, "courts may presume a proposed settlement is fair and reasonable when it is the result of arms' length negotiations. . . . There is also a presumption [that] no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary." *DeHoyos*, 240 F.R.D. at 287 (*citing* **4 Newberg on Class Actions** §§ 11:41, 11:51 (4th ed. 2002)). In its Order preliminarily approving the Settlement, the Court found that the Settlement is the "result of informed, good-faith, arm's length negotiations between the parties and their capable and experienced counsel and is not the result of collusion." (Docket no. 29, pg. 2). Further, no evidence of fraud or collusion has been submitted. Tellingly, both sides are represented by counsel experienced in class action litigation and statutory consumer finance class actions. Moreover, the fact that the parties reached a settlement with the assistance of a qualified mediator followed by three months of negotiations and discovery demonstrates a likelihood that the settlement was the result of informed, good-faith, arm's length negotiations rather than fraud or collusion. (Docket no. 5, exh. 2 ¶2, exh. 3 ¶8, and exh. 4 ¶4 (declarations of Riley,

Hervol, and Bingham).  Accordingly, this factor weighs in favor of finding the settlement to be fair, adequate and reasonable.

### 2. Complexity, Expense, and Duration of Litigation

The present case involves over 2,000,000 Settlement Class Members.  While the legal issues in this case are not especially complex, the case undoubtedly involved unsettled issues of law that could easily have prolonged litigation and increased attorneys' fees and costs.[2]  All in all, the Settlement affords some measure of recovery to over 400,000 class members. Additionally, the injunctive relief is expected to provide in excess of 2,000,000 settlement class members with immediate and substantial benefits.  While the pro rata share of the Settlement Fund will not make any of the Settlement Class Members rich, given the risk involved in pursuing this case to trial, it ensures a reasonable measure of relief under the circumstances.  The Court finds this factor also weighs in favor of the Settlement being fair, adequate and reasonable.

### 3. The Stage of the Litigation and the Available Discovery

Generally, before a settlement may be entertained as reasonable, some amount of discovery must have been conducted "to ensure that counsel had an adequate appreciation of the merits of the case before negotiating."  ***Jenkins***, 300 F.R.D. at

---

[2]This issue is addressed in greater detail in the Court's discussion of the 4th ***Reed*** prong: The Probability of Success on the Merits.

303-04 (internal quote omitted); *see also DeHoyes*, 240 F.R.D. at 292. However, formal discovery need not be conducted and information obtained in a prior case can be the basis for an informed settlement. *See San Antonio Hispanic Police Officers' Org., Inc.*, 188 F.R.D. at 459.

Class Counsel state that Mr. Hervol previously sued a Chase entity under the same theory, which enabled Class Counsel to anticipate Chase's defenses both on the merits and with respect to class certification. Further, it appears that the case was mediated before a seasoned mediator knowledgeable about class actions and that the settlement discussions continued during which discovery was exchanged. There does not appear to be any question that Class Counsel had an adequate appreciation of the merits of the case before negotiating. *Jenkins*, 300 F.R.D. at 303-04 (internal quote omitted); *see also DeHoyes*, 240 F.R.D. at 292.

Moreover, given the legal issues regarding the element of willfulness, addressed in detail later in this Memorandum and Recommendation, it is unclear how additional discovery would have helped plaintiff's case or increased Class Counsel's understanding of the issues. As such, this factor also weighs in favor of finding the settlement to be fair, adequate and reasonable.

### 4. The Probability of Success on the Merits

Perhaps the most important factor in determining the fairness, adequacy, and reasonableness of the settlement is the likelihood of plaintiff's success on the merits if the case were to proceed to trial. *DeHoyos*, 240 F.R.D. at 288 (citing *San Antonio Hispanic Police Officers' Org., Inc.*, 188 F.R.D. at 459 (internal cite omitted)). In comparing the terms of the settlement with the benefits the class would have been likely to receive following a successful trial, the Court finds this factor weighs heavily in favor of approval of this proposed settlement. *Id.*

In this case, plaintiff and Class Counsel faced several obstacles that could have easily resulted in dismissal of this suit. Plaintiff alleged that Chase obtained Consumer Report Information on former customers under circumstances where it did not have a "permissible purpose" pursuant to the FCRA. The accounts in question were closed accounts with zero balances; accounts sold or transferred to a third party; accounts where the debt had been discharged in bankruptcy; and accounts where the property securing the loan had been foreclosed, sold in a short sale, or transferred through a deed in lieu of foreclosure. (Docket no. 1, ¶ 28.7).

