```
 1                  UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                    SAN ANTONIO DIVISION

 4   EVA MARISOL DUNCAN,           §
       Plaintiff,                  §
 5                                 §
     V.                            § CIVIL ACTION NO: 5:14CV912-FB
 6                                 §
     JPMORGAN CHASE BANK, N.A.,    § April 27, 2016
 7                                 §
      DEFENDANT.                   §
 8

 9


10               TRANSCRIPT OF FAIRNESS HEARING
            BEFORE THE HONORABLE JOHN W. PRIMOMO
11                 MAGISTRATE COURT JUDGE

12   APPEARANCES:

13   For the Plaintiff:       BENJAMIN R. BINGHAM
                              Bingham & Lea, P.C.
14                            319 Maverick Street
                              San Antonio, TX 78212
15
                              CHARLES ANTHONY RILEY
16                            Riley & Riley, Attorneys at Law
                              320 Lexington Avenue
17                            San Antonio, TX 78215-1913

18                            CHARLES DARBY RILEY
                              Attorney at Law
19                            320 Lexington Avenue
                              San Antonio, TX 78215
20
                              H. ANTHONY HERVOL
21                            Law Office of H. Anthony Hervol
                              4414 Centerview Drive
22                            Suite 200
                              San Antonio, TX 78228
23

24
     Produced by mechanical stenography; computer-aided
25   transcription
```

Leticia Ornelas Rangel, CSR

1    APPEARANCES CONTINUED:

2    For the Defendant:   NOAH A. LEVINE
                          Wilmer Cutler Pickering Hale and Dorr LLC
3                         250 Greenwich Street
                          New York, NY 10007
4
                          WILLIAM LANCE LEWIS
5                         Quilling Selander Lownds Winslett & Moser, PC
                          2001 Bryan St., Suite 1800
6                         Dallas, TX 75201

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P–R–O–C–E–E–D–I–N–G–S

2            THE COURT SECURITY OFFICER:  All rise.

3            THE COURT:  Please be seated.  The case before the

4   Court is Eva Marisol Duncan v. JPMorgan Chase Bank et al.

5   And I'll ask for announcement from counsel for the plaintiff

6   and then for the defendant.

7            MR. BINGHAM:  Good morning, Your Honor, Ben Bingham

8   for the Plaintiff and the Class.

9            MR. HERVOL:  Morning, Your Honor, Tony Hervol for

10  the Plaintiff and the Class.

11           MR. RILEY:  Your Honor, Darby Riley for the

12  Plaintiff and the Class.

13           MR. RILEY:  And I'm Charles Riley also for the

14  Plaintiff and the Class.

15           THE COURT:  On behalf of the defendant?

16           MR. LEWIS:  Lance Lewis on behalf of defendant

17  JPMorgan Chase Bank, N.A..

18           MR. LEVINE:  And Noah Levine, Your Honor, on behalf

19  of the defendant JPMorgan Chase Bank, N.A..

20           THE COURT:  Okay.  And I understand there are some

21  individuals who are here who are going to be objecting to the

22  settlement, and I will be asking you for your names and

23  comments later in this hearing.  The purpose of this hearing

24  is to determine whether or not the settlement is fair,

25  whether the notice of the settlement and the settlement are

 1   fair, reasonable, and adequate, and including whether or not

 2   the plaintiff's request for attorney's fees is a reasonable

 3   request.  And there's also the matter of a service payment to

 4   the class representative.  And the Court will also consider

 5   any timely filed objections to the settlement.

 6            The Class was certified regarding a -- I believe it

 7   was a -- I don't have the specific notification or Class in

 8   front of the -- involved.  I think it involved allegations

 9   that JP Morgan Chase bank was looking at accounts of

10   individuals who no longer had active accounts at their bank.

11   And there's some question as to the validity of that.  And I

12   think the parties -- this lawsuit was filed in October 2014

13   or thereabouts, and the parties eventually reached a

14   settlement.  And as in any Class action settlement, it has to

15   be something that is approved by the Court after notification

16   is provided to the parties, to all the potential Class

17   members.  Class notice was approved by the Court back in

18   December.  I think Class notices were sent out.  I think

19   they, the Class members -- and I think there was somewhat

20   over 2 million potential Class members.  I think somewhat

21   over 400,000 Class members responded by the deadline in

22   March.  Some opted in.  Some filed claims.  Some opted out.

23   And then some individuals have objected to the settlement in

24   writing.  Some of those individuals will not be here today,

25   but their objections will still be considered by the Court.

1   And any individual who objects to this settlement who are

2   here today will have the opportunity to put their objections

3   on the record.

4            The first matter that the Court must consider is --

5   concerns the adequacy of the Court notice.  I don't recall

6   that anyone objected to the adequacy of the notice of the

7   settlement.  Mr. Bingham, Mr. Lewis, are you aware that

8   anyone objected either in writing or otherwise to the

9   adequacy of the settlement notice?

10           MR. BINGHAM:  No, Your Honor, you're correct.  No

11  one objected.

12           THE COURT:  Okay.  Mr. Lewis?

13           MR. LEWIS:  That's correct, Your Honor.

14           THE COURT:  Okay.  Then I think we'll get into the

15  matter of the Fairness of the Settlement.  I think a motion

16  to approve the settlement has been filed, and I really can't

17  recall now if that was filed by the -- by both parties or

18  just by the plaintiff.

19           MR. BINGHAM:  Just by the plaintiff, Your Honor.

20           THE COURT:  Okay.  If you would, Mr. Bingham, don't

21  go into a long dissertation about the -- you know, everything

22  in that motion.  But state on the record why you believe the

23  settlement is fair to the Class members in this case.

24           MR. BINGHAM:  Your Honor, I have copies of the

25  actual motion and the exhibits, if that would be helpful.

1          THE COURT:  I have that.  I don't need that.

2          MR. BINGHAM:  All right.  Thank you.

3          The settlement is fair, adequate, and reasonable

4    for several reasons:  First, it requires Chase to provide

5    annual audits of its--.

6          THE COURT:  If you could, again, state for the

7    record -- I bumbled through stating exactly what the problem

8    was and what the Class consists of.  If you could be more

9    specific about that for the people who are here.

10          MR. BINGHAM:  Sure.  The Class consists of people

11   who no longer have an account with Chase, people who have

12   either paid their accounts, been foreclosed on, and don't owe

13   any money after the foreclosure, have discharged their

14   personal liability and bankruptcy, and then there's a few

15   other short-sale transactions and things like that.  So it's

16   basically people who fell on hard times that is primarily due

17   to the mortgage crisis, either lost their homes or would go

18   bankruptcy and discharge their personal liability.  Some are

19   still in their homes.  But the thing they have in common is

20   they don't owe Chase any money.  The other thing they have in

21   common is they're very --

22          THE COURT:  Did all these people -- all these

23   accounts are people who owed money to Chase?

24          MR. BINGHAM:  Yes, they're all former customers.

25          THE COURT:  Okay.

Leticia Ornelas Rangel, CSR

1          MR. BINGHAM:  At one time they did owe money to

2    Chase.

3          THE COURT:  Okay.

4          MR. BINGHAM:  And now they don't.

5          THE COURT:  Okay.

6          MR. BINGHAM:  They're all former customers.  So

7    they're all people, too, that are trying to rebuild their

8    credit, so what's in their credit report is very important to

9    them.  Credit reports are very complex.  I don't know if

10   you've looked at yours lately, but they're hard to decipher.

11         THE COURT:  No, I'm afraid to.

12         MR. BINGHAM:  So these are people that are trying

13   to put it all back together.  And Mrs. Duncan is a good

14   example, Your Honor, she is here today.

15         THE COURT:  Okay.

16         MR. BINGHAM:  She actually had her house foreclosed

17   on when her understanding was that it wouldn't be foreclosed

18   on.  Litigation ensued, and she actually repurchased the

19   house for full -- paid off Chase completely.  So she was a

20   former Chase customer who didn't owe Chase any money.  And

21   she is in the industry.  She assists people with financing

22   their manufactured homes.  So she can read her credit record.

23         THE COURT:  Could you pull that microphone a little

24   bit closer to you?

25         MR. BINGHAM:  Sure.

1          THE COURT:  Thank you, sir.

2          MR. BINGHAM:  She is in the industry, so she could

3    recognize that Chase was continuing to access her credit

4    report after she did not owe Chase any money.  Now,

5    technically, there's not damages to people by what we call

6    soft pulls.  These are transactions where Chase looks at the

7    former customers' credit report.  But nobody else can see it,

8    and it doesn't affect the credit score.  That's called a soft

9    pull in the industry.

10          THE COURT:  What's the purpose of doing that?

11          MR. BINGHAM:  Well, we say none.  We say absolutely

12    none.  Because there's no -- there would be no reason to do

13    that, in our mind.  And that's what the lawsuit is all about.

14          THE COURT:  They must do it for some reason.

15          MR. BINGHAM:  Well, I think--.

16          THE COURT:  I don't want to stir things up.

17          MR. BINGHAM:  No.

18          THE COURT:  I would just like some understanding of

19    it.

20          MR. BINGHAM:  Well, I think the real reason is they

21    intend not to.  Their systems are designed not to do that.