The FCRA provides for statutory damages of $100 to $1,000 for "willful" violations of the FCRA; however, to prevail on her

claim for statutory damages under the FCRA, plaintiff would have to prove that (1) it is impermissible under the FCRA to conduct Account Review Inquiries on closed accounts, and (2) that Chase "willfully" violated the FCRA in conducting these inquiries. **15 U.S.C. § 1681n(a)(1)(A)**. However, a creditor can obtain Consumer Report Information when it intends to use the information "in connection with a credit transaction . . . involving the extension of credit to, or review or collection of an account of, the consumer" or "to review an account to determine whether the consumer continues to meet the terms of the account." ***Id.***

Plaintiff argued that any Account Review Inquiry conducted on a closed account is impermissible because there is no longer an account to review when an account is closed with a zero balance. However, case law runs contrary to plaintiff's argument in this respect. ***See Germain v. Bank of Am.***, No. 13-cv-767, 2014 WL 5802018, at *5 (W.D.Wis. Nov. 7, 2014)(providing that although a consumer is not personally liable for the loan after it is discharged in bankruptcy, the consumer still 'owes' the lender in the form of the collateral), *reconsideration denied*, 2015 WL 471704 (W.D. Wis. Feb. 5, 2015); ***Saumweber v. Green Tree Servicing, LLC***, No. 13-cv-3628, 2015 WL 2381131, at *4 (D.Minn. May 19, 2015)(providing that an account and a credit relationship existed between the parties for purposes of the

24

FCRA because plaintiffs had an obligation to make payments on the mortgage, even after bankruptcy proceedings were concluded, or face foreclosure).

Additionally, when the parties entered into a final agreement in September 2015, there was a possibility that plaintiff's claims would be foreclosed by the U.S. Supreme Court's decision in *Spokeo, Inc. v. Robins*, 135 S.Ct. 1892 (2015). *Spokeo* raised the issue of whether a violation of the FCRA that causes the consumer no actual injury but nonetheless entitles him to statutory damages can confer Article III standing. *Id.* Because the parties recognized that the Court's ruling in *Spokeo* could foreclose upon plaintiff's claims, the Settlement appears to have been both timely and strategic.

Moreover, to recover statutory damages under the FCRA, plaintiff was required to establish the element of willfulness. *Safeco Inc. Co. of America v. Burr*, 551 U.S. 47, 53 (2007)(*citing* **15 U.S.C. § 1681n(a)**). However, without a decision of a court of appeals or "authoritative guidance" from a responsible federal agency clearly prohibiting the challenged conduct under the statute, it is unlikely that a willful violation of the FCRA could be found. *Id.*, at 69-70 & n.20. Plaintiff cites to no appellate authority, agency rule or guidance addressing the impermissibility of pulling consumer credit reports under the circumstances involved here. In fact,

25

existing authority appears to suggest that the FCRA's permissible-purpose provision does not distinguish between closed and open accounts, further weakening plaintiff's position. *See Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318-1319 (11th Cir. 2009)(holding that it is not "objectively unreasonable" to interpret the FCRA to allow account reviews on closed accounts); *see also Wilting v. Progressive Cty. Mut. Ins. Co.*, 227 F.3d 474, 476 (5th Cir. 2000); *Banga v. Experian Info. Solutions, Inc.*, 473 F.App'x 699 (9th Cir. 2012).

Finally, even if plaintiff could have prevailed on her claims, there is the question of damages. Plaintiff does not allege she suffered any actual damages from these Account Review Inquiries or "soft pulls," since soft pulls do not affect a consumer's credit score and are only visible to the consumer and Chase. Presently, there appears to be no reported case of a consumer proving actual damages as a result of a soft pull account review inquiry. Given the unlikelihood that the Class Members would have recovered on an actual damages theory, this factor also weighs heavily in favor of the Settlement being fair, adequate and reasonable.

### 5. **The Range of Possible Recovery and Certainty of Damages**

The Court next considers whether the range of possible recovery or the benefit of the settlement to plaintiffs outweighs the risk of proceeding through litigation. *DeHoyos*, 240 F.R.D. at 290. This requires a Court to "determine the value of the settlement in light of the potential for recovery." *San Antonio Hispanic Police Officers' Org.*, 188 F.R.D. at 460 (*citing* *In re Shell Oil Refinery*, 155 F.R.D. at 563).

#### a. Actual Damages

The FCRA provides for recovery of actual damages for negligent violations. As previously stated, the account reviews at issue ("soft pulls") do not affect the consumers' credit scores which determine credit eligibility and the costs of credit. (Docket no. 57, exh. 3 ¶¶ 7,12, Hervol Decl.). Further, account reviews are not visible to third persons, making it difficult for a consumer to show actual damages from a soft pull. Also, there is no authority to support plaintiff's position that she suffered actual damages as a result of an account review and thus, little chance of recovery. *Id.*