22    But because they have so many customers in so many different

23    situations, they have loan packages acquired from other

24    lenders, the software may not integrate.  Their algorithms

25    may not integrate.  It's a complex computer kind of problem

1    that Mr. Hervol is better equipped to talk about.  But it's

2    generally not for a purpose of trying to collect a debt

3    because it's not owed, it's been discharged.  It's generally

4    not for the purpose of selling the account because the

5    account balance is zero.  There have been some -- in other

6    cases, there's been some arguments made about a legitimate

7    purpose to pull these.  But in our view there is none.

8    There's absolutely no reason.

9              THE COURT:  Do you believe that that's one of the

10   reasons it might make proof of willfulness difficult?

11             MR. BINGHAM:  That certainly is.  And that's why we

12   think this case is a little unique, though, because in our

13   mind the willfulness is the failure to audit because their

14   own system shows that they're not supposed to be doing that,

15   but nobody is checking the system to see if the system is

16   working.  That's where we say the willfulness is, not in, you

17   know, I can't imagine a reason why a creditor would willfully

18   and intentionally go out and pull one on a closed account,

19   unless perhaps sell the information to someone else.  But I

20   mean, the information that's in your credit report is pretty

21   readily available.

22             But that's -- that brings up another point.  What's

23   in your contract report, and these people are trying to

24   rebuild their credit, and they have got basically a former

25   creditor or a stranger pulling their credit report that has

1    their name, their former names, all their addresses, their

2    social security numbers, every account they've ever had.  All

3    that stuff is in the credit record.  So these people are

4    sensitive about somebody looking in.  The example we used in

5    discovery is, to the witness, let me see what's in your

6    wallet.  And it's even worse than that.  It's worse than

7    looking at somebody's wallet without a purpose, because

8    there's more information on the credit report than there is

9    in your wallet.  But it's the same kind of thing.  It's

10   not -- you're not damaged in a legal sense because someone

11   picks up your wallet and starts thumbing through it.  But

12   it's highly offensive, and you don't want it to happen.  You

13   want to protect your private information.  So that's what the

14   case is about.

15          And in the briefing you will see this is the second

16   time a case has been brought against Chase.  The first case

17   was actually prosecuted by Mr. Hervol, and it was Chase's

18   credit card unit.  This is mostly mortgages in this case.

19   But the credit card unit was in a Class action here in the

20   Western District that settled in 2009.  So, legally, we say

21   that helps our willfulness argument.  But we still have a lot

22   of hurdles to overcome to get there.  The law which we've

23   briefed out is that it's not Chase's behavior that's at

24   issue, it's whether their behavior is objectively

25   unreasonable in their interpretation of the Fair Credit

1    Reporting Act as it affects these count reviews.  And the

2    Supreme Court when addressing willfulness says:  To determine

3    willfulness you look for this objective behavior, and you

4    look for circuit court authority or regulatory authority.  We

5    don't have either of those in this case that is helpful to

6    the plaintiff.  The only circuit court authority says:  The

7    Fair Credit Reporting Act is ambiguous as to whether a

8    creditor can or cannot pull a closed account.  So the only

9    circuit authority is against us on that point.  And the same

10   case, the *Levine* case, says that it -- even if they -- their

11   interpretation was correct, the willfulness standard would be

12   lacking because there's no authoritative guidance.  And the

13   interpretation by the creditor, if it's ambiguous, how can

14   you hold him willful.  That's basically what it comes down

15   to.  If the statute is ambiguous, you can't find the creditor

16   willfully violated it.

17           Our argument is, that's fine for that case, but in

18   this case you have the same creditor doing the same thing a

19   second time.  The Court has to look at the subjective in --

20   procedures, I guess, as part of the willfulness inquiry.  We

21   think we probably will lose at the trial court level and have

22   to go to the Fifth Circuit on that just because the law is

23   what it is, and we've briefed that out.  But that's why we

24   took the case.  We just couldn't believe that common sense

25   would be entirely lacking even in the FCRA cases.  So that's

1    what the case is about.

2            Mr. Hervol and I have done three or four or five of

3    these type of cases.  I was originally in the *Sleezer* case.

4    We've done American Express.  We've done United San Antonio

5    Federal Credit Union.  Maybe that's it.  I can't remember.

6    So we're familiar with the -- how to get the discovery we

7    need and how to formulate the information that we need.  All

8    but one of those cases has settled.  One case we lost at the

9    certification.  We didn't get it certified, I guess the

10   American Express.  But we've got some good experience and so

11   we know what we're doing and we know what to look for, and we

12   know how to recognize a case, which this is kind off going

13   off in different directions, but our expert is here, Evan

14   Hendricks.

15           And one of the things he talks about is the

16   education and value of the settlement in itself because the

17   notice did go out and we got about 2.1 million notices went

18   out, and we reached a 94 percent, what they call re-trade.

19   We believe that 94 percent of the Class members actually

20   received the notice.  And so even if they didn't file a

21   claim, they got notice of what the lawsuit was about and that

22   there was a contention that this account was used on a closed

23   account, was a claim that they could do something about.  And

24   we've just been inundated with calls from the Class members,

25   and a lot of people are just saying, I didn't know it was a

1    claim.  I saw that they were pulling it.  But I didn't know

2    it was anything.  And I didn't know I could do anything about

3    it.  Thank you.  We got a lot of calls like that so.

4            Anyway, so the settlement the -- is fair,

5    reasonable, and adequate because what we did get is this

6    audit procedure whereby Chase will implement procedures for

7    three years to conduct audits to make sure that it's not

8    pulling the credit reports of people who have closed

9    accounts.  And those accounts include the same definition

10   that is in our Class definition.  So we think we're going to

11   get the process stopped.

12           Our expert calls that a landmark change and calls

13   it an important change.  And the reason he does -- one of the

14   objectors said something, well, the injunctive relief has no

15   value because that's what Chase is supposed to do anyway.

16   Maybe so, but Chase isn't doing it.  Chase has no legal

17   obligation to conduct these audits.  But now it's agreed to.

18   And that has value to the Class members because they're no

19   longer going to sue Chase for pulling their credit reports.

20   In fact, we've seen that since the case has been pending.

21   Mr. Hervol does bankruptcy law, and as far as that he pulls

22   the credit reports of clients and potential clients.  So

23   we're looking at it, and it appears the process has stopped.

24   So that's a benefit to the Class members.

25           The educational benefit I briefly mentioned, that's

1    a real thing too.  We believe from literally between the

2    three firms, thousands of calls from Class members and

3    probably less than five complaining about anything.  I mean,

4    people are understanding the notice.  They're thankful.  Our

5    phone numbers are not even on the Class notice.  They have to

6    hunt us down to call us.  There's no toll free number to the

7    lawyers.  There is to the settlement administration.  People

8    are hunting us down to say thank you.  So that's a part

9    of the reason the settlement is fair.  It brings value to the

10   Class members regardless of whether they filed a claim.  That

11   value extends to all the Class members, to the general public

12   as well.

13           But for those who file a claim, and there were 400,

14   we just reached 473,000 people filing the claims.  For those

15   who filed it, they share pro rata in this $8.75 million fund

16   that Chase has agreed to put up.  The settlement is fair,

17   adequate and reasonable because 8.75 million is only the

18   second common fund in these type of cases.  And there's

19   probably maybe a dozen reported cases.  It's only the second

20   common fund.  The other common fund was approved in the

21   settlement by Judge Nolack, that's United King v. United

22   Federal Savings or Federal Credit Union.  That fund was

23   500,000.  So this one is 8.75 million.  So it's by far the

24   largest fund.  It's only the second common fund in this type

25   of case.  It's only the second one that provides actual money

1  to people versus coupon-type of things.  And most of the

2  other settlements have, you know, like credit monitoring or a

3  free credit report or a free credit score or something like

4  that.  That's kind of what the relief is.  But the response

5  rate on those cases is miserable.

6          There's that chart we brought today, and it's in

7  our briefing also, that just compares this case to these

8  other similar cases.  In that *Sleezer* case there were two

9  claims.  It offered credit monitoring.  And most of those

10 cases, it's just a dismal response rate from the client --

11 from the Class.  We've -- in our briefing, we've gone

12 through -- there's not that many FCRA cases, but there are

13 cases under the Telephone Consumer Protection Act, which are

14 just rampant right now.  And that claim rate, the

15 participation rate of the Class members in those cases is

16 averaging between 5 and 6 percent.  In this case, we have

17 22-plus-percent of the people actually filing the claims,

18 which is unheard of in this business.

19         One of the judges in Chicago had the Class counsel

20 go survey cases from all over the -- well, from four circuits

21 I believe to try to identify the claim rate in TCPA cases.

22 There was one case that hit 19 percent.  And I have got a

23 list of those, if you would like to look at it.  One case hit

24 19 percent, two or three went over ten.  Some of them were

25 less than a percent.  But the average was 5.4 percent of the

1    people participating.  We've got just an unheard of claim

2    rate in this case.  And it's because people get it and

3    they're interested.  And it's also because part of our

4    notice, the notice was a claim form, and I brought a copy

5    here, if you need to see that.  But it was a claim form that

6    was double-sided, folded over, and it's all the person had to

7    do was read it, sign their name, update their address,

8    certify that they wanted the funds, and mail it back.  And

9    the mailing was postage prepaid.  So it didn't even cost them

10   the stamp to mail it back.