#### b. Statutory Damages

The range of recovery upon proof of a willful violation of the FCRA is $100 to $1,000. Given the approximately 2.2 million class members, the range of recovery in this case, upon class

certification and class-wide proof of willfulness, is $220 million to $2.2 billion. However, for reasons previously discussed, it is unlikely plaintiff can successfully prove a willful violation of the FCRA concerning account reviews on closed accounts based on the decision in ***Levine***, 554 F.3d 1314*,* the omission of language in the FCRA clearly prohibiting account reviews on closed accounts, and the absence of "authoritative guidance" by an agency with rulemaking authority declaring that account reviews on closed accounts are prohibited. Thus, while the range of recovery in this case is $220 million to $2.2 billion, the likelihood of the Class Members receiving this amount is virtually nil, warranting a reasonable compromise. ***See Fraley v. Facebook, Inc.***, 966 F.Supp.2d 939, 943-44 (N.D. Cal. 2013); ***see also King v. United SA Fed. Credit Union***, 744 F.Supp.2d 607 (W.D.Tex. 2010)(establishing a common fund of $500,000 for a class of 7,000 in a similar case involving a FCRA account review class action). For reasons previously discussed, the Court finds the settlement to be fair, reasonable and adequate under the circumstances.

**c. Injunctive Relief**

The terms of the Settlement also provide that for a period of three years from Final Approval, Chase will implement and follow a practice of annual audits designed to confirm that Chase's periodic Account Review Inquiries have excluded

individuals who owe no debt to Chase, retain no interest in any property securing a debt owed to Chase, and have no other account with Chase.  It is difficult to place an actual value on this type of recovery.  Plaintiff estimates the value to be $13.2 million while at least one objector claims the value of this recovery to be "illusionary".  While the Court finds plaintiff's valuation of this relief to be high, there is no question that requiring Chase to implement a practice of audits designed to protect the type of conduct complained of in this case has some value.  Further, because injunctive relief is not available under the FCRA, this type of relief could not have been obtained without a Settlement.  ***See Washington v. CSC Credit Servs.***, 199 F.3d 263, 268 (5th Cir. 2000).  Given the unlikelihood of plaintiff prevailing in this case, as well the inability to obtain injunctive relief under the FCRA, the Court finds this factor weighs in favor of the Settlement being fair, adequate and reasonable.

> **6. The Opinions of Class Counsel, Class Representatives, and Absent Class Members about the Settlement**

Lastly, the Court considers the opinion of experienced counsel in this case, as well as the opinion of the Class Representative, according the former great weight.  ***Klein v. O'Neal, Inc.***, 705 F.Supp.2d 632, 649 (N.D.Tex. 2010); ***see also DeHoyos***, 240 F.R.D. at 292 (class counsel's opinion "entitled to

deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims").

Here, Class Counsel recommends the Settlement, believing it is fair, reasonable, and adequate based upon the following:

    (i)    their extensive experience with other actions involving FCRA account reviews, other FCRA cases, and other statutory "no damages" class actions,

    (ii)    their hands-on involvement in this litigation and the prior *Sleezer* litigation,

    (iii)    their knowledge of the information that they reviewed in this case and in the prior *Sleezer* case,

    (iv)    the opinions and guidance they received from their experts,

    (v)    their participation in arm's-length and adversarial negotiations in the full-day mediation with a highly regarded and experienced mediator,

    (vi)    their conversations with Settlement Class Members who have called their offices, and

    (vii)    the exceedingly high claims participation rate which occurred in this case.

(Docket no. 57, exh. 3, Hervol Decl., ¶25; exh. 2, Riley Decl., ¶6,12; exh. 4, Bingham Decl., ¶8, 9, 11).  Additionally, Ms. Duncan submits her declaration "in support of final approval of this class action settlement," stating that she "believe[s] the settlement is a great settlement based upon what [she] has learned about the case along the way, and [she] want[s] the court to approve the settlement."  (Id., exh. 1, Duncan Decl.).

Based on the foregoing, the Court believes the settlement is fair, reasonable and adequate and Final Approval of this Settlement should be granted.

### IV. Attorneys' Fees

Plaintiff has filed a motion for approval of an award of attorney's fees and expenses to Class Counsel. (Docket no. 32). As noted above, Chase will pay $8.75 million into the Settlement Fund for pro-rata distribution to the class members after deduction of administrative expenses, attorneys' fees, and the class representative award. In addition to the monetary benefit to Settlement Class Members, and for a period of three years from Final Approval, Chase will implement and follow a practice of annual audits reasonably designed to confirm that Chase's periodic Account Review Inquiries have excluded individuals who owe no debt to Chase, retain no interest in any property securing a debt owed to Chase, and have no other account with Chase. Class Counsel retained a privacy and FCRA expert, Evan Hendricks, who attributes a value of $5 per Class Member ($11 million) for the three years of auditing agreed to by Chase. (Docket no. 32, Motion for Approval of Attorney Fees, exh. 4, pp. 4-5). In addition, he adds another $1 per class member ($2.2 million) for the value received by Settlement Class Members from the educational benefit they obtained from receiving notice advising them of "what has happened, why it

matters, and what they can do about it." (Id., pp. 3-4). According to plaintiff, the total value of the Settlement is just under $22 million.