11          We made it as easy as possible to participate in

12   this case because we didn't want to get stuck with a case

13   where, you know, 5 percent of the people had responded.  So

14   as a result of good notice and understandable notice, we got

15   this huge claim rate, which is one of the factors the Courts

16   look at to decide is this a fair, reasonable, and adequate

17   settlement.  We have got a huge participation rate.  We have

18   as of today I think 181 people who have opted out.  And I'm a

19   lawyer because I can't do math, but that's less than --

20   that's a fraction of one percent.  181 out of 2.1 million

21   have opted out of the settlement.  And from conversations

22   with Class members, I can tell you that a lot of those people

23   are people who went through bankruptcy, got a discharge, but

24   remained in the house.  And they didn't want to take any risk

25   with Chase by filing a claim.  They thought if they filed a

1   claim, Chase might kick them out of the house or something

2   like that.  We told them, no, but at the same time I can tell

3   you they considered that a part of the risk, and that's part

4   of the reason they opted out of the settlement.

5          We have -- we're down to two attorney objections

6   out of 2.1 million people.  Well, that's a factor the Courts

7   look at.  Is the settlement fair.  We have two objections

8   both of -- it's all briefed out, both from professional

9   objectors.  These are guys who object in every settlement

10  they can.  It's boilerplate objections.  There's not a single

11  fact in either one of those objections.  They -- Mr. Cox is

12  here.  Mr. Bamus didn't show up.  If the Court approves the

13  settlement, they will file a notice of appeal, and they will

14  ask us to pay part of our attorney's fees as part of the -- I

15  call it extortion, to get rid of the appeal and get the

16  settlement administration underway.  In other words, nobody

17  in the Class gets anything until these two guys get their

18  money.  That's what's going on here.

19         We have -- there's one other group from Chicago

20  that we filed a motion to strike the objection because Marlin

21  Paul had not filed a claim.  The Court granted that.  Her

22  significant other is an 80 year-old lawyer who has contacted

23  us, contacted defense counsel, has another buddy who is a

24  lawyer, who has contacted defense counsel.  We thought that

25  they might be here today.  They said they had mailed in a pro

1    hac motion ten days ago now.  So we don't know what their

2    status is, but we would ask that the Court, when reviewing

3    the objections just review the Marlin Paul objection too

4    because it's really no different than the others and just

5    consider that and overrule that.

6           THE COURT:  Let me get back to some of the factors,

7    though, that you dealt on most of them.  But one of the them

8    is the complexity, expense, and likely duration of litigation

9    as well as the state of the proceedings and the amount of

10   discovery completed because I do recall reading that someone

11   thought that this was a rush to settlement.  And if you

12   address that matter.

13          MR. BINGHAM:  Sure.  Well, I'll say yes and no.  It

14   was a rush -- we filed the case.  We got the order to

15   consider at least ABR pretty early in the case.  We agreed to

16   mediate the case.  And before the mediation, the Supreme

17   Court accepted a writ of certiorari in this case called

18   *Robins v. Spokeo* -- or *Spokeo*.  People say it different ways.

19   But that case would impact whether Mrs. Duncan had standing

20   to pursue this claim because the issue there is whether a

21   person without actual concrete injury has standing to pursue

22   an FCRA claim.  Mrs. Duncan doesn't have that kind of injury,

23   although we could allege it, if we had to.  But in general,

24   because these are soft pulls not seen by anybody, don't

25   affect your credit scores, people don't have damages.

1          So the Supreme Court had once before in a case

2     called *First American,* maybe three or four years ago,

3     accepted cert. on this same issue.  And then they dismissed

4     it saying that the certiorari was improvidently granted.  So

5     when *Spokeo* came up and they accepted cert. again, all the

6     plaintiffs bar thought, okay, they're going to rule that

7     if -- because all you can allege is a violation, you don't

8     have standing.  And courts have bought that.  FCRA cases

9     cited in our brief have been stayed pending that decision.

10    TCPA cases have been stayed pending that decision.  All kinds

11    of statutory causes of action have been stayed -- FTCPA cases

12    have been stayed all because of the standing issue.

13         So, yeah, we wanted to get a settlement before the

14    decision came out in *Spokeo*, but that doesn't mean that we

15    just layed down and said, hey, you know, whatever you give us

16    we'll take.  We had a hard-fraught mediation preceded by

17    extensive briefing.  All the cases are in our briefing, but

18    basically from the plaintiff's point of view, in the universe

19    of this type of case there's one case where a court in a

20    single individual action has found a violation that was

21    willful.  But in that case the defendant didn't even

22    challenge the violation, so it's not -- it doesn't give us

23    much hope.

24         The Fifth Circuit has ruled that because the FCRA

25    is ambiguous as to whether a creditor can pull on a closed

1   account, there can't be a willful violation.  That case is

2   cited in our briefing.  The Eleventh Circuit has ruled the

3   same way.  There's a couple other cases that deal with

4   bankruptcy folks.  Bankruptcy discharges a person's personal

5   liability to repay the debt.  But the Court says, yeah, but

6   they still had a house.  So the creditor has this -- don't

7   ask me how -- what the reason is.  But the court says -- the

8   creditor still -- there's still a creditor relationship

9   because there's still collateral.  And so the creditor still

10  has the permissible purpose to pull the former borrower's

11  credit report.

12          So it's against that backdrop that we're

13  negotiating with Chase, and then also the *Spokeo* case comes

14  down.  We all brief it out extensively.  We go to San

15  Francisco and mediate with Judge Edward Infante, who is a

16  former magistrate judge that kind of specializes in these

17  statutory cases.  He's done some of the biggest and probably

18  most of the biggest cases.  We mediate with him.  We reach a

19  settlement in principal.  There's still some due diligence to

20  do.  But this is -- we did serve discovery.  Chase did answer

21  the discovery.  The fact that Chase was doing these pulls was

22  never contested.  They admitted that.  So it really turns

23  into a legal argument and Class identification and process.

24  And I've been doing this 15 plus years.  In the big cases

25  with good lawyers they're usually not resolved with a bunch

1    of discovery battles.  Responsible lawyers give you what you

2    want.  You talk about it.  It's almost like problem-solving

3    type of deal.  And it's happened in several different kinds

4    of cases, but you don't -- there's not a bunch of discovery

5    battles.  They gave us what we wanted.  We didn't have to

6    make formal requests.  We did our due diligence.  If there

7    was something that came out, we would say, hey, how about

8    this.  We would have a conference call or they would produce

9    documents.  It was the way it was supposed to be.  And

10   we've -- this isn't our first case.  So we know when we've

11   got enough money -- or enough information, actually, both, to

12   settle a case.

13        So and that -- and I wouldn't say the negotiations

14   change much after a mediation, but the due diligence

15   continued.  The questions went back and forth because we

16   didn't have everything we needed.  We needed to verify

17   things.  We took a deposition of a Chase officer to verify

18   things.  But, you know, that's what we're supposed to do, and

19   we did it.  So, you know, everything is relative.  Was it

20   early compared to some other cases?  Yes.  Was it uninformed?

21   No.  Is it fair?  Yes.  It's the biggest of this type of case

22   ever.  It's hard to say it's unfair when you look at the

23   other similar cases.  It's just head and shoulders above.

24        THE COURT:  Anything else on the settlement itself?

25        MR. BINGHAM:  I think -- you know what, I talked

1    about the injunctive relief on our procedures.  Record date

2    breaking settlement -- record-breaking participation rate.  I

3    think that's all I have on the settlement.

4              THE COURT:  On the matter of attorney's fees,

5    counsel is asking for a third?

6              MR. BINGHAM:  That's right, Your Honor.

7              THE COURT:  Okay.  And why would you not -- I

8    understand that in this circuit the Court of Appeals tends to

9    prefer the Lodestar.

10             MR. BINGHAM:  Well.

11             THE COURT:  Is that or is that not true?

12             MR. BINGHAM:  I think that's not true anymore.

13             THE COURT:  Since when?

14             MR. BINGHAM:  Since the *Dell* case in 2012.  It's

15   cited in our briefing.  In a common fund case, let me qualify

16   that, where a common fund has been created, I don't think

17   since the *Dell* case came out.

18             THE COURT:  What's the name of the case?

19             MR. BINGHAM:  It's called *Union Asset Management v.*

20   *Dell, 699 F.3d 632.*  That's a Fifth Circuit case from 2012.

21   And the Court there says that they don't disapprove of the

22   Lodestar.  They say the Court can still choose.  But they do

23   say that they are joining the other circuits, majority of

24   other circuits I think is what they say, in allowing the

25   district court the discretion to use a percentage of the

1    funds in common-fund cases.  And since Dell came out, I can't

2    think of a case where in a common fund, where a Court had not

3    used percentage of the fund.  The *Dell* case also suggests

4    that a 25 percent should be kind of the benchmark but

5    almost -- with the exception of one case, every case is

6    used -- 33 either, either 33 percent plus expenses or

7    33 percent including the expenses.  We're in the second

8    group.  We're saying 33 including expenses, but I think

9    there's only one case that's not done a third since 2012.