As compensation for their efforts in creating not only the $8.75 million settlement fund, but also securing from Chase an agreement that Chase will conduct periodic audits of its FCRA account review compliance, Class Counsel requests 33 1/3% of the cash value of the fund as their fees and expenses. According to plaintiff, when combined with the value of the injunctive relief obtained for the benefit of the class, the requested fee is approximately 13% of the total value of the settlement of $22 million. In support of the attorneys' fee request, plaintiff notes that the cash fund created in this case is by far the largest fund ever created in a FCRA "account review" case and one of the largest FCRA settlements achieved under any provision of the FCRA. She also notes that the injunctive relief could not have been obtained absent a Settlement because, as the Fifth Circuit has held, injunctive relief is not available under the FCRA.

Various persons have objected to the proposed settlement based upon the attorneys' fee request. Thomas Cox filed written objections (docket no. 30) but, at the settlement approval hearing on April 27th, withdrew his objections except as to attorneys' fees. He recommended application of the lodestar

32

rather than a percentage of the common fund.  Amirali Jabrani objects to the 33 1/3% attorney's fee request by Class Counsel. (Docket no. 36).  He states the request is "clearly excessive" and exceeds the typical benchmark of 25-30%.  He also argues that all administration and notice expenses be deducted from the Settlement Fund before calculating a percentage.  Jabrani states that, in light of the poor settlement for the class, a lodestar be used to determine an appropriate fee.

At the hearing on April 27th to determine whether to approve the settlement, this Court questioned counsel for plaintiff regarding their attorneys' fee request.  Because the class is unable to establish actual damages, they must rely on the statutory damages provision of the FCRA which provides for an award, in the case of a willful violation, of not less than $100 and not more than $1,000.  **15 U.S.C.A. § 1681n(a)**.  In seeking 33 1/3% of the common fund, counsel request an award of $2,916,667 for their fees and expenses.  Administrative costs total $2,917,000.  Subtraction of those amounts leaves $2,916,333 to be distributed to the class members.  Because 473,000 claims were filed, each class member will receive $6.17. Costs and expenses incurred by Class Counsel total $24,651. Thus, while each class member, whose rights were actually violated, receives $6.17, the four attorneys will collectively receive $2,892,015.

Shocked by this revelation, the Court suggested that counsel for plaintiff reevaluate their attorneys' fee request and strongly recommended that a different percentage be submitted. Instead, counsel have filed an Advisory (docket no. 73) seeking to justify receipt of $2,916,667 or a lesser amount amounting to a lodestar of $1,000,000 times a multiplier of between 2.10 and 2.60. Under the most favorable scenario from plaintiff's counsel, class members will receive $7.70 each.

In their Advisory, counsel for plaintiff argue that the major factor that causes the $6.17 net payment is not the attorneys' fees, but the sheer number of claims that were filed in this case. Based upon empirical evidence, and after consultation with the settlement administrator, it was estimated that about 5% of the class, or approximately 106,000 class members, would file claims, and that the administrative costs would be about $1.3 million. At that level of claims, the estimated pro rata payout to claimants was $40-50. Instead, 473,000 claims were filed, and administrative costs more than doubled. Under the particular and unique circumstances of this case (i.e. the overwhelming response to the settlement causing an increase in administrative costs), Class Counsel believe an award of any one of the above amounts strikes a fair balance between the interest of the class and the interest of the Court in encouraging efficient settlement of complex cases.

34

Counsels' approach turns the administration of justice on its head. They blame the victims for their low compensation and, at the same time, seek to reward themselves for doing an outstanding job. No "fair balance" has been struck when each of the 473,000 class members cannot buy lunch with their share, while their lawyers can each purchase luxury homes, cars, vacations, and expensive jewelry with theirs. Undoubtedly, in a class action, counsel stand to gain substantially more than the class members. However, as the Court noted at the hearing, had a potential class member known when notice of the lawsuit was received that his/her share would amount to $6.17, the notice would most likely have been discarded. To approve such a settlement, the reduction in the class members share caused by the number of class members requires that the amount of attorneys' fees be significantly reduced. If it is not, then the settlement should be rejected.

Fifth Circuit law requires that when reviewing an attorneys' fee award for abuse of discretion, our Court of Appeals must determine whether "'the record clearly indicates that the district court has utilized the **_Johnson v. Georgia Highway Express, Inc._**, 488 F.2d 714 (5th Cir. 1974) framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.'" **_Union Asset Mgmt. Holding A.G. v. Dell,_**

35

*Inc.*, 669 F.3d 632, 642 n.25 (5th Cir. 2012)(*quoting* **Forbush**, 98 F.3d at 823). In common fund cases, courts typically use one of two methods for calculating attorneys' fees: (1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier. **Dell**, 669 F.3d at 642-43. In **Dell**, the Fifth Circuit joined the majority of circuits in allowing district courts the flexibility to choose between the percentage and lodestar methods in common fund cases, with their analyses under either approach informed by the **Johnson** considerations. **Id.**, at 644; **Kemp v. Unum Life Ins. Co. of Am.**, No. CV 14-0944, 2015 WL 8526689, at *8 (E.D.La. Dec. 11, 2015).