10           The one case that didn't do it was a data-breach

11   type of case where hackers had got into the Heartland Payment

12   System's payment processing systems data.  It was a

13   coupon-type settlement, and the Court valued the actual Class

14   relief at like $1600.  And that Court still awarded 20 --

15   there was injunctive relief there that the Court valued.  The

16   Court -- the total value of the fund was somewhere 1-3,

17   1-4 million.  And the Court awarded 20 percent of that amount

18   as the fee.  Every other case -- but most of them are from

19   Louisiana.  I'll have to admit that.  But every other case

20   has been a third plus expenses or a third including expenses.

21   But, you know, that's up to you.  And some of the objectors

22   say that's too much, you know.

23           THE COURT:  Have you kept track -- have all the

24   attorneys kept track of their hours?

25           MR. BINGHAM:  Yes, Your Honor.

1          THE COURT:  And what would -- what percentage of

2     the total settlement would it be if we applied the Lodestar?

3     Have you figured that out?

4          MR. BINGHAM:  Well, I could do it easily, we have

5     right as of today, we have 18 -- say, 1820 hours right now.

6     1819.55, and that's through I think yesterday.  And then we

7     have 20, 23,196 in expenses.  And so I think that comes up to

8     somewhere around 855,000 in actual time on the books as of

9     yesterday.  But the case is not over.  We have two objectors

10    who are notorious for filing notice of appeal.

11         THE COURT:  Okay.  Just stay with me.  And I know

12    it could go up.  As of today, what is the percentage of the

13    8.75 million that you have in attorney's fees and expenses?

14         MR. BINGHAM:  It's going to be approximately

15    12 percent -- 13 percent.

16         THE COURT:  So you're asking the Court to approve

17    going from about 12 percent, according to the Lodestar, up to

18    33?  That's a significant -- a highly significant increase.

19         MR. BINGHAM:  It's -- it's obviously an increase.

20    But it's not unjustified under the current case law because.

21         THE COURT:  It's not a matter -- I know.  But what

22    you told me, you told me what -- that there was no dispute.

23    That they did what they did.

24         MR. BINGHAM:  Correct.

25         THE COURT:  And you told me that there was somewhat

1    of a rush to settle the case because of the Supreme Court

2    case.

3              MR. BINGHAM:  Right.  Because otherwise we would

4    get nothing.

5              THE COURT:  I think out of an abundance of

6    fairness, 33 percent is an extremely high number to be asking

7    for.

8              MR. BINGHAM:  Well, as I say, the Court is going to

9    do what it's going to do.

10             THE COURT:  Well, it's not a matter of what I'm --

11   I'm not doing anything.  I will recommend to Judge Biery.

12   That's all I do.

13             MR. BINGHAM:  Right, right.

14             THE COURT:  And for those of you who may not be

15   aware of that, I am just a magistrate judge.  I recommend to

16   Judge Biery.  Judge Biery makes the final determination.  If

17   you go from a 12 percent Lodestar and higher depending upon

18   what else has to be done, to a 33 percent attorney's fees, is

19   a significant jump in any judge's mind.  And I think the

20   attorneys should have thought that out before they made that

21   request.

22             MR. BINGHAM:  Well, we have.  And I think as part

23   of our declarations you will see what we project we will have

24   at the end, and that the multiplier will be I think at that

25   time we said like 3.1.  It's going to be under a three

1   multiplier, which is commonly approved in this circuit.  And

2   we also have the injunctive relief.  There's some value to

3   the injunctive relief.  Our expert has put one dollar per

4   Class member on the educational value.  We can't get more

5   conservative than that.  On the audit procedures he has put

6   $5, which covers a three-year period.  So, you know, you're

7   talking a couple of bucks a year.  That's extremely

8   conservative.

9          In these FCRA cases, injunctive relief is  huge.

10  We've changed a practice.  And in the Fourth Circuit, the

11  Fourth Circuit recently approved a case, *Berry v. Lexis*

12  *Nexus,* it's cited in our stuff, where the relief was

13  injunctive relief.  And the Court awarded 5.2 million in

14  attorney's fees.  There's value to these injunctions.  So

15  when we add in the value of the injunction plus the common

16  fund, we say, one third of the common fund amount is the same

17  as 13 percent of the value of the case.  And every case in

18  the Fifth Circuit places a value on the injunctive relief.

19  So, yes, if you're only looking at that component, and if

20  you're only looking at the fact that where we are today

21  versus we know we're going to have an appeal.  We know we're

22  going to have a bond motion.  We know we're going to have a

23  motion in the Fifth Circuit for summary affirmance if the

24  settlement is approved.  We know that because the way the

25  settlement is structured, even after everything is done,

1    we're still in the case for like eight months.  We are going

2    to have Class member calls like you can't believe because

3    we've had them.  I've never experienced anything like this.

4    We're going to have so many calls, but, you know, when are we

5    getting our checks?  What's the status of the appeal?  It's

6    just going to go on and on.  Those things are real, and

7    they're going to happen.  And so if you take a snapshot right

8    now, they're entirely correct.  But I would suggest that

9    there's a lot more work to go and that as a common fund every

10   single court has done percentage of the fund.

11          THE COURT:  Have you computed -- that's -- let's

12   assume if you got 33 percent, how much -- and let's assume

13   that everyone that has filed a claim gets their money after

14   the 33 percent.  What would each claim member get?

15          MR. BINGHAM:  Right now -- and this is pretty

16   accurate, $6.17.

17          THE COURT:  That's it?

18          MR. BINGHAM:  That's more than any other cases of

19   this type has paid.  But that's it.

20          THE COURT:  I'm not asking if it's more than any

21   other case.

22          MR. BINGHAM:  No, that's it.  That's it.  May I

23   explain where that number comes from?

24          THE COURT:  I just assume that you took a third out

25   of 8.75 million, then divide it by 411,000.

1          MR. BINGHAM:  Or 73.

2          THE COURT:  Into the remainder.

3          MR. BINGHAM:  Right.

4          THE COURT:  Is that not accurate?

5          MR. BINGHAM:  That's accurate.  But I don't think

6   you can ignore the fact that we have 473,000, a 22 percent

7   claim rate, which is -- you know, it's four or five times

8   more than any other case.  The reason the amount is smaller

9   is because we have such extraordinary claim rates.  And even

10  though the amount is $6, it compares favorably with these

11  TCPA cases that are getting approved all over the country.

12  And under the TCPA, Telephone Consumer Protection Act, it's

13  strict liability.  You get 500 bucks if you get a call to

14  your cell phone that you didn't consent to.  Those cases are

15  settling for -- most of them are in the right around $30 on a

16  $500 claim.  That's the same as $6 on a $100 claim.  So it's

17  in the range of reasonableness.  It's more than anybody else.

18  It's driven by the fact that we made it easy to file claims.

19  You know, we could have done a lot of things to stop the

20  claim rate.  We didn't want to do that.  We want

21  participation.  You know, the big factor seems to be that we

22  paid for the return postage on the postcards because I

23  compared another--.

24          THE COURT:  I'm not criticizing.  Everything you

25  have done -- I'm not saying you did anything wrong.  I'm just

1    asking what they're going to come up with, which is decreased

2    by the amount of attorney's fees that you are asking for.

3                MR. BINGHAM:  No, there's no question about that.

4                THE COURT:  Okay.

5                MR. BINGHAM:  But everybody knew it.  In our notice

6    it says one third fees, and we got two objectors.  You know,

7    everybody knew it.  It's consistent with what attorneys

8    charge all the time in contingency cases.  And so, you know.

9                THE COURT:  Well, but generally --

10               (Cross-talking.)

11               MR. BINGHAM:  It's not unfair.

12               THE COURT:  Generally, there's one client that gets

13   the other two thirds.  In this case, it's being split among

14   400 and some-odd thousand people who get a check for $6.17

15   that won't buy them a big Mac.

16               MR. BINGHAM:  Well, but the example we use is

17   Starbucks.  But we tell them there's enough to get a

18   Starbucks or two.

19               THE COURT:  That's about --

20               MR. BINGHAM:  But that's the difference -- I would

21   suggest that if you're going to look at it like that, you

22   have to also look at they're also paying $6 of the attorney's

23   fees.  They're not -- none of them are paying the whole

24   third.  They're paying their pro rata share.  So, yeah, okay.

25   I get $6.07, but I'm not paying for the litigation.  Nobody

1  paid the filing fees.  Nobody is paying the lawyer.  Nobody

2  is paying the administration cost.  They're all paying their

3  pro rata share.  No money is going back to Chase.

4          THE COURT:  Let me ask you this:  How many of these

5  claimants would have returned this form had they known they

6  were getting $6.17?

7          MR. BINGHAM:  You're saying the same format that --

8          THE COURT:  Sure.

9          MR. BINGHAM:  Yeah, probably all of them.

10         THE COURT:  You really think that.

11         MR. BINGHAM:  Yeah, I really think so.  The

12 interest in this case --

13         THE COURT:  I would have thrown it away.  How much

14 are the attorneys getting out of this compared to my $6.17?

15         MR. BINGHAM:  We've had that discussion with

16 numerous Class members, and when I say, okay, here is how it

17 works.  You're only getting that much, but you're only paying

18 this much.  You're paying a third, you know.

19         THE COURT:  You should -- right now you can sit

20 down at the table and figure out a different number.  While

21 I'm talking to defense counsel, y'all need to sit down at the

22 table and figure out a different number to ask for.