Attorney fees awarded under the percentage method are often between 25% and 30% of the fund. **Klein**, 705 F.Supp.2d at 675 (*citing* MANUAL FOR COMPLEX LITIGATION (Fourth) § 14.121 (2010)). Citing **In re Heartland Payments Sys.**, 851 F.Supp.2d 1040, 1081-1082 (S.D.Tex. 2012), plaintiff notes that the "benchmark" rate in district courts in the Fifth Circuit is approximately 25%. In determining the appropriate benchmark, the Court can consider the size of the recovery obtained for the class and the number of class members, and lower the benchmark based upon the fact

36

that the class involves so many class members that the individual shares of the payout are highly diluted. ***See Klein***, 705 F.Supp.2d at 678-79; ***see also*** MANUAL FOR COMPLEX LITIGATION (Fourth) § 14.121 (2010)(among the factors used in making the award is the size of the fund and the number of persons who actually receive monetary benefits).

As noted above, plaintiff's expert, Evan Hendricks, attributes a value of $5 per Class Member ($11 million) for the injunctive relief which provides for three years of auditing agreed to by Chase and an additional $1 per class member ($2.2 million) for the value received by Settlement Class Members from the educational benefit they obtained from receiving notice advising them of Chase's violation. According to the expert, the total value of the Settlement should be valued at just under $22 million. Counsel for plaintiff acknowledged at the hearing he knows of no other case where the value of the settlement was enhanced by injunctive relief if the settlement also included payment of a cash award. The injunction may add some value to the settlement but it is minimal at best. Mr. Hendricks fails to explain, in any way, his reasoning for arriving at the figure of $5 per class member. Adding $1 per class member for educational value would apply to any class or collective action. The Court declines to enhance the value of the settlement to $22,000,000 as suggested by plaintiff. ***See Strong v. BellSouth***

*Telecomm., Inc.*, 137 F.3d 844, 852 (5th Cir. 1998)(district court did not abuse its discretion when it refused to base attorney fee award on purported $64 million phantom "common fund" value figure assigned by plaintiffs' counsel).

In light of the highly diluted payout to class members resulting from the large number of class members, the Court believes an appropriate benchmark is 25%.   Also, unlike plaintiff's counsel, the Court does not believe that the amount should be taken from the total common fund.   It is fair to both counsel and the class that administrative expenses be deducted before their respective shares are determined.   *See Anthony v. Yahoo!, Inc.*, 376 F.App'x 775 (9th Cir. 2010)(the district court properly exercised its discretion in favor of the class by requiring that attorney's fees be based on the net recovery after administrative and other costs were deducted from the gross settlement fund); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F.Supp.3d 781, 795 (N.D.Ill. 2015), appeal dismissed (May 5, 2015), appeal dismissed (June 8, 2015), appeal dismissed (June 26, 2015)(when calculating attorney fees in a class action based on the percentage-of-the-fund method, court first deducts any administrative and notice costs from the fund; although these items are paid through the settlement fund, they are not benefits to the class and thus, not part of what the class members received).   Therefore, the attorneys' fee

benchmark, prior to application of the *Johnson* factors, is $8,750,000 minus $2,917,000 which equals $5,833,000 divided by four equals $1,458,250.

The Fifth Circuit endorses the use of the percentage method cross-checked with the *Johnson* factors. *Dell, Inc.*, 669 F.3d 644. "The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, i.e., to ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 751 (S.D.Tex. 2008). The twelve *Johnson* factors are (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable;" (11) the type of attorney-client relationship and whether that relationship was long-standing; and (12) awards made in similar cases. *Johnson*, 488 F.2d at 717–19. To assist in this analysis, the Court ordered Class Counsel to submit itemized time records of the hours they

have spent working on this case, hours they anticipate will be spent in the future, and affidavits of their customary billing rates and itemized expenses.

According to the Supplemental Declarations submitted by Class Counsel (docket no. 75), as of May 3, 2016, the total number of hours expended by Benjamin R. Bingham is 957.20 at a customary rate of $500 per hour; the total number of hours expended by H. Anthony Hervol is 531.20 at a customary rate of $500 per hour; the total number of hours expended by Darby Riley is 54.80 at a customary rate of $500 per hour; and the total number of hours expended by Charlie Riley is 396.80 at a customary rate of $300 per hour.   Attorney Hervol adds the services of paralegal Brenda L. Brewer who spent 28.2 hours on the case at the rate of $95 per hour.