23         MR. BINGHAM:  We'll do that.

24         THE COURT:  Is that -- what about the Cy Pres?

25         MR. BINGHAM:  There's been no opposition to the Cy

1    Pres.  I mentioned no money is going back to Chase.  If and

2    when it's approved--.

3              THE COURT:  And, again, I assume this is people

4    who, even though they filed a claim, for some reason they

5    don't cash their check or they don't get their check.

6              MR. BINGHAM:  Correct.

7              THE COURT:  And you can't track them down.

8              MR. BINGHAM:  Correct.

9              THE COURT:  And there is a fund -- is there any

10   problem with -- it sounded like y'all worked out where those

11   funds should go.  I didn't see any problem with that.

12             MR. BINGHAM:  Okay.  Yes, we worked that out, and

13   in part because another court had already approved those two

14   organizations.

15             THE COURT:  Is there any concern from the plaintiff

16   about that?

17             MR. BINGHAM:  Not from the plaintiff.  I think

18   Mr. Cox has a problem.

19             THE COURT:  Pardon me?

20             MR. BINGHAM:  I think Mr. Cox has a problem, when

21   you get to him.

22             THE COURT:  I'll get to that.  And as far as the

23   service payment to the Class representative?  I mean, is

24   that, does that seem to be a typical amount?

25             MR. BINGHAM:  It's below any in this district in

```
1    this type of case, yes, it's very typical.  That was

2    negotiated with Chase.

3              THE COURT:  Okay.

4              MR. BINGHAM:  So.

5              THE COURT:  All right.  Thank you, Mr. Bingham.

6    I'll hear from Mr. Lewis now.

7              MR. BINGHAM:  Thank you.

8              THE COURT:  Mr. Levine or -- either Mr. Levine or

9    Mr. Lewis, whoever wants to go first.  And, again, I will ask

10   you, since there no question about the notice, I'll ask you

11   to go through, and I'll just state them for the record.  The

12   different factors that the Court of Appeals, our Court of

13   Appeals looks at in determining the fairness of the

14   settlement, the existence of fraud or collusion behind the

15   settlement, the probability of the plaintiff's success on the

16   merits, the range of possible recovery, and the complexity,

17   expense, and likely duration of the litigation, as stated,

18   the proceedings and the amount of discovery completed, and

19   the opinions of Class counsel to Class representative and

20   absent Class members.

21             MR. LEVINE:  Thank you, Your Honor.  I think it's

22   usually typical to let the plaintiffs do this because

23   understandably I think some judges think my job as the

24   defense counsel is to negotiate the best deal I can get, you

25   know, for my client.  And so you might not trust everything I
```

1    have to say as much as the people who have the interest in

2    representing the Class.  But let me go through it and explain

3    why we think, you know, we went in to negotiate.  We had a

4    hard-fraught negotiations with them.  We would obviously

5    prefer not to pay anything in these cases.  But there's risk

6    in all litigation.  And especially in the statutes like the

7    Consumer Protection Statutes, like the Fair Credit Reporting

8    Act, and the TCPA and those that have these statutory damages

9    that can add up very quickly if you're multiplying because as

10   a large financial institution you tend to engage in

11   repetitive transactions.  And so if there is a problem

12   anywhere in your systems or anything like that, those can

13   multiply quickly, and you have to take into account the risk

14   of what's going to happen.

15             Here, let me actually group together -- on the

16   fraud and the collusion, there's no fraud or collusion here

17   whatsoever.  I think they've explained it well in their

18   papers.

19             THE COURT:  Did it actually settle in mediation or

20   after mediation?

21             MR. LEVINE:  It did.  It settled in mediation.

22             THE COURT:  Okay.

23             MR. LEVINE:  We had a settlement agreement in

24   principal.

25             THE COURT:  I understood that there were some

1   things y'all still did after mediation, but it actually

2   settled in mediation?

3          MR. LEVINE:  We did.  After the mediation, what had

4   to happen is we had to draft up the agreement, for one.  And

5   they had to do a confirmatory discovery to figure out

6   exactly, you know, as we drafted the agreement to confirm

7   everything.  But we had a settlement agreement in principal

8   there.  And, again, Judge Infante is one of the most

9   respected mediators in this area, and he was absolutely

10  instrumental to getting this done.  I said as kind of an

11  aside, when I was looking back at things in preparing for

12  this hearing today, I went back through my notes of the

13  mediation, and as I went through each step, you know, session

14  one, session two, session three with the mediator, even

15  though I lived through it, I didn't realize -- I didn't think

16  we were going to get to a settlement looking at it, you know,

17  knowing where we wanted to end up at the end of the day.  And

18  I think he was really instrumental, and it was the definition

19  of a good deal.  You know, a good deal is something that

20  we're not happy with necessarily at the end of the day, but

21  we'll live with, and that's what happened here.  So there was

22  no fraud or collusion whatsoever.

23          In terms of the factors about the merits, the range

24  of reasonable recovery, the complexity, the duration, those

25  factors, I think they all basically go to the merits.  And

1  here we think we have a strong merits case.  As he explained,

2  there's no intent to do these pulls.  These are complicated

3  computer -- you know, computers run a lot of this stuff.

4  And, unfortunately, what we found, after, you know, the

5  litigation came, was that there were some instances where it

6  was getting pulled and they get repetitive.  That said, the

7  case law here is very favorable to us, and I think there were

8  four things that were going to become very significant

9  factors for them to litigate.  We couldn't count on any one

10  of those four, but they were very important.

11          The first was just the basic liability question.

12  Under the FCRA, would they be able to prove that we aren't

13  allowed to do a pull on an account of someone who was a

14  customer, but who now asserts that they no longer have a

15  credit relationship with the bank for a number of different

16  reasons.  And the Fifth Circuit case law says that there's --

17  that the statute is ambiguous on that.  But it doesn't say

18  that you can't have access to credit reports.  The Eleventh

19  Circuit case which is -- then followed the Fifth Circuit

20  case, that's the *Levine* case, said there where there were

21  several pulls after the account was closed actually

22  considered both the liability and the willfulness question.

23  On the liability question, it said the statute was ambiguous.

24  And then on willfulness said, therefore there's no

25  willfulness liability.  So we think on liability -- and then

1    there have been more decisions, which Mr. Bingham alluded to,

2    that have been decided more recently in district courts up in

3    Wisconsin.  I believe in Minnesota as well.  They are cited

4    in the plaintiff's brief.  Those are the *Germain* case and the

5    *Saumweber* case where they have said, you really have to look

6    into exactly what is the nature of the relationship

7    afterwards because when you're talking about mortgages there

8    very well may be a security interest.  And while the bank may

9    not be allowed to go personally collect through a suit, they

10   do still have the security interest that they can execute on.

11   And does that constitute a credit relationship?  It can.  So

12   that was first major obstacle.

13           The second major obstacle is willfulness because

14   under the statute the only thing you get for proving a

15   violation that isn't willful is actual damages.  And this is

16   the circumstance where there are no actual damages.  These

17   pulls don't show up on the credit reports at all.  The only

18   people who can see them on the credit report are the

19   individual consumers themselves.  But if they are applying

20   for credit from somebody else and that person has permission

21   to go look at the credit report to evaluate them for credit,

22   they will not see that there had been any pull, in any one of

23   these types of what we call soft pulls.  So there were no

24   damages here.  So they really have to prove willfulness, and

25   that's where everything comes down to in an FCRA case.  And

1   as I said, because the case law itself in the Court of

2   Appeals says that the statute is ambiguous on this, that

3   would be impossible under the Safe Code Decision we believe

4   in the Supreme Court.  Now is there a risk that for the

5   reasons that Mr. Bingham said that we might not persuade a

6   judge, there's always a risk I think in litigation.  That's

7   what we all know from our litigation careers.  But we thought

8   we had a very strong position there.

9          The third obstacle they were going to have to

10  overcome was Class certification.  And as I think they had

11  said in their brief, there is no reported case of a certified

12  Class in these circumstances where Class certification was

13  contested.  And indeed in the Germain case, although the

14  district court ruled on summary judgment, the Court went on

15  to say what it would have done on Class certification and why

16  Class certification was inappropriate in a case like this.

17  They would have had to overcome that.

18         And the last is the *Spokeo* case.  We felt that

19  things looked pretty good when the Court granted *Spokeo*

20  because they had tried to reach this issue before.  They

21  hadn't been able to reach it.  It wouldn't necessarily

22  resolve the standing issue here.  There are some differences

23  between the claim in that case and this one.  But it looked

24  pretty good, and most of -- I think, as Mr. Bingham said,

25  most of the consumer bar also was worried.  I don't know what

1    the current composition of the court now being eight members,

2    whether we have that same optimism right now.  The decision

3    hasn't come down yet.  But that said, we're talking about at

4    a time when we were settling this case, you know, those were

5    all major obstacles for them to overcome.  That would have

6    been a long, hard-fraught litigation to get through all of

7    that for a claim that at the end of the day the only recovery

8    is possibly -- is it only possibly going to be the statutory

9    damages.

10            So at the end of the day, we think in light of the

11   range of reasonable recoveries, what they accomplished for

12   the Class here was very good.  And I think that the three

13   things which really confirm why this settlement is fair,

14   reasonable, and adequate, is, as they said, number one, they

15   did -- we have agreed to a conduct provision here, which is

16   addressed to the issue that came up in the litigation, and,

17   that is, that we will have audits that are reasonably

18   designed yearly for three years to ensure, not just to have

19   the intent, but to ensure that none of these pulls are

20   happening in these circumstances.  That is a great value.