Initially, the Court finds that the amount of time spent by counsel is excessive.   Combined, without the paralegal, Class Counsel have spent 1,940 hours to this point.   No reason is given for requiring four attorneys and a paralegal to prosecute this case, with three attorneys who charge an hourly rate of $500.   The Court shall eliminate the 54.80 hours of Darby Riley, as well as the paralegal, and count only the hours of Bingham, Hervol and Charlie Riley which total to this point 1,885.20 hours.

The Court also notes that the number of hours expended by the three attorneys appears high considering the early stage at which this case was resolved.  Counsel's expenditure of attorney fees began in August 2014 with the lawsuit being filed shortly thereafter in October.  Chase answered in December, and a Joint Proposed Discovery Plan was received from the parties in February.  (Docket no. 11).  The case was referred to the undersigned in March 2015, and a Scheduling Order was issued on April 3, 2015.  (Docket no. 13).

On April 21, 2015, the parties filed an agreed motion to stay the scheduling order deadlines pending mediation, which motion was granted by the Court.  (Docket no. 16).  On June 22, 2015, the parties filed a Joint Advisory notifying the Court that the case had been settled.  (Docket no. 19).  Benjamin R. Bingham, who has the highest number of hours, was added as an attorney of record *after* the notice of settlement.  On October 21, 2015, the Court entered an Order preliminarily approving the terms of the proposed settlement, conditionally certifying a settlement class, and approving a proposed notice to the class. (Docket no. 29).  The settlement approval hearing was held April 27, 2016.

Class Counsel have not been forced to contest anything in this lawsuit.  They did not have to defend against a motion to dismiss which, in light of the questionable liability, was most

fortunate for the class.  Plaintiff's counsel was not even required to prosecute a motion to certify this case as a class action.  It was agreed to in mediation.  Class Counsel conducted very little discovery.  Less than three weeks after issuance of the Scheduling Order, the parties filed an agreed motion to stay the scheduling order deadlines pending mediation, which led to settlement.  As noted above, Benjamin R. Bingham, who has the highest number of hours, was only added as an attorney of record after the notice of settlement.

The Court also notes that a vast number of entries in the attorneys' time records involve counsel contacting co-counsel in which both attorneys charged for the same time.  Hours billed for conferences between co-counsel are not generally recoverable by both counsel.  ***Broyles v. Texas***, No. CIV.A.H-08-02320, 2009 WL 2215781, at *15 (S.D.Tex. July 23, 2009), *aff'd*, 381 F.App'x 370 (5th Cir. 2010).  Class Counsel estimate that another 200-300 hours of attorney time remain to be accomplished, even if the settlement is approved.  In addition to the 1885.20 hours of time claimed by counsel to this point, the Court will grant another 114.80 hours for future work for a total of 2000 hours.  Due to the excessive hours billed, the Court shall reduce the total number of hours claimed by 25%.

As to the second ***Johnson*** factor, plaintiff contends that the FCRA, particularly in the class action context, is a complex

and challenging area of law.  However, the particular issue
presented in this case was not.  Attorney Hervol has represented
the class in two other cases involving the same claim presented
here: an FCRA impermissible access claim grounded upon "soft
inquiry" account reviews.  Factually, the case simply involved
Chase's accessing the contents of credit files of former Chase
customers who no longer retained a debtor-creditor relationship
with Chase when Chase had no legitimate business need for such
information.  Legally, the issue before the Court was not so
complicated as it was unsettled.

As noted above, the skill of Class Counsel was never really
put to the test in light of the early stage at which this case
was resolved.  The Court does not doubt that litigation of a
case of this magnitude would preclude other employment.  Again,
however, interference with other employment was minimized in
light of the early settlement.

The Court has no reason to question the customary hourly
fees charged by Mr. Bingham ($500), Mr. Hervol ($500) and Mr.
Charlie Riley ($300).  The experience, reputation, and ability
of the attorneys warrant the hourly rate they seek.  The fee was
obviously contingent and, as discussed above, imposed time
constraints on counsel.  To the extent liability is
questionable, the case is undesirable and justifies the hourly
fee each attorney has requested.

Regarding the next *Johnson* factor, plaintiff argues that the most critical factor in determining a fee award is the "degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Ransom v. M. Patel Enters.*, 734 F.3d 377, 388 (5th Cir. 2013). Plaintiff states that "the cash payment available to class members is significant, particularly in view of the challenges of litigating a claim for willful damages to judgment—and, even more to the point, the challenges of certifying a class for litigation on a willfulness claim." (Docket no. 32, Motion for Approval of Attorney's Fees, pp. 22-23).