21   Their expert, you know, I think acknowledges in his report

22   that it's hard to put value on it.  But it is -- whether you

23   can put a monetary value on it at all, it's substantial.  And

24   conceptually it's very substantial because at the end of

25   litigation they wouldn't have been able to get that.  There

1   is no injunctive relief under the FCRA, and this -- as many

2   courts have held, including the Fifth Circuit.

3          The second reason, fair, reasonable, and adequate

4   is the monetary relief.  And I take to heart your questions

5   about the $6.17 if they were to get 33 percent of the

6   attorney's fees.  But in this circumstance, that is -- first

7   of all, that is real money.  Second of all, we'll have to

8   evaluate it against the range of a reasonable recovery and

9   against the type of injury, which is alleged here.  And this

10  is one where there is no economic damage, no economic harm.

11  And for that reason, and given all of the hurdles they would

12  have had to overcome, that compares very favorably.

13         In fact, it really gets to the heart of what Rule

14  23 is about.  Rule 23 is about having a system in which you

15  can put together these types of small claims to be litigated.

16  So I think the Class settlement here actually demonstrates

17  that Rule 23 is working the way it's supposed to.  It does

18  compare favorably to other settlements.  As they pointed out,

19  in the account review world, under these provisions of the

20  FCRA, there has only ever been one other settlement in which

21  there was any monetary relief whatsoever.  And very

22  frequently no injunctive relief either.  This one gets both.

23  And it gets the monetary relief.  It compares very favorably

24  with the TCPA settlement.  And, if anything, the reason

25  that, you know, $6 might be lower than might -- what it might

1    have otherwise have been--.

2              THE COURT:  Why are you defending their attorney's

3    fees?

4              MR. LEVINE:  I'm not.  I'm not defending any of

5    their attorney's fees.  I was -- I have an agreement that I

6    cannot object to them, but I was just getting to your comment

7    about is $6 worth, because you said you would have thrown it

8    away.  So I just wanted to make sure to address that as an

9    issue.

10             THE COURT:  I know.  But that was based on the

11   amount of attorney's fees they're requesting.

12             MR. LEVINE:  Okay.  Well, I just wanted to address

13   the $6.  That was it.

14             THE COURT:  Okay.

15             MR. LEVINE:  And then the final thing, the reason

16   why, you know, it's really been shown to be fair, reasonable,

17   and adequate is that there -- the response has been

18   tremendous.  In all of these, you know -- I defend Class

19   actions quite a bit, and the response rate is very good here.

20   And, in fact, you compare the very few people who wanted to

21   exclude themselves from this settlement compared to the

22   number that wanted to participate, and compare it to the very

23   few number of objections.  And, frankly, the objections that

24   were received, you know, weren't all that substantial, you

25   know, including the lawyered ones.  You know, they were

1    pretty much boilerplate.  They were just kind of sentences

2    you could have taken out of the same person's objections in

3    other cases.  And I think -- so for all those reasons, I

4    think it is fair, reasonable, and adequate.

5         In terms of the stage of the case at which this

6    settled, I think this, as this Court knows, we were all

7    encouraged us to talk about ADR early, and we took that

8    seriously.  They served their discovery on us.  We provided

9    them with the documents that they needed to know.  We

10   provided them with a corporate representative deposition.

11   They took that deposition.  They asked us questions all

12   during this process to find out things that they needed to

13   know.  So in light of all of the hurdles that they would have

14   had to overcome, and the fact that they could have lost the

15   case, had they pushed the case through any one of those

16   hurdles -- and this is one of those situations I always say

17   as a defendant, I need to win at one of those four hurdles.

18   They need to win at all four.  And if they lose at any one of

19   those, the case could be over for everyone.  And, frankly,

20   the order matters.  If they lose on the merits after they

21   lose the Class certification, that means the Class has a

22   judgment against them for zero.  I think it was wise to do

23   what they did at this time.  And I think, you know, we wanted

24   to explore it, and if it was possible, we would reach it and

25   we did.

1        The last factor I can't do because that's the

2   opinions of Class counsel, but they've given you their

3   opinion on that, so I'm happy to answer any questions the

4   Court may have.

5        THE COURT:  And the -- and as the Class

6   representative, payment, you're okay with?

7        MR. LEVINE:  Okay with both.  And on the Cy Pres, I

8   would say, on top of everything else, this only is going to

9   come up if there happens to be an uncashed check, you know,

10  and to the extent that there are those uncashed checks.  So

11  where there are issues in cases with Cy Pres, those are ones

12  where, you know, they're designating like a million dollars

13  for a Cy Pres or something like that.  This is really out of

14  practical necessity.  There needs to be a Cy Pres here just

15  because there could be some uncashed checks, and it won't be

16  economical to send them out again.  We designed the Cy Pres

17  with them based on another -- based on a TCPA settlement to

18  go to organizations that really help people like the Class.

19  There are good programs for, you know, credit counseling,

20  things like that, so, yeah, we have no problem with that.

21       THE COURT:  Well, and if the rate, whatever the

22  rate is going to be, we are not talking about significant

23  checks here.  Did counsel happen to make some rough estimate

24  about what a Cy Pres fund might look like in this case?

25       MR. LEVINE:  I don't think we have because we

```
 1   always knew it would really only get down to as long as we

 2   have the healthy claims rate that they wanted, it would only

 3   get down to the uncashed checks, and so I don't think we have

 4   ever looked at, you know, how much do we expect, what the

 5   projected uncashed check rate.  I don't think we have.  But

 6   we're happy to make sure that that -- it's important for

 7   them, and I would assume it would be important for the Court

 8   in approving any settlement, that that money not come back to

 9   my client.  So it's important for it to go out to someone

10   that would benefit the Class, and we're good with that.

11           THE COURT:  Is there a rough percentage of

12   claimants that do not get their checks in Class actions, and

13   maybe the plaintiffs are best to answer that.  But just so

14   that I'm -- have some idea in my head what number we're

15   talking about.

16           MR. LEVINE:  There, maybe we could certainly ask

17   the settlement administrator.  My guess is that it varies

18   tremendously.

19           THE COURT:  Okay.

20           MR. LEVINE:  The settlement administrator will

21   probably tell us, well, it depends on this factor, this

22   factor, this factor.  You could use this, you could use this.

23   But I don't see it being that much here.  I mean, I think

24   it's going to be really well, well, well, under 1 percent is

25   my guess.
```

Leticia Ornelas Rangel, CSR

1          THE COURT:  Okay.  Thank you, sir.

2          MR. LEVINE:  Thank you, Your Honor.

3          THE COURT:  Mr. Lewis, do you have anything to add?

4          MR. LEWIS:  Nothing to add, Judge.

5          THE COURT:  Okay.  Does the plaintiff want to add

6   anything before I take the objections?

7          MR. BINGHAM:  We're taking your suggestion to

8   heart, but I was hoping maybe there would be a little break

9   where the counsel could talk about the fee.

10         THE COURT:  Well, then I'll go ahead and take the

11  objections at this time.

12         MR. BINGHAM:  Thank you.

13         THE COURT:  Ms. Lewis, if you would come forward,

14  please, ma'am.  Ms. Lewis, the summary I have of your

15  objection is that Chase foreclosed on your condominium

16  causing you to become homeless and that you do not believe

17  this settlement is sufficient to compensate you for your

18  losses?

19         MS. LEWIS:  Yes.

20         THE COURT:  Is there anything else that you

21  wanted -- you're welcome to say anything else you had.  Now

22  you understand that to object to the settlement--

23         MS. LEWIS:  Uh-hum.

24         THE COURT:  -- the settlement would allow you -- I

25  mean, if you're a member of the Class, and I assume you are a

Leticia Ornelas Rangel, CSR

1   member of the Class, you can recover actual damages if you

2   can prove that you lost your -- that your condominium was

3   foreclosed on because of what Chase did.  Okay.

4           MS. LEWIS:  Well, basically what I have.

5           THE COURT:  Well, let me finish.

6           MS. LEWIS:  Okay.

7           THE COURT:  If you can prove that what Chase did in

8   this case.

9           MS. LEWIS:  Uh-hum.

10           THE COURT:  Not because of something else Chase

11   did.

12           MS. LEWIS:  Uh-hum.

13           THE COURT:  But by looking into your file after it

14   was closed.

15           MS. LEWIS:  Uh-hum.

16           THE COURT:  That caused them to foreclose on your

17   condominium.

18           MS. LEWIS:  Uh-hum.

19           THE COURT:  Now if they look into your file while

20   it was still open, that doesn't count.  You understand that?

21   Do you understand that?

22           MS. LEWIS:  No, no, I do not.

23           THE COURT:  Okay.

24           MS. LEWIS:  No, I do not.  No.

25           THE COURT:  Okay.  Okay.  This only applies to

1    people whose accounts were closed by Chase.

2              MS. LEWIS:  Uh-hum.

3              THE COURT:  And then Chase continued to look into

4    their files afterwards when they may not have had a right to

5    do that.  Now, if they looked into your file while your file

6    was still open at Chase, technically, I'm not sure you should

7    be a member of the Class.