The Court disagrees with plaintiff's assessment of the degree of success obtained. The statutory damages for each violation is $100 to $1,000. Plaintiff Eva Marisol Duncan was "violated" on 14 occasions. While she will receive a $10,000 service award as the class representative, her compensation for the 14 violations is $6.17. In her motion, plaintiff cites several cases, asserting that courts have approved settlements in the "same range of payment per claimant." (Id., p. 23). In the cases cited by plaintiff where a payout was made, each claimant received $20-$40, not $6.17. Awards in similar cases are higher than the payout to the class members here. In fact, plaintiff cites no case where the settlement was approved for such a low payout to class members. As discussed above, the

injunctive relief adds minimal value to the settlement and nothing to the amount of money the claimants will receive. The Court accords no value to the fact that Darby and Charlie Riley have a previous relationship with the class representative Eva Marisol Duncan.

As noted above, the attorney's fee benchmark, prior to application of the *Johnson* factors, is $1,458,250. In accordance with the Court's findings and conclusions after application of the *Johnson* factors, the total number of hours expended by Benjamin R. Bingham shall be raised by 42.80 hours to include work to be performed in the future for a total of 1,000 hours and thereafter reduced by 25% to 750 hours. The total number of hours expended by H. Anthony Hervol shall be raised by 68.80 hours to include work to be performed in the future for a total of 600 hours and thereafter reduced by 25% to 450 hours. The total number of hours expended by Charlie Riley shall be raised by 3.20 hours to include work to be performed in the future for a total of 400 hours and thereafter reduced by 25% to 300 hours. Applying the customary hourly rate for each attorney, Mr. Bingham is entitled compensation of $375,000, Mr. Hervol is entitled to compensation of $225,000, and Mr. Riley is entitled to compensation of $90,000. Costs and expenses incurred by Class Counsel total $24,651. Thus, application of

the lodestar generates fees and expenses for plaintiff's counsel of $714,651, less than one-half the benchmark.

Deduction of the administration expenses of $2,917,000 from the overall award of $8,750,000 and the service representative's award of $10,000 leaves $5,823,000 to be distributed to the attorneys and the class members.  If the Court applies the 25% benchmark to this amount, the attorneys will receive $1,458,250, while the approximately 473,000 class members will divide the remaining $4,364,750 and receive an individual share of $9.22, somewhat more than the original $6.17.

Application of the lodestar amount of $714,651 would increase the individual class member's share to $10.79.  The Court does not find this amount to be much more palatable, but it at least breaks the $10 barrier.  In light of the difficulties with establishing liability, dilution of the individual amount to such a low degree could be justified. While it is not much different than the $6.17 the class members would have originally received if counsel were paid their entire $2,916,667, it reflects a far more equitable distribution after proper consideration of the *Johnson* factors under ***Dell, Inc.*** Should plaintiff's counsel continue to insist on receiving a higher amount of attorney's fees, then this Court recommends that the settlement be rejected.

**V.    Costs**

Class Counsel state that the administrative costs are capped by the settlement administrator at $2,917,000, which includes the original notice, pre-paid postage return mail on claim forms, and creating and mailing settlement checks. Counsel, Charles Darby advised the Court that had this cost not been capped, it would have exceeded $3,000,000.  While this cost is significant, given the 2,119,217 notices that were mailed out, and the 472,167 claims timely filed, it appears to be reasonable.  Further, no objections to the administrative costs have been raised.

**VI.   Incentive Awards**

Plaintiff seeks $10,000 as an incentive or service award for Ms. Duncan.  Incentive awards, also called service awards, are used in class action lawsuits to compensate named plaintiffs for the services they provide. *DeHoyos*, 240 F.R.D. at 339 (citations omitted).  Courts "commonly permit payments to class representatives above those received in settlement by class members generally." *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d at 830 (E.D. La. 2007) (citing cases).  District courts in the Fifth Circuit routinely award $5,000-$10,000 per named plaintiff. *De Hoyos*, 240 F.R.D. at 340 (citing cases).  In similar FCRA "account review" cases, courts in the Western District of Texas have awarded much higher amounts than is

47

requested here.  *See King v. United SA Federal Credit Union*, No. 5:09-cv-00937-NSN (W.D.Tex. October 8, 2010)($15,000 to each of two class representatives); *Sleezer v. Chase Bank USA*, No. 5:07-cv-00961-HLH (W.D.Tex. Aug. 6, 2009)($25,000 to class representative).

In the present case, there have been no objections to the service award proposed for Ms. Duncan.  Further, plaintiff maintains that Ms. Duncan played a key role in discovering that Chase was accessing her account after it was closed, and that initiated contact with an attorney and further, has assisted in investigating this claim, as well as in reviewing settlement documents.