8              MS. LEWIS:  Well, Your Honor, I did get a card.

9              THE COURT:  Okay.

10             MS. LEWIS:  I did get a card, and I do not

11   understand it.

12             THE COURT:  Okay.

13             MS. LEWIS:  That's why I'm here.

14             THE COURT:  Okay.  Well, let's try it again.

15             MS. LEWIS:  That's why I'm here because of the fact

16   that I did not understand the purpose of why I was part of

17   this Class.  Second of all, I am homeless.  I do have

18   information regarding the foreclosure of my condo in Oak

19   Park.  It's not in Chicago.  In Oak Park, Illinois.  I have

20   all of that information with me today in this court because

21   of the fact I did not understand.

22             THE COURT:  Well, let's get it straightened out.

23             MS. LEWIS:  And I also have the--

24             THE COURT:  Okay.

25             MS. LEWIS:  -- I have information stating I am

1    living on the streets in Illinois.

2              THE COURT:  Well, let's get it straightened out.

3              MS. LEWIS:  Okay.

4              THE COURT:  Mr. Bingham, why would -- if her -- if

5    she was foreclosed on through Chase, I would assume she still

6    had an open account at Chase.

7              MS. LEWIS:  Right.  That's what I'm thinking too.

8              THE COURT:  Then why would she be a member of the

9    Class?

10             MR. BINGHAM:  She received a postcard notice.  And

11   she also sent to us a letter, which indicated that Chase had

12   forgiven the indebtedness resulting from the foreclosure.

13   They had issued her a 1099-dash something IRS form, which is

14   a debt forgiveness form, which means she did not owe Chase

15   the money, and that's why she is in the Class.  Chase

16   foreclosed, but there's no deficiency left.

17             THE COURT:  Well, tell me again.

18             MR. BINGHAM:  Well, there was, but it was.

19             MS. LEWIS:  It's--

20             (Cross-talking.)

21             THE COURT:  Just a minute -- just a second,

22   Ms. Lewis.

23             MS. LEWIS:  The deficiency was $7,000.  Go ahead.

24   Okay.

25             THE COURT:  Tell me again.

1              MR. BINGHAM:  Chase foreclosed on her condominium.

2              THE COURT:  Yes.

3              MR. BINGHAM:  There was a--.

4              THE COURT:  There was still an amount outstanding?

5              MR. BINGHAM:  There was an amount outstanding, but

6       then Chase issued this IRS form 1099 something.  Ms. Lewis

7       sent it to me.

8              THE COURT:  Okay.

9              MR. BINGHAM:  May I look at it?

10             MS. LEWIS:  Yes, it's here.  I put it back here.

11      And this is back in the back, but I do have it with me.  It's

12      back there somewhere.

13             MR. BINGHAM:  Well, so Chase foreclosed on the

14      home, the condo, and then there was a deficiency owing, and I

15      talked at length with Ms. Lewis, and I couldn't figure out --

16      it sounded to me like Chase was trying to collect from her.

17      And she shouldn't be in the Class in that case.  But, you

18      know, one of those in the shower thoughts, made me think is

19      what she was talking about was a Form 1099 forgiveness of

20      debt form.

21             THE COURT:  Erased her debt.

22             MR. BINGHAM:  So we called her and asked her if

23      what she got from Chase had 1099 on it, and it did.

24             THE COURT:  Okay.

25             MR. BINGHAM:  And so Chase has forgiven -- it's

1    either 53 -- I think the amount is 53,900 and 698.82.  Chase

2    forgave that amount.

3              THE COURT:  Okay.

4              MR. BINGHAM:  So she doesn't owe Chase.  But she

5    still got her credit report pulled.

6              THE COURT:  Okay.  Now -- and so at some point

7    after that she qualifies to become a member of the Class

8    because after that her file was pulled and Chase looked at

9    it?

10             MR. BINGHAM:  That's correct.

11             THE COURT:  Okay.

12             MR. BINGHAM:  That's correct.

13             THE COURT:  Ms. Lewis, you are a member of the

14   Class, and you're entitled to receive a portion of the

15   settlement.  But your foreclosure had nothing to do with what

16   is being alleged in this lawsuit.  Therefore, what -- and I

17   have no idea about the circumstances of your foreclosure, but

18   your foreclosure occurred while you had an active account at

19   Chase Bank.  And what Chase did in this lawsuit occurred

20   after you had no active account at Chase Bank.  Therefore,

21   there's no way that you can be compensated in this lawsuit

22   for the foreclosure.

23             MS. LEWIS:  Okay.  I just wanted to know exactly

24   what was going on.

25             THE COURT:  And that's -- that's all I can tell

```
1   you.  Is that nothing that happened when you had an active

2   account at Chase can be compensated by anything in this

3   lawsuit.  And so the -- so if you have any claim against

4   Chase, it would have to be done through a separate, separate

5   litigation, separate claim, but it cannot be done through

6   this lawsuit.

7            MS. LEWIS:  Okay.  Because I was just wanting to

8   know because like you said earlier, $6 and 90 some cents for

9   me is not going to do -- it's not going to do anything for

10  me.

11           THE COURT:  No, of course not, not as far as

12  foreclosure.

13           (Cross-talking.)

14           MS. LEWIS:  You know, because of the fact that I am

15  living on the streets.  I am homeless.  And part of that --

16  even though I know you said it doesn't have anything to do

17  with it, but throughout the foreclosure, throughout those

18  proceedings, they kept pulling my credit, and it kept asking

19  me about credit rights, which I did not understand

20  whatsoever.  So that's why I came here today with nothing in

21  my pocket, but I came here because I wanted to know exactly

22  what was going on.

23           THE COURT:  Well, and you are entitled to consult

24  with a lawyer about what happened during your foreclosure,

25  but that is separate from what we're talking about in this
```

1    lawsuit.

2                MS. LEWIS:  Okay.

3                THE COURT:  Thank you, Ms. Lewis, for being here.

4                MS. LEWIS:  You're welcome.

5                THE COURT:  Mr. Lam. I do not have a summary of

6    your objection, sir.  When did you file an objection?

7                MR. BINGHAM:  Your Honor, he did not file an

8    objection.  He just showed up for the hearing today, and I

9    don't know if he's actually got anything.  He's just

10   attending.

11               THE COURT:  Oh, you're just attending?

12               MR. LAM:  Yes.

13               THE COURT:  Oh, okay.  That's fine.  You're

14   welcome.  Sorry, sir, I didn't mean to scare you.  I also

15   have a Basilio and Janie Tijerina, but I don't have any

16   notice of an objection from them.

17               MR. BINGHAM:  Same situation.

18               THE COURT:  They're just here to observe?

19               MR. BINGHAM:  Yes.

20               THE COURT:  Okay.  That's fine.  Mr. Cox.

21               MR. COX:  Your Honor, may I approach to give the

22   court reporter my name and phone number?

23               THE COURT:  Sure, that's fine.  And I do have

24   everything you have done in writing, so you don't need to

25   repeat everything that you have submitted before, but you're

 1   welcome to tell me whatever you would like.

 2          MR. COX:  I don't intend to repeat what I've said

 3   before.  One of the things I do want to do is respond to the

 4   personal attack that Mr. Bingham launched against me.  And

 5   specifically I have great offense at Docket 62, Page 89,

 6   where they imply that every case I've objected in I've filed

 7   an appeal and never written a brief.  Approximately, almost

 8   half of the cases they cite in there, nothing was done but to

 9   file an objection at the district court.  No appeal was

10   taken.  In particular, the one case they list In re Mutual

11   Funds, no appeal was taken.  They state no briefs have ever

12   been filed.  Four briefs were filed with the appellate court,

13   particularly to *Country Wide, Lividia, and Forever v.*

14   *Batement.*  And a brief was filed in *Dewey v. Volkswagen,* but

15   my name was not on it.

16          THE COURT:  I'm really more concerned about your

17   objection to this settlement, Mr. Cox.

18          MR. COX:  I understand that, but I don't want the

19   Court to think --

20          THE COURT:  I'm not judging you based on what

21   happened--

22          MR. COX:  Okay.

23          THE COURT:  -- in other cases.

24          MR. COX:  All right.

25          THE COURT:  I mean, that's not as much my concern.

1    What my concern is, is what objection do you have to this

2    settlement?

3            MR. COX:  It probably goes back to what somebody

4    said earlier, and you may have said it, was there a rush to

5    settlement.  And I believe Mr. Bandas, in his objection noted

6    that.  And when you kill a case early on with an attorney's

7    fees agreement, that raises a question.  And that's what,

8    really, we have here, was we suggested you use the Lodestar

9    crosscheck against what they're saying that they've done.

10           And, secondly, they have provided me all the

11   documents, which is very courteous of them.  But I don't

12   recall seeing any detailed time sheets.  I think without

13   detailed time sheets, you really can't support their fee

14   based on an affidavit that said we spent this many hours.  So

15   that's why I would say that there's a real problem there

16   without the time sheets showing what work was done and what

17   exactly it was done for.  And if they have been filed, I

18   didn't see them, and I apologize to the Court, if they have

19   been filed.  But I just haven't seen them.

20           THE COURT:  And you're talking about attorney's

21   fees?