**VII. Cy Pres**

Plaintiff also moves for approval of Cy Pres Designations. (Docket no. 33).  The equitable doctrine of cy pres ensures that undistributed or unclaimed settlement funds are put to their "'next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011)(citations omitted). Before a cy pres distribution is found to be appropriate, it must be infeasible to make further settlement distributions to class members, and "the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the

interests of those similarly situated." *Id.* (citations omitted). It is infeasible to make further distributions when (1) remaining class members cannot be identified or chose not to participate, (2) the claim amounts are too small to make individual distributions economically viable, and/or (3) the class members' damages claims are fully satisfied by the initial distribution. *See id.* at 475 & n.15. The court considers the following in applying the cy pres doctrine: "(1) the objectives of the underlying statute(s), (2) the nature of the underlying suit, (3) the interests of the class members, and (4) the geographic scope of the case." *In re Lease Oil Antitrust Litig.* *(No. II)*, MDL No. 1206, 2007 WL 4377835, at *21 (S.D.Tex. Dec. 12, 2007) (internal citations omitted)).

In the present case, plaintiff maintains that because the settlement funds are to be distributed on a pro-rata basis, there will be very little funds remaining. However, plaintiff states that in the event that checks are uncashed after the fund is distributed, it would be too costly to redistribute these remaining funds on a pro rata basis. Additionally, given the millions of consumers affected and the allegations, plaintiff states that the cy pres recipients in this case should be national in scope and further, that they be organizations that deal with consumer-protection laws pertaining to credit reporting as the "'next best compensation use." The parties,

each represented by experienced class action counsel, have conferred and agreed, subject to the court's approval, to disburse any unclaimed funds one-half to the National Consumer Law Center ("NCLC") and one-half to the National Foundation for Credit Counseling ("NFCC"). Counsel for both the Class and Chase believe that these two organizations have the required nexus to this FCRA case.

Based upon the information contained in plaintiff's motion, and the fact that no objection to the cy pres designation has been filed,[3] the Court believes that the NFCC and NCLC are appropriate recipients for the cy pres distributions in this case as such distributions would be for a purpose as near as possible to the legitimate objectives underlying this lawsuit, the interests of class members, and the interests of those similarly situated.

<u>**CONCLUSION**</u>

After careful consideration, the undersigned believes that the proposed settlement is fair, reasonable and adequate and further, a satisfactory compromise of the Settlement Class Members' claims that fully complies with **FED.R.CIV.P. 23(e)**. However, the undersigned believes that the proposed award of

---

[3] Thomas Cox initially objected to the cy pres designation but withdrew his objection during the hearing held on April 27, 2016. (Docket nos. 30 and 70).

attorneys' fees is neither reasonable nor fair and should be reduced.

Therefore, the undersigned recommends that plaintiff's motion for Final Approval of the Settlement be **GRANTED,** as modified (docket no. 57), with the settlement class being certified; the proposed settlement in the amount of **$8,750,000.00** being approved as fair, reasonable, and adequate; attorneys' fees in the amount of **$714,651.00,** including total costs and expenses incurred by Class Counsel, being awarded; administrative costs in the amount of **$2,917,000.00 b**eing awarded; and an incentive award in the amount of **$10,000.00** being awarded to Eva Duncan.

## RECOMMENDATION

Accordingly, the undersigned recommends that the District Court: (1) grant Final Approval to the Settlement, excluding from the binding effect of the judgment all persons who have timely and validly excluded themselves from the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) approve the cy pres recipients; (4) approve the requested Service Award for the Class Representative in the amount of $10,000.00; (5) grant in part the objections to the attorneys' fees and overrule all other objections; (6) award Class Counsel

attorneys' fees and expenses, as modified, in accordance with this recommendation; and (6) dismiss the action with prejudice.

Should the District Court determine that an award of attorneys' fees and costs in excess of $714,651.00 is warranted, then this Court recommends that the Final Settlement be **REJECTED**.

Should the District Court accept this recommendation, an Order should issue that the cy pres distributions authorized herein be paid directly from the settlement fund in accordance with the terms of the Settlement Agreement filed under Docket No. 28-1, with the distribution of such funds as follows: one-half to the National Consumer Law Center and one-half to the National Foundation for Credit Counseling.

### Instructions for Service and Notice of Right to Object

The District Clerk shall serve a copy of this Memorandum and Recommendation on all parties either electronically or by mailing a copy by certified mail, return receipt requested. Pursuant to **28 U.S.C. § 636(b)(1)** and **FED.R.CIV.P. 72(b)(2)**, any party who desires to object to this Memorandum and Recommendation must serve and file specific written objections within 14 days after being served with a copy. *Such party shall file the objections with the District Clerk and serve the objections on all other parties and the Magistrate Judge.* A

party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within 14 days after being served with a copy shall bar that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of factual findings and legal conclusions to which the party did not object, which were accepted and adopted by the District Court. ***Thomas v. Arn***, 474 U.S. 140, 150 (1985); ***Douglass v. United Servs. Auto. Ass'n***, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

   **SIGNED** May 23, 2016.

_____
**JOHN W. PRIMOMO**
**UNITED STATES MAGISTRATE JUDGE**