22           MR. COX:  Attorneys' fees.

23           THE COURT:  Is that your main complaint?

24           MR. COX:  That's the main complaint.

25           THE COURT:  Okay.

Leticia Ornelas Rangel, CSR

1              MR. COX:  I raised the Cy Pres issue, but at the

2       time the notice went out, they were not specified.  They have

3       specified them since then.

4              THE COURT:  Okay.

5              MR. COX:  And I wouldn't have picked them, but, you

6       know, that's not my call.

7              THE COURT:  Okay.  And I don't know that there's

8       going to be that big of a fund into that anyway.

9              MR. COX:  The only thing else I would say on the Cy

10      Pres issue is sometimes the law firms involved in the cases

11      will have a highest to the recipients.  It doesn't appear

12      from what they have said how they came to determine these

13      people, do we have any problem that they, you know,

14      somebody's wife is the director or an employee of one of

15      these agencies.  I don't think that exists here.

16             THE COURT:  Okay.

17             MR. COX:  So that is really all I had was just to

18      question the attorney's fees.  And I do -- and I don't recall

19      off the top of my head whether it was one third in expenses

20      or one third less expenses.

21             THE COURT:  I think they were asking for one third

22      including expenses.

23             MR. COX:  Okay.  I wasn't sure.  But that's -- I

24      wanted to just bring that to the Court's attention to make

25      sure that's what in fact what it is.

1          THE COURT:  Yes, sir.  And I think they said their

2    expenses were at this point 23,000.

3          MR. COX:  Well, what about the administrative

4    expenses?  Those are going to be borne by the Class then?

5          THE COURT:  Does that come out of the 8.75 as well?

6          MR. COX:  I believe so.

7          THE COURT:  Mr. Bingham?

8          MR. BINGHAM:  Yes, Your Honor, it does.

9          THE COURT:  And how much -- approximately how much

10   are those?

11         MR. BINGHAM:  Those are about 2.9 because we've got

12   the Class notice.  That's how we get to the six, $6.17.

13         THE COURT:  Okay.  So it's administrative expenses

14   of 2.9 million?

15         MR. BINGHAM:  Right.  The -- that's primarily due

16   to the fact that we sent out the notices.  We prepaid for the

17   return claims by business reply mail.  The only case I've

18   seen that's like ours, they didn't do that.  But they only

19   got a 5 percent claim rate.  So, in my opinion, prepaid and

20   postage made a huge difference in this case.  Now, we have to

21   mail out checks, so we've got three big tranches of postage.

22   And the more claims we have, the higher the cost is.

23         THE COURT:  Okay.  I just wanted to ask that.  Go

24   ahead, Mr. Cox.

25         MR. COX:  And the only thing I would say on that,

1    you would have to consider that -- lump that together with

2    the attorneys' fees.  As a percentage, is that reasonable?

3    And I think they have to be included that there's case law to

4    that effect.  That's all I've got, Your Honor.

5              THE COURT:  Thank you, sir.

6              Mr. Bingham, let me just clarify, then, you're

7    talking about taking as far as attorney's fees, one third of

8    the 8.7 million -- 7.5 million?

9              MR. BINGHAM:  We are saying that, but we're saying

10   the value is 22 million.  We're saying the value of the

11   settlement is 22 million.  The cash plus the injunctive

12   relief.  So we're taking 13 percent of the value of the

13   settlement, which is -- but also one third of the cash.

14             THE COURT:  You're -- run that by me again.

15             MR. BINGHAM:  Okay.  In our papers, the -- our

16   expert, who is present here today, values the injunctive

17   relief, the change of practice and the educational benefit of

18   this at $13.2 million.  So you add the cash plus the value of

19   the injunctive relief, and it comes up to a number just shy

20   of $22 million.

21             THE COURT:  And how do you value it at

22   $13.2 million?

23             MR. BINGHAM:  He valued it at $1 per Class member

24   for the educational benefit, so that's 2.2 million.

25             THE COURT:  An educational benefit?

1          MR. BINGHAM:  Right.

2          THE COURT:  How did they get an educational benefit

3     from this?

4          MR. BINGHAM:  Well, as I mentioned, they get the

5     Class notice.  They see that there's a claim under the FCRA

6     for a creditor conducting their account reviews, and now they

7     know about a claim that they didn't know about before, and

8     countless people have told us that.  They've called and said:

9     I appreciate that because either Chase or they have other

10    creditors doing it.  They say, I didn't know it was a claim.

11    Now I do.  I didn't know I could do it but -- something about

12    it, now I do.  So there's that benefit, just becoming aware

13    of a claim they did not know about before.

14          And our expert, who is the nation's primary privacy

15    expert, he's testified in Congress ten times on these kind of

16    issues.  He says it's worth a dollar a person for that

17    benefit at $3 -- or $5 over a three-year period for the

18    change of practice that Chase has agreed to implement despite

19    having no obligation to do so and despite the FCRA not having

20    injunctive relief in the Fifth Circuit at least.

21          So the change of practice and the educational

22    benefit, when you total that up times the 2.2 Class members,

23    you get the $13.2 million.  Add that to the 8.75, there's the

24    $22 million settlement, and a third of the cash computes to

25    about 13 percent for attorneys' fees and administrative fees.

1          THE COURT:  Do you have -- can you cite to any

2    other case where those kind of numbers have been plugged in

3    by an expert?

4          MR. BINGHAM:  Well, yes, there's--.

5          THE COURT:  Did you put that in your brief?

6          MR. BINGHAM:  It's in our briefing.  The latest one

7    is this case in the Fourth Circuit.  It's pure injunctive

8    relief.  The court values it.

9          THE COURT:  No, I mean where there was actually a

10   find plus injunctive relief where they actually added money

11   because of the injunctive relief.

12         MR. BINGHAM:  I can't think of a case -- the *De*

13   *Hoyos case v. All State* that Judge Biery did.  I can't

14   remember -- I can't remember.  I know it was primarily

15   injunctive relief.  I can't remember if there was a cash

16   component.  But the case out of the *Fourth Circuit is Berry*

17   *v. B-E-R-R-Y v. Shulman.*  And there's two subclasses, and one

18   subclass got some money.  But the bulk of the opinion is the

19   value of the injunctive relief, is it proper to award

20   attorneys' fees on injunctive relief.  If there's no

21   injunctive relief under the FCRA, can a creditor agree to it,

22   and does that confirm that value on the Class.  And that case

23   cites lots of FCRA cases where the only relief is injunction.

24         And I think there's one called -- it's also in the

25   briefing.  I think -- I don't know how to pronounce it.

1  Something like Chajikin, C-H-A-J-I-K-I-N, or something like

2  that.  That is primarily -- it has some cash, but it's

3  primarily injunctive relief also.

4         THE COURT:  Is there anything else either side

5  would like to comment on regarding the matters that we're

6  here for today?

7         MR. RILEY:  Your Honor, we'd like to get back with

8  you on attorney's fees.

9         THE COURT:  You can do it by an advisory because

10 it's going to take -- I'm going to be gone for the next few

11 days, and you can do it by Monday next week.  Just file an

12 advisory.

13        MR. RILEY:  I'd like to make a few comments about

14 attorney fees, Your Honor, if you don't mind.

15        THE COURT:  Yes, sir, go right ahead.

16        MR. RILEY:  I think I would like to just point out

17 that the contingency fee attorney business is a high risk

18 business, and lot of times they come out with nothing.  The

19 courts and Congress want to encourage the enforcement of the

20 FCRA and these kinds of statutes.  Very few lawyers know

21 about these statutes.  Very few have heard of a soft pull.

22 And it was fortuitous that this case was brought at all.

23 Ms. Duncan was -- happened to be able to read a credit

24 report, read her own credit report, see what was going on,

25 and complain about it, find the right attorney who happened

```
1    to know the right attorney, Bingham and Hervol having filed
2    this same Class action in this court five years ago for the
3    exact same violation.  This is almost unique in the country.
4    It's a very, almost a weird circumstance that came together,
5    so I think those things along with the tremendous amount of
6    work involved in this, for example the calls that we get are
7    from people who have other beefs with Chase.  And so we're
8    going to continue to get those as well, Your Honor.  And so
9    they have foreclosure problems and other things, and they get
10   confused as to what's involved here.  So this is just some
11   other factors concerning attorney fees.
12            THE COURT:  Thank you, Mr. Riley.  Anything else
13   from either side?
14            MR. BINGHAM:  No, Your Honor.
15            MR. LEVINE:  No, Your Honor.
16            THE COURT:  Okay.  I will enter a recommendation.
17   If you do have an advisory to make, please file it by Monday,
18   and I will submit a recommendation to Judge Biery, and both
19   sides will have an opportunity to respond to that.  The court
20   is in recess.
21            THE COURT SECURITY OFFICER:  All rise.
22            (Adjournment.)
23
24
25
```

Leticia Ornelas Rangel, CSR

-oOo-

1

2        I certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter.

5        I further certify that the transcript fees and

6   format comply with those prescribed by the Court and the

7   Judicial Conference of the United States.

8

9   Date signed:  August 29, 2016.

10

11                          /s/ Leticia Rangel
                            **LETICIA RANGEL**
12                          United States Court Reporter
                            P.O. Box 831751
13                          San Antonio, Texas 78204
                            (512)550-6886
14

15

16

17

18

19

20

21

22

23

24

25

Leticia Ornelas Rangel, CSR